THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

AMY DUNN, INDIVIDUALLY AND )
AS THE NATURAL PARENT OF   )
DANIELLE DEMONBREUN, JAMES )
DUNN AND RONALD CURTIS     )
PATTERSON,                 )
                           )
     Plaintiffs,           )
                           )
     vs.                   ) Case No. 2:170CV-00246-RWS
                           )
COLUMBIA NATIONAL          )
INSURANCE COMPANY,         )
                           )
     Defendants.           )

VIDEOTAPED DEPOSITION OF DAVID HUBBARD
TAKEN ON BEHALF OF DEFENDANT PATTERSON

August 8, 2018
9:27 a.m.

3210 Bluff Creek Drive
Columbia, Missouri

REGENCY-BRENTANO, INC.

Certified Court Reporters

Suite 140

13 Corporate Square

Atlanta, Georgia 30329

(404) 321-3333

**EXHIBIT**

**G**

1      Q.    Okay.  So you came in as a litigation manager,

2   and that's what you've been ever since?

3      A.    Correct.

4      Q.    And before Columbia, did you work in the

5   insurance industry?

6      A.    Yes, sir.

7      Q.    And where was that?

8      A.    I worked at Rockingham Mutual.  I was head of

9   claims of a company called Rockingham Mutual in Virginia.

10     Q.    How long were you there?

11     A.    I was there just a year.

12     Q.    And prior to Rockingham?

13     A.    I was with Great American Insurance, and I was

14   head of claims of -- of their New Jersey operation.

15     Q.    And how long were you with Great American?

16     A.    Six years.

17     Q.    Always head of claims for those six years?

18     A.    Yes.

19     Q.    And before Great American?

20     A.    I was with State Farm Insurance.

21     Q.    In what office?

22     A.    I was in their -- I was in several offices.  I

23   was in their Fort Worth office in Texas, and then before

24   that I was in a Kansas City office, and before that in a

25   Sedalia, Missouri office.

1      Q.   And so you were handling liability claims?

2      A.   Correct.

3      Q.   Okay.  And at Great American, while you were

4   head of claims, you were handling liability claims?

5      A.   Yes, sir.

6      Q.   And in -- at Rockingham for that one year there,

7   you were handling liability claims?

8      A.   Correct.

9      Q.   And that's what you are doing now in Columbia?

10     A.   Yes.

11     Q.   So you've been handling liability claims in the

12  insurance industry since 1981?

13     A.   Correct.

14     Q.   All righty.  Now, could you describe your duties

15  as a litigation manager at Columbia?

16     A.   Yes.  What my role is to, is if our insureds or

17  the company are sued, then the lawsuit or petition or

18  complaint is sent to me to review, and then we determine

19  how -- and I determine how we're going to be handling it.

20          We have a group of outside counsel that we work

21  with regularly, and we do not -- not work with.  In-house

22  lawyers, so to speak.  Obviously I'm a lawyer, but we have

23  outside counsel representing our insureds directly, or the

24  company directly.

25          So like in a lawsuit, then we determine what's

David Hubbard                  Dunn, et al. v. Columbia National Insurance                  August 8, 2018

1        A.    Uh-huh.

2        Q.    And -- and is it your understanding that in 2013

3    Mr. Barczykowski reported to Michael LeBlanc?

4        A.    Yes.

5        Q.    Okay.  And who is Janice Heaton?

6        A.    Oh, she was my litigation assistant.  It was a

7    clerical position, and she's retired, I believe, in

8    September of 2017.

9        Q.    Okay.  Would you describe her position as

10   clerical only?

11       A.    And -- yes, sir, clerical only.

12       Q.    She would do no substantive work on claims

13   handling?

14       A.    Right, not -- not -- none whatever.

15       Q.    Okay.  Are you familiar with a concept in the

16   liability insurance industry that is referred to as

17   splitting the file?

18       A.    Yes.

19       Q.    Can you tell me what that is?

20       A.    Yeah.  My interpretation of it would be that

21   there are situations, such as in this file, where we feel

22   that it's appropriate to set up a -- well, to back up

23   myself and maybe make it a little more coherent, that we

24   will -- we think it's proper and I think it's proper, for

25   example, if there's even a potential conflict to set up an

1    entire new file with a new claim number, new claims

2    handler, you know, possibly an entirely new attorney.

3          For example, in this case, when there was -- it

4    appeared to be an ongoing, you know, coverage issue.  And

5    when this came -- case came into litigation, we split --

6    and I made this decision that we split off a separate

7    coverage file.  And the purpose for this, not to go on

8    with a long law journal lecture about this, but it's

9    simply to prevent any potential conflict of interest.  So

10   the files are completely split and that the parties do

11   not -- no longer -- for example, one does not supervise

12   the other.

