IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| AMY DUNN, individually and as the natural parent of DANIELLE DEMONBREUN, JAMES DUNN and RONALD CURTIS PATTERSON, <br><br> Plaintiffs, <br><br> v. <br><br> COLUMBIA NATIONAL INSURANCE COMPANY, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) )  CIVIL ACTION <br> FILE NO.: 2:17-CV-00246-RWS |

**RONALD CURTIS PATTERSON'S BRIEF IN SUPPORT
OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT**

**I.     STATEMENT OF FACTS**

**A.     The Accident.**

As most cases involving an insurance company's precipitate denial of coverage and negligent failure to settle, this one begins with a horrible auto accident.  The accident victims are members of the Dunn Family who are co-Plaintiffs in this case.  As they were walking out of a Walmart on June 7, 2013, they were struck by a pick-up truck driven by co-Plaintiff Ronald Curtis Patterson.  Patterson's employer, Lawson Air Conditioning & Plumbing, Inc., owned the truck

and had assigned it to Patterson one year before.  (<u>Exhibit D</u>, RFA Nos. 1, 6 and 8)

The accident was recorded on surveillance video, which graphically shows

Patterson's clear liability and his exposure to punitive damages. (Doc 58; and

<u>Exhibit D</u>, RFA No. 4)  Each member of the Dunn Family was injured, and none

bore fault.  (<u>Compare</u>, Doc 1, <u>with</u> Doc 9, ¶14; and <u>Exhibit D</u>, RFA No. 3)

**B.**      **Use of the Truck for Personal Errands was a Job Perk.**

The accident video and photos show the truck emblazoned with Lawson's

logo.  (<u>Exhibit E</u> and Doc 58)  Lawson had a large fleet that, according to former

vice-president Jeff Dale, served an obvious and legitimate business purpose:

> Experienced field plumbers and those in a foreman position expect a
> truck as a perk of their job and position. It was our practice at Lawson
> to allow employees to use the trucks Lawson assigned to them for
> personal errands so we could attract and retain skilled workers.

(<u>Exhibit B</u>, ¶5)  Patterson was such a foreman.  (<u>Exhibit A</u>, 10:12-21)  When

Lawson negotiated Patterson's starting pay, Lawson used the truck perk to pay

less:  "[I]f you'll come on board with us at the lower pay, I'll go ahead and give

you a truck off the bat."  (<u>Exhibit A</u>, 12:9-18; <u>Exhibit C</u>, ¶2)

Lawson gave Patterson keys, which he placed on his personal key ring.

(<u>Exhibit D</u>, RFA Nos. 18-19; and <u>Exhibit A</u>, 14:16-21)  Patterson drove his truck

as his primary vehicle, parked it at home on weekends and holidays and used it for

personal errands.  (<u>Exhibit A</u>, 15:5-25)  Lawson gave Patterson a gas credit card to

keep.  (Exhibit D, RFA Nos. 16-17; Exhibit A, 16:9-10)  Without complaint,

Lawson paid for all gas, even gas for personal errands.  (Exhibit A, 16:9-25)

Lawson knew employees routinely availed themselves of the truck perk.

Patterson dented a bumper while helping his dad work on a porch.  He reported it

to his supervisor, who told him, "don't worry about it."  (Exhibit A, 19:4-24)  The

dent was visible at the accident.  (Exhibit E; and Exhibit A, 19:4 – 23:8)  He texted

pictures of personal use.  (Exhibit A, 23:15-22 and 65:19 – 67:4; and Exhibit C,

¶5)  He parked his Lawson truck at the hospital for days and told his supervisors so

that they could get tools out of the truck.  (Exhibit A, 105:3 – 107:10)  Lawson laid

him off, but told him to keep the truck while laid off.  (Exhibit A, 25:8 – 27:14)

Patterson's workmates had similar experiences.  William Blankenship used

his Lawson vehicle for personal errands.  (Exhibit G, ¶¶2-4)  Charles Bryson used

his vehicle for "side jobs" with Lawson's knowledge.  (Exhibit H, ¶5)  Bryson was

also allowed to use his Lawson vehicle when he was laid off, and Lawson paid for

the gas.  (Exhibit H, ¶7)  Patterson's supervisor confirmed Lawson allowed

employees to take their trucks home when they were laid off.  (Exhibit F, 71:5-14)

### C.    No one Enforced Lawson's Internal Rule.

Lawson had an internal rule that said, "Company trucks will not be used for

personal use at any time, unless approval has been granted by Lawson."  (Exhibit I,

p.5)  Supervisor Matthew Poole testified that no one enforced the rule.  (Exhibit F,

78:22 – 79:11 and 69:6 – 70:10)  VP Dale agreed.  (Exhibit B, ¶10)

### D.    Lawson's Policy Covers Drivers with "Permission," but Columbia Denies Coverage Without Investigating Permission.