13       Q.   And when say parties, are you really -- are you

14   referring to the claim professionals?

15       A.   I'm referring to the claim professionals.

16   Forgive me.  Yeah, that was not -- that was not the most

17   graceful phrase.  Yeah.

18       Q.   That's okay.  And let me -- one thing.  And I

19   speak kind of slowly, and so sometimes you start answering

20   my question before I start to answer (sic), and sometimes

21   I also might start to ask the next question before you

22   finish your answer.  So if you would, stop me from doing

23   that.  If I do that again, I'd appreciate it, and by the

24   same tone, let's just one of us talk at a time.

25       A.   Oh, I apologize.  Yeah, of course.

1      Q.   Okay.  Good.  You know, us from the south, we

2   speak kind of slowly.

3           All right.  So back to splitting the file.  So

4   it occurs when -- when the insurance company sees a

5   conflict of interest -- a conflict of interest; is that

6   correct?

7      A.   Oh, and -- I want to make sure I got your --

8   your question.  Yeah, we see a potential conf-- even a

9   potential conflict of interest, that's when the idea of

10  splitting the file arises, and typically is implemented.

11     Q.   Okay.  And an example might be if two of

12  Columbia's insureds are co-defendants in the same case and

13  there's a conflict of interest as to how liability might

14  be apportioned against them in the case, then there might

15  be a conflict of interest between those two insureds.

16  Correct?

17     A.   Yeah.  Correct.

18     Q.   And that would be an example of a situation

19  where you would determine it's probably in the best

20  interests of the insured to split the file?

21     A.   Yes.

22     Q.   And you mentioned claim professionals.  I think

23  you used the word "purpose."  The purpose is so the claim

24  professionals will not inadvertently share information

25  with each other that might harm one or the other of the

```
 1    two insureds with the conflict of interest?

 2         A.   Correct.

 3         Q.   Okay.  And so do you guys ever use the phrase

 4    "Chinese wall"?

 5         A.   I've heard the phrase.  It's not one that I

 6    personally use, but I'm familiar with it.

 7         Q.   Okay.  And is that basic -- generally what you

 8    do there at Columbia is establish a Chinese wall between

 9    two files when they are split?

10         A.   It absolutely is.  And by the way, being

11    originally from the south, I want to apologize for

12    apparently speaking over you a couple of times earlier

13    again, so I should know better.

14         Q.   It's fine.

15              Well, the thing is, that's what people do in

16    regular conversation because we know where the other one's

17    going before the sentence is done, but it just makes it

18    harder on the court reporter, so -- but thank you.

19              And -- and another example of a conflict of

20    interest would be between the insurer and the person the

21    insurer is defending if the insurer questions coverage?

22         A.   Correct.

23         Q.   Okay.  Now, you are still a licensed attorney.

24    I think we heard that.  Correct?

25         A.   Yes.
```

David Hubbard                Dunn, et al. v. Columbia National Insurance                August 8, 2018

1    opinion as to how the claim against the insured should be

2    defended?

3         A.    Yes.

4         Q.    And you're doing that as a claim professional in

5    the insurance industry.  Correct?

6         A.    Yes.

7         Q.    Though -- and though you are a licensed

8    attorney, you don't view it as giving legal advice, though

9    you certainly bring those skills and that knowledge to

10   bear?

11        A.    Yes.

12        Q.    Okay.  Now, specifically as to your involvement

13   in the claims of the Dunn family brought against Lawson

14   and Curt Patterson, did you act as an attorney or as a

15   claim adjust-- or as a claim professional in -- with

16   respect to that claim?

17        A.    A claims professional.

18        Q.    Okay.  Did you give legal advice to anyone with

19   respect to your involvement in the claims the Dunn family

20   brought against Lawson and Curt Patterson?

21        A.    No.

22        Q.    None at all?

23        A.    None that I recall.

24        Q.    And it's not something you would normally do?

25        A.    Yes, it is not something I would normally do.

David Hubbard                    Dunn, et al. v. Columbia National Insurance                    August 8, 2018

 1   first involvement with this -- with this claim was after

 2   the lawsuit was filed?

 3         A.    Yes.

 4         Q.    Okay.  Now, let me ask you about Richard Foster.

 5         A.    Yes, sir.

 6         Q.    And now, he was defense counsel for Lawson.

 7   Correct?

 8         A.    Correct.

 9         Q.    All right.  And he advised Lawson on its defense

10   in the lawsuit.  Correct?