Lawson furnishing vehicles as a job perk is relevant to insurance coverage

for Patterson.  Defendant Columbia National Insurance Company issued two

policies to Lawson:  A primary policy with $1 million limits and an umbrella

policy with $3 million limits.  (Compare, Doc 1, with Doc 9, ¶18)  Both policies

define an "insured" to include "[a]nyone else while using with your permission a

covered auto."  (Doc 24-4, p. 47 of 152 and Doc 24-4, p. 75 of 152)  The truck

Lawson assigned to Patterson is a "covered auto."  (Exhibit D, RFA No. 7)

Columbia's investigation is relevant, because its slipshod nature explains

why Columbia denied coverage.  On June 11, 2013, adjuster John Barczykowski

began his work, which was to "promptly" and "thoroughly" investigate coverage

for Patterson.  (Exhibit L, p. 1 and Exhibit M, 13:10 – 14:1)  Barczykowski had

many investigative tools to find people so he could talk to them, including field

adjusters, skip-trace services and plain old Google.  (Exhibit M, 30:11 – 31:15)  He

never used a single such tool to try to talk to Patterson.  (Exhibit M, 77:21 – 78:19)

Barczykowski attempted to call Patterson once on June 11, 2013, but the

number was disconnected.  (Exhibit L, p. 1; and Exhibit M, 74:3-15)  Although he

4

was communicating with Lawson on June 11, 2013, Barczykowski did not ask Lawson for a number or do anything else to find an alternative number.  (Exhibit M, 72:18 – 74:8 and 75:16 – 76:9)  It would have been easy, because Patterson still had his Lawson-issued cell phone on June 11, 2013.  (Exhibit A, 42:8 – 43:4)

During his "investigation," Barczykowski wrote a single letter to Patterson. (Exhibit N and Exhibit M, 71:4-15)  Patterson never received it.  (Exhibit C, ¶6)

Debbie Lawson Davis, a Lawson owner, told Barczykowski employees were not allowed to use their vehicles for personal use.  (Exhibit L, p.1, entry dated June 11, 2013, 1:19 p.m.) She later provided him Lawson's internal rule, but no one noticed the huge exception to the rule.  The rule allowed personal use if Lawson gave "approval."  (Exhibit I, p.5; and Exhibit M, 47:14 – 48:12)  Barczykowski did nothing to investigate approval.  (Exhibit M, 48:18-21 and 49:24 – 50:10)

On August 22, 2013, Barczykowski sent a letter to Patterson denying coverage on the sole alleged basis that he was "not a permissive driver at the time of the accident."  (Exhibit O)  The denial letter is unambiguous, unconditional, unqualified and fully explains all reasons Columbia denied coverage.  (Exhibit D, RFA Nos. 33-35; and Exhibit M, 45:6-8)  Prior to denying coverage, Columbia did not discuss with Patterson his use of his truck or what permission Lawson gave him.  (Exhibit D, RFA Nos. 46-47; and Exhibit M, 67:13-15)

5

### E.     The Underlying Lawsuit.

On April 7, 2014, the Dunn Family filed the "Underlying Lawsuit" against Lawson and Patterson.  (Compare Doc 1, with Doc 9, ¶37)  Columbia received prompt notice.  (Exhibit D, RFA Nos. 51-53)  The complaint alleges Lawson "entrusted" the truck to Patterson and that he was using the truck within the scope and course of his employment during the accident.  (Exhibit P, ¶9 and ¶46)

Columbia defended Lawson.  Columbia did not defend Patterson or file a declaratory judgment action.  (Exhibit D, RFA Nos. 55 and 57-59)  Depositions in the Underlying Lawsuit revealed Lawson knew about personal use of its vehicles and that the standard in Lawson's industry is that foremen get trucks as a "perk" of the job.  (Exhibit Q, 123:7-11 and 54:10 – 55:17)

Seeing "arguable" or "potential" coverage, Columbia tried to make an appearance and intervene in the Underlying Lawsuit.  (Exhibit R and Exhibit S)  The court denied both motions.  Columbia's goal for both motions was to save the cost of a declaratory judgment action and to have the jury in the Underlying Lawsuit decide coverage for Patterson.  (Exhibit D, RFA Nos. 61-65 and 68-70)

On January 5, 2016, the Dunn Family settled their claims against Lawson only.  (Exhibit D, RFA No. 72)  The Underlying Lawsuit proceeded with Patterson as the sole defendant.  (Exhibit D, RFA No 73)  On February 26, 2016, Columbia

sent a "reservation of rights" letter to Patterson offering to defend him under

certain terms and conditions.  (Exhibit D, RFA No 76; and Exhibit T)  Patterson

got suspicious, discussed it with family members and rejected the defense.