11         A.    Correct.

12         Q.    Okay.  But did Mr. Foster give advice to

13   Columbia regarding coverage for Lawson?

14         A.    He did not.

15         Q.    Okay.  And that -- it would be normal that he

16   would stay away from that.  Right?

17         A.    Correct.

18         Q.    That would be a conflict of interest.  Correct?

19         A.    Yeah.  We felt it would be.  Exactly.

20         Q.    Okay.  Did Mr. Foster give advice to Columbia on

21   coverage from Mr. Patterson?

22         A.    No, he did not.

23         Q.    Okay.  And for the same reasons?

24         A.    For the same reasons.

25         Q.    Okay.  That wouldn't be copesetic, cosher,

**REGENCY-BRENTANO, INC.**

1    proper?

2        A.    Right.  It's really contrary to our internal

3    procedures.  Exactly.

4        Q.    Okay.

5        A.    We feel there's potential for conflict, and we

6    want to stay away from that.

7        Q.    Yeah.  And why is it contrary to your internal

8    procedures?

9        A.    We like -- and, again, I apologize.  I'm

10   probably repeating myself.  We think that if there's any

11   potential conflict of interest, it's just something we

12   want to stay away from.  So we want to set up separate

13   claims files, again, with completely separate handlers.

14   We just think that's the right way to do things.

15       Q.    Okay.  And who promulgated these internal

16   procedures?

17       A.    I believe -- since I've been there so long, I

18   believe it started with me.  Yeah, I believe I did.

19       Q.    Okay.

20       A.    Yeah.

21       Q.    So did you draft them?

22       A.    I did not.  It was -- it was verbally, you know,

23   how we were going to do things.

24       Q.    Okay.

25       A.    And they may have done this before I came but,

| | |
|---|---|
| 1 | you know, I think things became a -- I think things became |
| 2 | a little more clearer and organized, in all honesty, after |
| 3 | I came there. |
| 4 | Q.   Okay. |
| 5 | A.   Yeah. |
| 6 | Q.   Well, have you ever written down these internal |
| 7 | procedures? |
| 8 | A.   No, sir, I have not. |
| 9 | Q.   Okay.  And -- and the source of them was, I |
| 10 | guess, your many years of work in the insurance industry? |
| 11 | A.   Correct. |
| 12 | Q.   And these internal procedures you are talking |
| 13 | about, you believe are standard for the liability |
| 14 | insurance industry? |
| 15 | A.   I believe they're standard or should be, you |
| 16 | know. |
| 17 | Q.   Fair enough. |
| 18 | A.   You know, sometimes -- thank you.  Yeah, I can't |
| 19 | say that I always see them followed, but I think they |
| 20 | should be followed. |
| 21 | Q.   Okay.  And why should they be followed? |
| 22 | A.   Sure.  I just think it's -- it's the -- you |
| 23 | know, it's the ethical and right way to do things just to |
| 24 | prevent any potential conflict of interest that people |
| 25 | have their assigned tasks that it don't conflict with each |

```
 1   other.

 2        Q.    Okay.  And but -- but why?

 3        A.    Oh, sure.  Okay.

 4        Q.    Is it to protect the insured?

 5        A.    Yeah.  And really -- yeah, to protect the

 6   insureds and to protect -- precisely.

 7        Q.    How does it pro--

 8        A.    Ultimately to protect the insureds.

 9             That -- oh, for example, with -- I guess taking

10   this case with Richie Foster, I took over and consciously

11   took over the defense of the Lawsons with -- with Richie

12   Foster as the defense counsel, and I did not want us to be

13   dealing with any coverage issues whatever that -- that --

14   and I didn't want to be involved -- I'm not -- I think

15   it's unethical for me to be involved in possibly looking

16   into coverage that might impair coverage or defense of the

17   Lawsons while I'm defending them.  So I want all of my

18   energy and focus to be defending them.

19        Q.    And that would be true regarding coverage issues

20   for Patterson.  Right?

21        A.    Yeah.  Correct, if I'm understanding you

22   correct -- properly.

23        Q.    Well, what you just said about how you would

24   feel about being involved in coverage issues for Lawson,

25   that would also apply to coverage issues for Patterson?
```

```
 1          A.    Yes.

 2          Q.    The unethical part?

 3          A.    Yes.

 4          Q.    Now --

 5          A.    Or potentially unethical, should I say.  Yeah.

 6    Or the conflicted part.  Yeah.

 7          Q.    Conflict of interest?

 8          A.    Yes.  Yes, sir.

 9          Q.    Okay.  Now, Preston Burroughs, what was his role

10    in all of this?

11          A.    Yeah.  When the file came in -- and, again, I

12    believe it was in April of 2015.  I apologize.  As you

13    know, this is a number of years ago.

14                MR. ALEXANDER:  14.  14.

15                THE WITNESS:  That it went into litigation?  Was

16    it -- oh, forgive me.  Yeah, the accident took place in

17    2013, and it went into litigation in 2014.  I apologize,

18    gentlemen.  Thank you.

19    BY MR. DOLDER:

20          Q.    It's not a memory test.  That's okay.

21          A.    You're refreshing my memory.  You're refreshing

22    my recollection.

23                Correct.  So in April 2014, even longer ago than

24    I thought.  Sorry.  The -- when it came in, I saw that

25    there was an ongoing or I understood that there was an
```