(Exhibit D, RFA No. 78; Exhibit C, ¶¶8-9)  The Underlying Lawsuit went to trial,

and the jury rendered an $11.5-million verdict against Patterson.  (Doc 1-12)

## II     ARGUMENT AND CITATION TO AUTHORITY

### A.     Standard for Partial Summary Judgment.

This motion involves claims on which Patterson bears the burden of proof:

(1) Waiver, (2) duty to defend, and (3) coverage as a permissive user.  Patterson

"bears the initial burden to show the district court, by reference to materials on file,

that there are no genuine issues of material fact that should be decided at trial."

*Clark v. Coats & Clark*, 929 F.2d 604, 608 (11th Cir. 1991).  "[T]he inquiry is

whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law."

*Anderson v. Liberty Lobby*, 477 U.S. 242, 243 (1986).  This motion also involves

affirmative defenses on which Columbia bears the burden:  (1) Breach of the

cooperation clause, and (2) mitigation.  On those claims, Patterson prevails by

showing that Columbia cannot support an essential element of its case.  *Divine*

*Motel v. Rockhill*, 655 F. App'x 779, 781 (11th Cir. 2016).

7

## B.     Columbia Waived Coverage Defenses Other than Permission to Use the Vehicle.

When a liability insurer denies coverage and refuses to defend, the insurer waives all coverage defenses not stated in the denial letter. *Hoover v. Maxum Indem. Co.*, 291 Ga. 402 (2012). Columbia's denial letter lists one reason for denying coverage, alleging Patterson was "not a permissive driver at the time of the accident." (Exhibit O)  It was the sole reason for the denial. (Exhibit M, 45:6-8)  Columbia's denial is unambiguous, unconditional and unqualified. (Exhibit D, RFA Nos. 33-35)  Columbia waived all other coverage defenses as a matter of law.

## C.     Columbia Breached the Duty to Defend.

It is well settled that the duty to defend is governed by a lesser standard than the duty to indemnify. "[W]hether an insurer has a duty to defend depends on the language of the policy as compared with the allegations of the complaint." *Hoover*, 291 Ga. at 407-08. "If the facts as alleged in the complaint even **arguably** bring the occurrence within the policy's coverage, the insurer has a duty to defend the action." *Id* (emphasis added). "The duty to defend is excused only when a complaint unambiguously excludes coverage under the policy, and thus, the duty to defend exists if the claim **potentially** comes within the policy." *Nationwide v. Somers*, 264 Ga. App. 421, 424-5 (2003) (emphasis added). "Where the claim is one of potential coverage, doubt as to liability and the insurer's duty to defend

8

should be resolved in favor of the insured." *Id.* (citing *Penn–America Ins. Co. v. Disabled American Veterans,* 268 Ga. 564 (1997).

The complaint in the Underlying Lawsuit alleges Lawson "entrusted" the truck to Patterson, who was operating the truck "within the scope and course of his employment with [Lawson]" at the time of the accident.  (Exhibit P, ¶9 and ¶46)  If Lawson "entrusted" the truck to Patterson, "the facts as alleged in the complaint [] arguably bring the occurrence within the policy's coverage." *Hoover*, 291 Ga. at 407-08.  If Patterson was driving within the scope of his employment, he *necessarily* had Lawson's permission.  The plain language of the complaint alleges *arguable* or *potential* coverage, triggering the duty to defend as a matter of law.

An insurer "must defend the Underlying Lawsuit where the facts alleged against the insured might arguably give rise to coverage, even if those facts are not ultimately proven at trial." *Evanston Ins. Co. v. Dillard House*, 2017 WL 3498953, at *6 (N.D. Ga.).  Thus, in determining the duty to defend, it does not matter whether the allegation that Patterson was driving within the scope of his duties at the time of the accident was ultimately proven at trial.[1]  This Court should rule that Columbia breached the duty to defend as a matter of law.

---

[1] Incidentally, in denying Lawson's motion for summary judgment, the court in the Underlying Lawsuit ruled there was an issue of fact as to whether Patterson was driving within the scope of his duties for Lawson at the time of the accident.

**D.     Patterson Is Covered Because He Had Permission.**

1.     "Permission" must be broadly construed in favor of coverage.