David Hubbard                    Dunn, et al. v. Columbia National Insurance                    August 8, 2018

1     ongoing coverage.

2              There had been a denial of coverage to

3     Mr. Patterson.  I saw, though, that he was named as a

4     defendant in the lawsuit.  I viewed this as an ongoing

5     coverage, you know, question and issue.  So we set up,

6     then, a separate coverage file for Mr. Burroughs with

7     separate coverage of counsel, which was Bill Strickland.

8         Q.   Okay.  And Preston Burroughs was in charge of

9     this separate coverage file?

10        A.   Yes, sir.

11        Q.   And this is an example of splitting the file?

12        A.   It is, yes.

13        Q.   Okay.  And Mr. Burroughs was involved only in

14    coverage issues regarding Patterson; is that correct?

15        A.   He was -- it's not fully correct.  When we set

16    up a coverage file, typically the coverage file is to

17    address really any and all coverage issues that -- that

18    they may see.  And I'm not aware if they address any other

19    coverage issues, because I then had no involvement in

20    their file.

21        Q.   Okay.

22        A.   Yeah.

23        Q.   But -- so let me reword that question, and I

24    thank you for that answer.  The -- Preston Burroughs was

25    involved in coverage issues but not involved in the

**REGENCY-BRENTANO, INC.**

1     Q.    Okay.  And -- and Mr. Rust was not involved in

2  the defense of Lawson.  Correct?

3     A.    Correct.

4     Q.    And that would have been outside the scope of

5  his representation as retained by Columbia?

6     A.    Yes, sir.  That is indeed my recollection.

7     Q.    Okay.  And Mike Rust and the rest of his firm,

8  the scope of the representation was limited to the defense

9  of Mr. Patterson?

10     A.    Yes, sir.

11     Q.    Now, you mentioned Mr. Strickland?

12     A.    I did.

13     Q.    Okay.  And, yeah, and that's fine to, you know,

14  look to your attorney before you answer any of these

15  questions.  But let me ask you a yes-or-no question.  Was

16  Mr. Strickland retained to provide coverage advice to

17  Columbia?

18     A.    Yes.

19     Q.    Okay.  And specifically was Mr. Strickland

20  retained to provide advice to Columbia as to whether

21  Mr. Patterson was covered?

22     A.    Yes, I believe that was part of his role.  It

23  was really -- he was retained really to provide coverage

24  of -- advice on really any and all issues that might

25  pertain to coverage or -- and really to represent the

1    company generally, which, you know -- but chiefly in

2    coverage it in this case, certainly.

3         Q.   Okay.  And by the company, you mean Columbia?

4         A.   Mean Columbia, yes, sir.

5         Q.   Okay.  Was he retained to provide legal advice

6    to Columbia on Lawson's defense?

7         A.   No.

8         Q.   That would have been outside the scope of his

9    representation?

10        A.   Yeah.  That's correct.  Yeah.  Generally, unless

11   there was some coverage issue that he wanted to give us

12   direction on.

13             For example, if he'd come in and said, oh, you

14   know, my analysis reveals that there's no coverage for the

15   Lawsons, I guess he would have been honor bound to tell us

16   that.  But that, of course, was not the situation.

17        Q.   So if there had been a coverage issue adverse to

18   Lawson, you would have expected Mr. Strickland to advise

19   Columbia of that?

20        A.   Yes, sir.

21        Q.   And that being the case, there would be a

22   potential conflict of interest, so you would not want

23   Mr. Strickland to advise Columbia on how to defend Lawson?

24        A.   I think I understand your question.  Yeah, we

25   would not want to -- and I apologize if I'm kind of

1    rephrasing to make sure I understand your question, sir.

2              The -- the -- yeah, that we would not -- yeah,

3    we would not expect him to provide, shall we say, you

4    know, tactical or factual information or direction to the

5    defense counsel about the defense.