"Insurance policies are to be construed strictly in favor of the insured and against the insurer since they are prepared and written by the insurer." *Sovereign Camp v. Heflin*, 188 Ga. 234 (1939).  "It is a cardinal principle of insurance law that a policy or contract of insurance is to be construed liberally in favor of the insured." *Clark v. United Ins. Co. of Am.*, 199 Ga. App. 1, 5 (1991).  "Under Georgia law, insurance policies are liberally construed in favor of coverage." *Barrett v. Nat'l Union*, 304 Ga. App. 314, 320-21 (2010).  The rule of broad construction applies even if there is no ambiguity.  *Roland v. Georgia Farm Bureau*, 265 Ga. 776 (1995) and *Hartford Cas. Ins. Co. v. Smith*, 268 Ga. App. 224 (2004), *cert. denied*, Sept. 27, 2004.

This case involves an undefined term, "permission," but that is not a problem.  "Words used in the policy are given their usual and common meaning … and the policy should be read as a layman would read it and not as it might be analyzed by an insurance expert or an attorney." *Georgia Farm Bureau v. Smith*, 298 Ga. 716, 719 (2016).

2.   Lawson allowed its employees to use Lawson vehicles
for personal use as a "perk" of the job.

Columbia defines an insured as "[a]nyone else while using with your permission a covered 'auto.'"  (Doc 24-4, p.47 and Doc 24-4, p.75)  The truck Lawson assigned to Patterson was a "covered auto."  (Exhibit D, RFA No. 7)  Thus, the sole coverage issue is whether the accident occurred while Patterson was using with Lawson's permission the truck.  If so, he is an insured.

"Permission" must be construed broadly to effect coverage for drivers of an "insured vehicle."  *See*, *Sovereign Camp*, *Clark*, *Barrett*, *Roland*, and *Hartford*, all cited *supra*, §II.C.1.

In determining permission, the relevant inquiry is "whether a *reasonable person could conclude under the circumstances* that the use of the [insured vehicle] fell within the scope of the permission granted by the policyholder." *Allstate v. Spillers*, 260 Ga. App. 436, 438 (2003) (emphasis in original).  Relevant factors include possession of the keys and the lack of reprimand (i.e., not being "scolded … for driving the car").  *Id*.  "[I]mplied permission is simply actual permission circumstantially proved [and] permission can be implied from the course of conduct between the parties."  *Dairyland v. Makover*, 654 F.2d 1120, 1127 (5th Cir. 1981) (Georgia law).  The existence of a master-servant relationship

strongly supports the existence of implied permission.  *Am. Emp. Ins. Co. v. Johns*, 122 Ga. App. 577, 579 (1970).

As Lawson's owner testified in the Underlying Lawsuit, the standard in the HVAC and plumbing industry is that foremen get a truck as a "perk" of the job. (Exhibit Q, 54:10 – 55:17)  Lawson's former vice-president avers as follows:

> Experienced field plumbers and those in a foreman position expect a truck as a perk of their job and position. It was our practice at Lawson to allow employees to use the trucks Lawson assigned to them for personal errands so we could attract and retain skilled workers.

(Exhibit B, ¶¶4 & 6)  These admissions are enough to prevail on summary judgment, but much more testimony allays any doubt that Lawson allowed its skilled workers wide and unfettered use of Lawson vehicles.

When negotiating Patterson's pay, Lawson leveraged the truck in lieu of higher pay.  (Exhibit A, 12:9-18)  Lawson used the "truck perk" as leverage in denying a raise to Bryson, Patterson's workmate.  (Exhibit H, ¶6)

Bryson and Blankenship were Patterson's workmates at Lawson during the relevant time period and are non-parties to this case.  They aver that just like Patterson they were assigned trucks, given keys and gas credit cards and allowed to keep and use their trucks overnight, on weekends and on holidays.  (Exhibit G, ¶2; Exhibit H, ¶3; Exhibit A, 14:16-21 and 15:5-12)  Columbia admits that Patterson, Blankenship and Bryson are correct on these points.  (Exhibit D, RFA Nos. 16-19)

Lawson paid for all of Patterson's gas, even gas for his personal use, but never criticized him for it.  (Exhibit A, 16:9-25)  Patterson bought gas on Sundays and days he did not work without comment from Lawson.  (Id.)