6         Q.   Okay.  The defense of Lawson?

7         A.   Defense of Lawson in this case, exactly.  Yes,

8    sir.

9         Q.   Because there would be a conflict of interest

10   between doing that and then also providing advice to

11   Columbia on coverage for Lawson had that situation

12   arrived?

13        A.   Correct.

14        Q.   Okay.  So -- and is it true that Mr. Strickland

15   and the other attorneys at his firm were the sole coverage

16   counsel for Columbia with respect to this claim?

17        A.   That is my recollection, sir.  To my knowledge,

18   they were -- to my knowledge, that's correct.  If there

19   was anyone else involved, I -- I do not know if Preston

20   Burroughs involved anyone else in this.  To my knowledge,

21   he didn't.  I don't see why he would, but . . .

22        Q.   So as far as you know -- I'm sorry.  Were you

23   done?

24        A.   Yes, sir.  Again, I hope I didn't speak over you

25   again.

1          Q.    No.  You're good.

2          A.    Thank you.  Good.

3          Q.    And I just did.  I just spoke over you, so . . .

4                All right.  So -- but no one -- as far as you

5    know, no one but Mr. Strickland and his firm was providing

6    legal advice to Columbia regarding coverage for Patterson?

7          A.    Correct.

8          Q.    Now, how common is it for you, Mr. Hubbard, to

9    get into the nitty-gritty and actually supervise and

10   monitor litigation against a particular insured?

11         A.    It's very common.  It's a daily part of my -- of

12   my job, my position.

13         Q.    So you -- you take several cases at any

14   particular time?

15         A.    I do, sir.  I feel that's part of my job.  I

16   always say I'm not too good to actually work.  So I -- I

17   haven't gotten into the senior partner mode, in which I'm

18   sure neither of you gentleman have where you don't

19   actually do anything but watch other people work.

20         Q.    Small firms.

21         A.    Yeah.

22         Q.    So, now, when you are supervising and monitoring

23   litigation, are you expected to thoroughly document your

24   work on the claim file?

25         A.    Yes, with -- with the proviso, I don't

1    the former claim notes, Mr. Barczykowski's?

2         A.    It does not.   It's separate and apart.

3         Q.    Okay.   But it's something that you could go and

4    click on and look at?

5         A.    Yes.

6         Q.    All right.   And, now, how was this -- how and

7    why was this assigned to you to supervise the defense?

8         A.    Oh, it was really my decision.   When it came in

9    as a lawsuit against the Lawsons and Mr. Patterson, I

10   decided, you know, to take over the defense of the Lawsons

11   and to then set up -- then have this separate coverage

12   file set up, again, with Preston Burroughs, who I believe

13   chose to work with Bill Strickland.

14        Q.    And why did you decide that you would be the one

15   to manage Lawsons' defense?

16        A.    I don't believe there's any particular reason.

17   I think it would just -- it just was a -- I think it was

18   just sort of happenstance.

19        Q.    Okay.

20        A.    That --

21        Q.    Did it have anything to do with the fact that

22   there had been a denial of coverage as to one of the

23   Defendants?

24        A.    No.   No, I think . . .

25        Q.    And you decided that Mr. Burroughs would handle

1    possession to rule that out at the time?

2         A.   Yes, which -- only to the degree that it was in

3    the -- I mean, the short answer, yes.

4         Q.   Okay.  And what were those facts?

5         A.   Yeah.  It would be based on John Barczykowski's

6    investigation that he found that Mr. Patterson, who I

7    believe also refused to communicate with him, was -- had

8    taken this vehicle without permission, had take taken it

9    at night, was drunk and had run into, you know, the Dunns

10   in a Wal-Mart parking lot.  And I believe we -- so they

11   felt that that wasn't within the course and scope of his

12   employment.

13        But -- but, again, you know, that wasn't an

14   area -- I was, however, again -- apologize for repeating

15   myself.  That was going to be an issue to be -- to be

16   reviewed further to the degree it needed to be by the

17   coverage handler and counsel.