Lawson allowed Patterson to use the truck when he was laid off.  (Exhibit A, 15:5-12 and 25:8-20 and 27:8-14)  Bryson had the same experience and observed others using Lawson vehicles when laid off.  (Exhibit H, ¶7)  Patterson's supervisor confirmed that Lawson allowed employees to take their Lawson trucks home when laid off for "a week or two."  (Exhibit F, 71:5-10)  When Lawson temporarily laid off plumbers, it paid for the gas they used driving their Lawson vehicles while laid off.  (Exhibit H, ¶7 and Exhibit A, 16:9-19)

Lawson's upper management knew employees kept child car seats permanently installed in Lawson vehicles and that employees used Lawson vehicles to hunt and fish without asking for prior approval.  (Exhibit B, ¶¶7-8)  Blankenship used his vehicle for personal errands and observed other employees using Lawson vehicles for personal errands with no complaint or reprimand.  (Exhibit G, ¶¶2-4)  Lawson had no complaints when Bryson used his Lawson vehicle for personal reasons without prior approval, even for "side jobs" that were not part of his work for Lawson.  (Exhibit H, ¶¶2, 4 & 5)  Likewise, Lawson never

criticized Patterson, and Patterson never saw Lawson criticize any other Lawson employee for personal use of Lawson vehicles.  (Exhibit C, ¶4)

Prior to the accident with the Dunn Family, Patterson dented the left rear bumper of his Lawson truck while using it to help his dad work on a porch over the weekend, an obvious personal use.  He showed a supervisor the dented bumper, explained it occurred during personal use, and the supervisor said, "not a problem, don't worry about it."  (Exhibit A, 19:4-24)  The dent from the personal porch project was still visible on Patterson's Lawson truck at the scene of the accident with the Dunn Family.  (Exhibit E and Exhibit A, 19:4 – 23:8)  Former VP Dale confirms that management allowed use of Lawson vehicles for personal projects like the porch project.  (Exhibit B, ¶9)

Patterson used his Lawson truck to purchase an ATV for his son.  He texted pictures showing the ATV in the back of the Lawson truck to his workmates and supervisors, but no one complained.  (Exhibit C, ¶5)  Patterson used his Lawson truck to take his wife to the hospital and left it there for days while she had their son.  He told Lawson management his truck was at the hospital so Lawson could get tools from the Lawson truck.  (Exhibit A, 105:3 – 107:10)  Management observed Patterson using his truck for personal errands.  (Exhibit A, 31:17-23)

The record overwhelming and undisputedly shows that at the time of the accident, just like all other times, Patterson was "using with [Lawson's] permission a covered 'auto,'" making him an "insured" under the Columbia policies.

3.      Lawson's internal rule does not prohibit personal use,
        and Lawson did not enforce the rule anyway.

The absence of an "express prohibition" of personal use is a factor in determining permissive use, *Allstate*, 260 Ga. App. at 438.  Lawson's internal rule was not an "express prohibition" of personal use:  "Company trucks will not be used for personal use at any time, **unless approval has been granted**."  (Exhibit I, p.5, emphasis added)  Because of its undisputedly incomplete investigation, Columbia never noticed that Lawson's internal rule had an exception big enough to drive a Lawson truck through it.[2]

Even if the rule were relevant, Lawson's former VP confirmed the rule was not enforced.  (Exhibit B, ¶10)  Additionally, in response to questioning by Columbia in this case, Poole flatly admitted Lawson did not enforce the rule:

A:      I would agree that they [Lawson] did not enforce that rule.

---

[2] Lawson's internal rule is irrelevant, as such rules do not control whether permission exists.  *Great American v. Anderson*, 847 F.3d 1327 (11th Cir. 2017).  *Great American* declined to follow a case in which the insurer relied on the employer's internal rules in denying coverage to an employee driving an insured vehicle.  *See*, *Barfield v. Royal Ins. Co.*, 228 Ga. App. 841 (1997).  Columbia made the same mistake in this case as did the insurer in *Barfield*.

Q:      Did you enforce that rule?

A:      No, sir.

(Exhibit F, 78:22 – 79:11)  Poole supervised Patterson and Blankenship.  (Exhibit F, 69:6 – 70:10)  It is no wonder, therefore, that neither Patterson nor Blankenship thought personal use violated any rules.  (Exhibit C, ¶3; and Exhibit G, ¶¶2-4)

The evidence is overwhelming and "so one-sided that [Patterson] must prevail as a matter of law." *Anderson*, 477 U.S. at 243.  There are no facts for a jury to decide with respect to permission. *Clark*, 929 F.2d at 608.  This Court should rule Patterson had permission to use his truck for personal purposes when the accident occurred and is an "insured" under the policies as a matter of law.