18        Q.   Okay.  Mr. Burroughs?

19        A.   Yes.  Yes, sir.

20        Q.   And -- but you would agree with me that if the

21   allegations in Exhibit -- in paragraph 46 were true,

22   Columbia should have defended Mr. Patterson?

23        A.   Assuming they were true, yes.

24        Q.   All right.  And the facts alleged in

25   paragraph 46 allege potential coverage?

```
 1    had with Mr. Patterson other than letters denying

 2    coverage?

 3         A.   Yes.  My recollection is, I don't recall precise

 4    dates, is that John Barczykowski had called him and -- I

 5    just recall this my initial review of the file.  That he

 6    had called him and left messages for him as well, phone

 7    messages, as well as writing him, and never heard back.

 8         Q.   And that went into your thinking as to no

 9    contact from Patterson?

10         A.   Yes, no contact from Patterson.  And I know

11    subsequent to this, I simply happened to hear about it,

12    that after we attempted to engage in a reserve defense, we

13    even hired a private investigator to go find him, who

14    Mr. Patterson -- physically find him, and Mr. Patterson

15    then ordered off of his property, and I was told even

16    threatened to shoot him if he continued to bother him.

17    So, you know, there gets to be a limit as to how -- as to

18    how much we can attempt to contact someone --

19         Q.   Okay.

20         A.   -- who clearly does not want to be contacted

21    and, again, even threatening this -- this private

22    investigator.

23         Q.   And that event occurred after Columbia denied

24    coverage.  Correct?

25         A.   No.  That's true.
```

**REGENCY-BRENTANO, INC.**

 1    system.  It's not part of Amicus, but we use it in

 2    conjunction with Amicus.

 3         Q.   And are you able to look at, like, a week at a

 4    time and a month at a time, different time periods and

 5    everything you have to do during those?

 6         A.   Yes.

 7         Q.   And then aren't you also able to click on

 8    something so it'll easily limit your calendar items as to

 9    a particular climb or file number?

10         A.   Yes.  Yes, absolutely.

11              One thing, if I may elucidate is --

12         Q.   Sure.

13         A.   -- our internal procedure, too, is that defense

14    counsel are instructed and our outside defense counsel

15    who -- this will probably simplify my answer and I

16    probably should have answered it before -- my -- is

17    they're instructed to copy coverage counsel on all

18    correspondence.  So I should have mentioned that.

19              So they're instructed to do that.  So that's

20    probably why I didn't have any recollection of discussing

21    this with Richie Foster, because he certainly is aware of

22    that, and I assume that he did that.

23         Q.   So Richie foster should have copied

24    Mr. Burroughs on Exhibit 43?

25         A.   Yeah, or -- precisely, and I don't see that he

1    is listed there, but that is our procedure is that they

2    are -- they're to be copied on all -- certainly all

3    meaningful correspondence.

4         Q.    Okay.

5         A.    Just since -- so they can be kept abreast with

6    the file.

7         Q.    Sure.

8              And would the same be true of the attorney

9    assisting Mr. Burroughs that Mr. Strickland would copy you

10   on all correspondence to Mr. Burroughs?

11        A.    No.  Absolutely not.  He does not.  It goes one

12   way.  It goes only from the Defense file to the coverage

13   file.

14        Q.    And you say absolutely not, because back to the

15   Chinese wall, the splitting of file, the ethics?

16        A.    Yeah, exactly, that the defense might be

17   relevant to coverage but, you know, they will have to let

18   us know if coverage is relevant to the defense.

19        Q.    And let me go back to Amicus.  So when you -- is

20   Amicus a single program that you open up?

21        A.    Yes.

22        Q.    And you are able to kick out -- click on, for

23   example, the claim notes?

24        A.    Yes, absolutely.

25        Q.    And other folders that have correspondence or

1    person, so I don't recall.

2    BY MR. DOLDER:

3        Q.    Well, in a case like this, is a setoff something

4    you would normally seek if -- once it became clear that

5    you were going to settle the claims against Lawson but not

6    the claims against Patterson?

7        A.    I wouldn't say normally.  It would be kind of an

8    unusual situation.  Yeah, certainly would be out of the

9    norm.

10            MR. DOLDER:  All right.  Let's take a break.

11            THE VIDEOGRAPHER:  We're now going off the

12    record.  The time is 11:56.

13            (OFF THE RECORD.)

14    BY MR. DOLDER:

15        Q.    Mr. Hubbard, how did you prepare for your

16    deposition today?

17        A.    Reviewed yesterday the file that I'd been

18    handling and then I talked a bit with Mr. Rapp yesterday.

19        Q.    And who did you speak to at Columbia in the last

20    few weeks in order to prepare for your deposition?

21        A.    Really no one, just -- just reviewed the file

22    and talked with Mr. Rapp.  I advised Mr. Burroughs that

23    the deposition was upcoming, but it turns out he knew

24    that.

25        Q.    Okay.  Let me hand you what's been marked as

1 some classes on negotiations.

2   Q. Teach anything on coverage determinations?

3   A. Yeah, I did not.

4   Q. Teach anything on investigation of facts for the

5 purposes of making coverage determinations?