### E.      Patterson Did not Breach the Cooperation Clause.

#### 1.      Columbia has the burden to prove a breach.

Columbia contends it had the right to compel Patterson to cooperate with its belated defense in February, 2016.  (Doc 1-10, p.4)  When Patterson rejected the belated defense, Columbia contended he breached the cooperation clause.  (Exhibit X, p.5)  To narrow the issues for trial, this Court should rule that both contentions fail as a matter of law.

To deny coverage for non-cooperation, Columbia must establish, *inter alia*, that it reasonably requested cooperation. *Travelers v. Castellanos*, 297 Ga. 174,

16

177 (2015).  It is Columbia's burden to establish all elements of its cooperation

defense, and if it fails to do so, the defense fails as a matter of law.  *State Farm v.*

*Wendler*, 120 Ga. App. 839, 841-42 (1969) (ruling that trial judge *should have*

decided against insurer on breach of cooperation clause as a matter of law). The

record in this case – or lack thereof – shows Columbia cannot meet its burden.

2.     *Before* the Underlying Lawsuit, Columbia can show no
       request for cooperation and no breach.

Columbia never contacted Patterson to request his cooperation – or for any

other reason – prior to the Underlying Lawsuit.  (Exhibit C, ¶6)  Thus, Columbia

cannot prove an essential element of any alleged breach prior to the filing of the

Underlying Lawsuit.  Furthermore, Columbia's imprudent and hasty denial letter

did not allege a breach of the cooperation clause.  (Exhibit O)  Thus, when

Columbia did not defend Patterson, it waived any breach of the cooperation clause

as a matter of law.  *Hoover*, 291 Ga. 402.  The Court should rule there is no breach

of the cooperation clause.

3.     *After* the Underlying Lawsuit, Patterson was released
       from the duty to cooperate by Columbia's breach.

"[O]nce the carrier has wrongfully denied coverage, an insured is no longer

bound by the insurance policy's provisions governing cooperation."  Windt, 1

Insurance Claims and Disputes § 3:10 (6th ed.).  "In Georgia, an insurer that denies

17

coverage and refuses to defend an action against its insured, when it could have done so with a reservation of its rights as to coverage, waives the [cooperation clause]." *S. Guar. Ins. Co. v. Dowse*, 278 Ga. 674, 676 (2004).[3]

Once an insurer waives a policy condition, it cannot be "reclaimed." *Sargent v. Allstate*, 165 Ga. App. 863, 867 (1983) (residency requirement). "Once an insurer has breached the insurance contract by refusing to defend, the insured is not required to accept the insurer's defense if the insurer subsequently changes its mind." Windt, 1 Insurance Claims and Disputes § 4:25 (6th ed.). An insurer that refuses to defend "does so at its peril, and if the insurer guesses wrong, it must bear the consequences." *Dowse*, 278 Ga. at 676.

Columbia recognizes that the aforementioned principles are accepted in the insurance industry, and that the consequences of its denial of coverage made Patterson a "free agent" who was no longer bound by policy conditions. (Exhibit W, 101:15 – 102:3)

The February 26, 2016, ROR Letter was the first time since the Underlying Lawsuit was filed that Columbia requested cooperation. (Doc 1-10, p.4 and Exhibit V, 52:5-16) By that time, Columbia had released Patterson from all policy

---

[3] *Dowse* dealt with a provision barring settlement, which is a part of the cooperation clause. Columbia's own cooperation clause is like the *Dowse* provision. (Doc 24-4, page 53 of 152, §IV(A)(2)(b)(1) and (3))

conditions, including the cooperation clause. *Dowse*, *supra*. Columbia could not unilaterally "reclaim" the right to demand cooperation. *Sargent*, *supra*. This Court should rule that Patterson did not breach the cooperation clause as a matter of law.

### F.   Columbia's Mitigation Defense Fails.

#### 1.   Patterson brings claims in contract and tort.

Columbia raises the affirmative defense of mitigation. (Doc 9, p.2) Patterson brings claims in contract and tort. A breach of the duty to defend sounds in contract. *Leader National v. Kemp*, 259 Ga. 329 (1989). "A claim for bad-faith failure to settle sounds in tort." *Camacho v. Nationwide*, 188 F. Supp. 3d 1331, 1355 (N.D. Ga. 2016), *aff'd,* 692 F. App'x 985 (11th Cir. 2017).

Patterson's recoverable damages for both causes of action include, *inter alia*, the full judgment from the Underlying Lawsuit.[4] With respect to breach of the contractual duty to defend, a jury must decide whether the failure to defend proximately caused the excess judgment. *Leader National*, 259 Ga. 329. With respect to the failure to settle, "after an insurer's liability for wrongful refusal to settle a claim against its insured is established, the insured or its assignee is entitled as a matter of law to recover damages equal to the amount by which the judgment exceeds policy coverage." *Camacho*, 188 F. Supp. 3d at 1348.