6   A. No.

7   Q. You indicated that you've been -- let me ask you

8 this:  You indicated that in preparation for this

9 deposition you've reviewed what -- what was it that you

10 reviewed?  You said the claims file?

11   A. Yeah.  Reviewed the claims file that I was

12 involved in and handled, yeah, which would be the one for

13 the defense of the Lawsons.

14   Q. All right.  Does that have a particular number

15 that's associated with it?

16   A. Yes, sir, it does.  Let me see if I -- it was

17 13 something.  It was -- let's see if I --

18   Q. 1307115?

19    MR. DOLDER:  Look at Exhibit 38, Mr. Hubbard.

20 That might help.

21    THE WITNESS:  Thank you.  I bet that that's

22 correct, but let me . . .

23    MR. RAPP:  You are way past 38.

24    THE WITNESS:  I'm going backwards.  I think

25 it's -- yeah, see there.  There's method to my madness.

 1    Here we go, last.  I'm so sorry.  Yep, that is it,
 2    1337115.
 3    BY MR. ALEXANDER:
 4         Q.   Okay.  Now, how did you review that claims file?
 5         A.   Yeah.  I reviewed the notes and looked at the
 6    documents that were attached to the file --
 7         Q.   And --
 8         A.   -- briefly, yeah.
 9         Q.   -- did you do that electronically?
10         A.   Yes.
11         Q.   Okay.  So you did that electronically.  You did
12    not review the file as it's referenced on the exhibit that
13    you were just referring to that you got the claim number
14    for?
15         A.   Right.  I didn't review it in paper format.
16         Q.   Right.
17         A.   I did not.  Yes, sir.
18         Q.   So the file that you reviewed, the claims file
19    that you reviewed in its electronic format contained no
20    redactions?
21         A.   Right.  Correct.  I had no redactions in mine.
22         Q.   You indicated earlier that you've testified, I
23    don't know, a handful of times, maybe a half dozen times
24    before?
25         A.   Correct.

David Hubbard                    Dunn, et al. v. Columbia National Insurance                    August 8, 2018

1    gathering, investigation of the facts concerning the

2    coverage determinations made by Mr. Barczykowski, on a

3    scale of one to ten, how would you rate his efforts, one

4    being very, very poor, ten being excellent?

5              MR. RAPP:  Object to form.

6    BY MR. ALEXANDER:

7         Q.   Do you understand the question?

8         A.   I do, sir.  Yeah, and forgive me.  I'm -- want

9    to, of course, give you a correct answer.

10             Yeah, the -- I would say 7.5.  You can always do

11   more, but -- but if I -- as I understand it, plenty was

12   done in the investigation and the -- you know, again, I --

13   this is from my vantage point and what I know.

14        Q.   And from your vantage point and what you know,

15   what you say -- what more could have been done?

16        A.   I mean, it's always possible to -- which is, as

17   I understand it was done later, to, oh, let's say, hire a

18   private investigator, but I believe that was tried later

19   with no success.  That's the chief thing that I was --

20   that had occurred to me.

21        Q.   So when you reviewed and -- obtained the file

22   and reviewed the file in, I guess, April of 2014, you had

23   some pause that a private investigator could be used to

24   try to, what, communicate with Mr. Patterson?

25        A.   Yeah.  And I really don't know if that even

REGENCY-BRENTANO, INC.

1    occurred to me at that time.  I think it -- I think it

2    only occurred to me later when one was actually used.

3              But, again, based what I know, it looked like

4    plenty of effort had been -- had been used.  The reason I

5    didn't give him a nine or a ten was, you know, there's

6    always more you can do, or typically.

7         Q.   Well, before Columbia denies coverage to a

8    potential insured, wouldn't you want Columbia's

9    investigation efforts to be a nine or a ten?

10             MR. RAPP:  Object to form.

11             THE WITNESS:  Yeah.  That would -- that would

12   certainly be my goal about.

13   BY MR. ALEXANDER:

14        Q.   So your goal as it relates to the investigative

15   efforts in this case weren't satisfied?

16        A.   My -- my ideal goals weren't satisfied, you

17   know.

18        Q.   Just so I'm clear, when you say your idea of

19   goals weren't satisfied as relates to Columbia's efforts

20   to investigate facts to make coverage determinations for

21   Mr. Patterson?

22        A.   No, and I'm sorry.  Let me clarify.  I think

23   that -- the only part that I think we could -- I think

24   that what we did was adequate in trying to find and

25   communicate with Mr. Patterson, but that was the only

1    A.    Well, in -- I guess to view it in a -- you know,

2    there is -- there is always the potential of getting new

3    information, which is why we like to always leave that

4    door open.  If you have more information, please let us

5    know.