---

[4] Patterson does not suggest he is entitled to a double recovery. Rather, his causes of action are alternative means to similar ends.

19

2.    Patterson acted reasonably given the nature of his
      circumstances and could not have lessened his damages.

Under the mitigation statutes for tort and contract law, Columbia has the burden to show Patterson could have lessened his damages "by the use of ordinary care and diligence."  O.C.G.A. § 51-12-11 (tort) and O.C.G.A. § 13-6-5 (contract). "This rule [of mitigation] is applicable only where the damages can be lessened by reasonable efforts and expense."  *Century National v. Dixon*, 188 Ga. App. 680, 682 (1988) (contract).  "The burden is upon the party asserting that the opposite party could have lessened his damages, and such proof must include sufficient data to allow the jury to reasonably estimate how much the damages could have been mitigated."  *Id.*

In this case, Patterson reasonably believed Columbia was going to deal with any claims brought against him.  (Exhibit C, ¶7)  After a previous accident with a skateboarder, when Patterson was using his Lawson truck for a personal errand, Columbia and Lawson had taken care of everything, and Patterson reasonably believed that would occur again.  (Exhibit C, ¶7 and Exhibit A, 43:15 – 45:24) Patterson did not know he was on his own, and he could not reasonably avoid the ultimate judgment against him.  (Exhibit C, ¶¶9-11)

Patterson could not afford an attorney.  (Id.)  Even if he could have hired an attorney or had represented himself, there was nothing he could reasonably do to

avoid the judgment, given the undisputed facts:  Patterson was in fact at fault and could not come into court and deny it.  (Id. and Exhibit D, RFA No. 4)  No member of the Dunn Family was at fault.  (Exhibit D, RFA No. 3)  As the surveillance video objectively shows, no inferences are necessary to conclude that the case against Patterson exposed him to punitive damages.  (Doc 58)  Because he pled guilty to driving under the influence, his exposure to punitive damages was unlimited.  O.C.G.A. § 51-12-5.1(f).  Columbia cannot fulfill its burden to show that Patterson, a *pro se* plumber with no high school diploma, acted unreasonably. (Exhibit C, ¶1)

In the Underlying Lawsuit, Patterson failed to appear at his deposition. However, Columbia cannot show there was something truthful Patterson could have said at his deposition to reduce the judgment against him.  His sanction for failing to appear was an inability to contest damages.  However, Columbia cannot show what it is Patterson could have reasonably done as a *pro se* plumber to contest damages.  Whatever argument it hopes to make finds no support in the record.  The Court should rule against the mitigation defense as a matter of law.

### 3. Had he accepted Columbia's defense, Patterson would have put himself in a worse position.

Mitigation does not require making matters worse for yourself.  The worst thing Patterson could have done for himself would have been to accept

Columbia's untimely and self-serving attempt to swoop in and defend in

February, 2016.  A respected treatise explains why:

> After a breach of contract, the injured party may consent to accept
> further performance from the wrongdoer. In the event of such consent,
> however, the injured party's remedy for the breach will be limited to
> obtaining compensation for the defective partial performance, and the
> parties will thereafter remain bound by the contract.  This principle
> can have profound significance in the context of insurance disputes.
>
> Once an insurer wrongfully denies coverage and refuses to defend, the
> insured will no longer be obligated to comply with his or her own
> obligations under the policy.  This can be extremely advantageous to
> insureds, allowing them, *inter alia*, to control their own defenses and
> to enter into settlements without the carrier's consent.  That
> advantage, however, will be lost, pursuant to the principles discussed
> above, if the insured later allows the company to change its mind and
> provide a defense. **The insured, therefore, having no duty to
> reinstate the contract following the insurer's material breach,
> should rarely allow the insurer to assume the defense after it has
> initially wrongfully refused to do so.**

Windt, 1 Insurance Claims and Disputes § 4:9 (6th ed.) (emphasis added).

Columbia performed a slipshod investigation.  (*Supra*, § I.D)  Columbia

unilaterally and unambiguously denied coverage to Patterson on a single basis,

resulting in a waiver of all other defenses under *Hoover v. Maxum*, 291 Ga. 402.

After the Underlying Lawsuit was filed, Columbia failed to take the

"prudent course of action" and defend under a reservation of rights while seeking

a declaratory judgment as to coverage.  *Alexander Underwriters v. Lovett*, 182 Ga.