6          But, for example, if we actually did get a

7    response from Mr. Patterson and he said, oh, hey, I've got

8    this written letter from Mrs. Lawson saying, I can use --

9    you know, here's the this note signed by her that I can

10   use this truck really whenever I -- you know, basically

11   for personal errands whenever I feel like it, that could

12   be a real game changer.

13   Q.    Okay.

14   A.    And there are times that I'll get in a case and

15   think, hey, this analysis is inaccurate, and I do have the

16   authority to override that.

17   Q.    Okay.  All right.  Anything else that would be a

18   game changer that you could learn from Mr. Patterson other

19   than a written authorization from Debbie Lawson Davis to

20   use the truck for personal use?

21   A.    I don't immediately -- can't immediately think

22   of what it would be.  I mean, other than -- I mean, I

23   guess one example would be it wouldn't be a written

24   authorization, but if Mrs. Lawson then, said, oh, you

25   know, I was asking him to perform a personal errand for me

1  while you could have made those decisions, I understand

2  you delegated that responsibility maybe to others?

3       A.   Uh-huh.  Correct.

4       Q.   And I'm wanting to know who specifically with

5  Columbia Insurance Company --

6       A.   Oh, exactly.

7       Q.   -- had the responsibility of making the

8  determinations about whether to provide either coverage or

9  counsel to Mr. Patterson when the lawsuit was filed.

10      A.   Yeah.  Once -- after the delegation was made,

11 correct.  I mean, in theory I could have done it before

12 the delegation.  Afterwards it -- it would have been

13 Preston Burroughs.

14      Q.   At any -- as it relates to -- well, okay.  I

15 think that's all I have at this time.

16                    REDIRECT EXAMINATION

17 BY MR. DOLDER:

18      Q.   Just a very few follow -- follow-up questions.

19      A.   Sure.

20      Q.   When you sat down at your computer to look at

21 the Amicus claim notes to prepare for your deposition --

22      A.   Uh-huh.

23      Q.   -- did you also go and -- into the other system

24 to look at the claim notes that Mr. Barczykowski kept?

25      A.   I did not.  No.  I looked only at my own claim

 1   notes.  Yeah.

 2       Q.    Okay.  In the -- was it Amicus or Americus?

 3       A.    Yeah, Amicus.

 4       Q.    Amicus?

 5       A.    Right.

 6       Q.    I'm sorry.  In the Amicus computer system?

 7       A.    That's right.

 8       Q.    That's the version you looked at in preparation

 9   for your deposition today?

10       A.    Yes, sir.

11       Q.    And you read your claim notes?

12       A.    Read my claim notes and looked at some of the

13   documents in the claim -- my claims file.

14           MR. DOLDER:  All right.  That's all I have.

15                       RECROSS-EXAMINATION

16   BY MR. ALEXANDER:

17       Q.    I'm just going -- as it relates to your -- the

18   three different claim files that are set up that we've

19   discussed --

20       A.    Yeah.

21       Q.    -- do you -- while you primarily were involved

22   in simply what we've called the Lawson claim file, do you

23   also have access to the Columbia claim file, as well as

24   what we've referred to as the Patterson defense claim

25   file?

David Hubbard                Dunn, et al. v. Columbia National Insurance                August 8, 2018

```
 1        A.    Yes.  If I choose to, yes, I can.
 2        Q.    And that's just a matter of logging in on your
 3   computer and clicking on the button to that file?
 4        A.    Correct.
 5                    FURTHER REDIRECT EXAMINATION
 6   BY MR. DOLDER:
 7        Q.    One more.
 8              While you were reviewing your -- your claim file
 9   in preparation for your deposition today, did you review
10   the memo that Mr. Barczykowski sent to you when the claim
11   was first assigned to you?
12        A.    Yes, because that was in my claims file.
13        Q.    Okay.
14        A.    Exactly.
15        Q.    And you -- how long was it?
16        A.    It was, I believe, kind of one long page.
17        Q.    Okay.  And you read it?
18        A.    And I read it, yes.  Yes, sir.
19        Q.    Okay.  Thank you.
20        A.    Thank you.
21              MR. ALEXANDER:  I know everybody's, like, ready
22   to get out of here.  I may not ask another question, but
23   rather than say, boom, we're done, if we could take, like,
24   a two-minute break, let me just sort of consult with
25   Mr. Lawson --
```

**REGENCY-BRENTANO, INC.**