App. 769, 773 (1987).  By resting on its unequivocal denial and refusing to defend,

22

Columbia was no longer able to seek a declaratory judgment as to coverage.

*Morgan v. Guar. Nat. Cos.*, 268 Ga. 343, 344 (1997).

Columbia then took the unorthodox step of attempting to appear and later to intervene in the Underlying Lawsuit. (Exhibit R, and Exhibit S) Columbia unabashedly wanted to save the cost and trouble of a declaratory judgment action and have the jury in the Underlying Lawsuit decide coverage issues against Patterson. (Exhibit D, RFA Nos. 61-65 and 68-70) Columbia clearly recognized there was "potential" or "arguable" coverage. *See*, *Penn–America* and *Hoover*, *supra*. Because it knew it had breached its duty to defend, Columbia wanted to litigate coverage when it knew Patterson was not represented.

That strategy having failed, and Lawson having settled, Columbia tried a different tactic to undo its previous waivers and re-enable its ability to file a declaratory judgment. The tactic was to offer Patterson a defense under a reservation of rights. Had Patterson accepted the defense, he would have been worse off and Columbia would have been better off.

Under Georgia law, the insurer and insured can agree to a defense under a ROR that will allow the insurer to file a declaratory judgment action **after** having denied coverage and a defense. *State Farm v. Allstate*, 132 Ga. App. 332, 334 (1974). Indeed, an ROR is considered a binding contract between the insured and

insurer that can alter the terms of the insurance policy.  *Illinois Union v. NRI*, 846

F. Supp. 2d 1366 (N.D. Ga. 2012) (ruling that by accepting defense under ROR,

the insured agreed to the terms in the ROR that were not in policy).

Columbia tried that trick in this case when it attempted to defend under a

reservation of rights.  (Doc 1-10)  Columbia's ROR Letter attempted to reclaim

two rights Columbia had lost:  (1) The right "to assert additional grounds for denial

of coverage" in the future and (2) the right "to file a declaratory judgment action."

(Doc 1-10, p.3)  Had Patterson accepted the defense, he would have been bound by

the terms in the ROR, and Columbia would have been rescued from (1) the waiver

effected by its unambiguous coverage denial and (2) its inability to file a

declaratory judgment action.

In light of Columbia's previous attempt to intervene and inject coverage

issues into the Underlying Lawsuit (Exhibit R, and Exhibit S), Patterson was wise

to be leery when Columbia-controlled attorneys entered an appearance.

It is beyond dispute that if Patterson had agreed to the ROR, he would have

been in a worse position and Columbia would have been in a better position.  At

the time, he was distrustful of the ROR and Columbia's belated attempts to defend

once Lawson had settled.  (Exhibit C, ¶¶8-9 and Exhibit A, 79:14 – 82:22)

Patterson certainly did not understand the legal subtleties of Columbia's

machinations, but Patterson's instincts were dead on.  Patterson's wise decision to reject Columbia's defense cannot constitute a failure to mitigate damages. Columbia cannot meet its burden to show a lack of reasonable steps to mitigate, and this Court should grant this motion.

## III     CONCLUSION

The evidence that personal use of Lawson's trucks were a perk of the job is overwhelming.  Patterson is an insured, and Columbia breached the duty to defend as a matter of law.  Columbia cannot show Patterson breached the cooperation clause or failed to mitigate his damages.  This Court should grant this motion and narrow the issues to be decided in future motion practice and at trial.

Respectfully submitted November 27, 2018.

> */s/ Richard E. Dolder*
> James ("Jay") Sadd
> Georgia Bar No. 622010
> Richard E. Dolder, Jr.
> Georgia Bar No. 220237
> SLAPPEY & SADD
> 352 Sandy Springs Circle
> Atlanta, Georgia 30328
> (404) 255-6677 (telephone)
> jay@lawyersatlanta.com
> rich@lawyersatlanta.com
> Attorneys for Mr. Patterson

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing **Ronald Curtis Patterson's Brief in Support of His Motion for Partial Summary Judgment** was filed electronically with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the attorneys of record for all parties.  I further certify that the foregoing was prepared in Times New Roman 14pt font and otherwise complies with Local Rule 5.1.

Respectfully submitted November 27, 2018.

*/s/ Richard E. Dolder*
James ("Jay") Sadd
Georgia Bar No. 622010
SLAPPEY & SADD, LLC
352 Sandy Springs Circle
Atlanta, Georgia 30328
(404) 255-6677 (voice)
jay@lawyersatlanta.com
Attorney for Mr. Patterson