1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF GEORGIA
2                       ATLANTA DIVISION

3
   AMY DUNN, individually and)
4  As the natural parent of  )
   DANIELLE DEMONBREUN,       )
5  JAMES DUNN and RONALD      )
   CURTIS PATTERSON,          )
6                             )
                 Plaintiffs,  ) CIVIL ACTION FILE NO.:
7                             )   2:17-CV-00246-RWS
              vs.             )
8                             )
   COLUMBIA NATIONAL          )
9  INSURANCE COMPANY          )
                              )
10               Defendant.   )

11

12        The video deposition of RONALD CURTIS PATTERSON

13  taken on the instance of the Plaintiffs, pursuant to

14  stipulations herein, the reading and signing of the

15  deposition being reserved; before Aurora Gutierrez,

16  Certified Court Reporter, at 125 Maple Street,

17  Gainesville, Georgia, commencing at approximately 10:02

18  a.m., on Wednesday, June 20, 2018.

19

20

21

22  _____
23             APPALACHIAN COURT REPORTING
                     P.O. BOX 943
24             BLAIRSVILLE, GA 30514
                   (706) 745-4455
25

1

1    APPEARANCES OF COUNSEL:

2    ON BEHALF OF THE PLAINTIFF:

3        STEWART, MELVIN & FROST, LLP
         MARK W. ALEXANDER, Esq.
4        200 Main Street, Suite 600
         P.O. Box 3280
5        Gainesville, GA 30503
         Email: malexander@smf-law.com

6

7    ON BEHALF OF THE WITNESS:

8        SLAPPEY & SADD, LLC
         RICHARD E. DOLDER, Esq.
9        352 Sandy Springs Circle
         Atlanta, GA 30328
10       Email: Rich@lawyersatlanta.com

11

12   FOR THE DEFENDANTS:

13       WEINBERG WHEELER HUDGINS GUNN & DIAL
         STEPHEN J. RAPP, Esq.
14       3344 Peachtree Road
         Suite 2400
15       Atlanta, GA 30326
         Email: srapp@wwhgd.com

16

17

18    ALSO PRESENT:

19   Elvin Farkas - Video Technician

20

21

22

23

24

25

```
 1                       I N D E X

 2

 3    Exhibits                                     Page

 4    Patterson-1     Photograph                    20

 5    Patterson-2     Photograph                    20

 6    Patterson-3     Photograph                    22

 7    Patterson-4     Photograph                    23

 8    Patterson-5     Statement                     36

 9    Patterson-6     Letter dated 8/22/13          46

10    Patterson-7     Letter dated 9/13/13          46

11    Patterson-8     Lawson's Employment Manual    51

12    Patterson-9     Interrogatories               61

13    Patterson-10    Accident Report               74

14    Patterson-11    Certified Copy of Records     76

15    Patterson-12    Letter dated 2/26/16          83

16    Patterson-13    Letter dated 3/1/16           85

17    Patterson-14    Letter dated 3/16/16          92

18    Patterson-15    Letter dated 3/28/16          92

19    Patterson-16    Letter dated 4/18/16          92

20    Patterson-17    Letter dated 5/26/16          92

21    Patterson-18    Letter dated 8/19/16          92

22    Patterson-19    Letter dated 10/18/16         92

23    Patterson-20    Letter dated 2/28/17          92

24    Patterson-21    Letter dated 3/31/17          92

25    Patterson-22    Letter dated 4/14/17          92
```

1    Exhibits                                              Page

2

3    Patterson-23    Letter dated 5/1/17                    92

4

5

6    Examination                                           Page

7    Examination by Mr. Alexander                            7

8    Examination by Mr. Rapp                          49, 106

9    Examination by Mr. Dolder                             104

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1           VIDEO TECHNICIAN:  Good morning.  We're going
 2      on the record at 10:02 a.m. on Wednesday, June 20,
 3      2018.  Please note that the microphones are
 4      sensitive and make whispering, private
 5      conversations and cellular interference.  Please
 6      turn off all cell phones or place them away from
 7      the microphones, as they can interfere with the
 8      deposition audio.  Audio and video recording will
 9      continue to take place unless all parties agree to
10      go off the record.
11           This is the video-recorded deposition of
12      Donald Curtis taken by counsel for defendant in the
13      matter of Amy Dunn et al. versus Columbia National
14      Insurance Company filed in the U.S. District Court,
15      for the North District of Georgia, Gainesville
16      Division.
17           This deposition is being held at the Law
18      Offices of Fox and Chandler located at 125 Maple
19      Street in Gainesville, Georgia.
20           My name is Ervin Parkas from the firm Veritext
21      and I'm the videographer.  The court reporter is
22      Aurora Gutierrez from the firm Appalachian Court
23      Reporting.
24           I am not related to any party in this action,
25      nor am I financially interested in the outcome.
```

1      Counsel will now state their appearances and

2      affiliations for the record.

3           MR. DOLDER:  This is Rich Dolder here for

4      Mr. Patterson.

5           MR. ALEXANDER:  I'm Mark Alexander.  I'm here

6      on behalf of the plaintiffs in the case -- well,

7      the plaintiffs Amy Dunn, individually and as a

8      natural parent of Danielle Demonbreun and James

9      Dunn.

10           MR. RAPP:  Steve Rapp for defendant, Columbia

11      National Insurance Company.

12           VIDEO TECHNICIAN:  Will the court reporter

13      please swear in the witness.

14           RONALD CURTIS PATTERSON, having been first

15      duly sworn, was examined and testified as follows:

16           MR. DOLDER:  Can you please put on the record

17      that the witness will read and sign.

18           MR. ALEXANDER:  This is going to be the

19      deposition of Ronald Curtis Patterson taken in this

20      case pursuant to notice and pursuant to the

21      agreement of counsel.  The deposition is being

22      taken for all purposes permitted by the Georgia

23      Civil Practice Act.  And Mr. Patterson's counsel

24      has indicated he wishes to read and sign the

25      deposition.

```
 1            I assume all objections will be reserved --
 2       all objections except as to the form of the
 3       question will be reserved until such time as the
 4       deposition is sought to be used.
 5            MR. RAPP:  Fine with me.
 6                        EXAMINATION
 7  BY MR. ALEXANDER:
 8       Q    Mr. Patterson, my name is Mark Alexander.  I
 9  represent basically the Dunn Family, and I want to ask
10  you a handful of questions, sort of about your time
11  with Lawson Heating -- well, Lawson, is it Air
12  Conditioning and Plumbing?
13       A    Yes, sir.
14       Q    And your use of the truck and maybe some other
15  folks' use of trucks while at Lawson, okay?
16       A    Okay.
17       Q    I want to kind of backup and begin when you
18  started at Lawson.  Now, my notes reflect that you
19  began initially or were initially hired by Lawson
20  sometime in 2004.  Does that sound about right to you?
21       A    Yes, sir.
22       Q    And when you were initially hired by Lawson,
23  what was the position that you were hired for?
24       A    A plumber's helper.
25       Q    And when you were working for Lawson initially
```

```
 1    in 2004 as a plumber's helper, were you provided or
 2    assigned a truck or vehicle to use?
 3         A    No, sir.
 4         Q    Did you, though, often ride with other folks
 5    in Lawson vehicles to and from job sites?
 6         A    Yes, sir.
 7         Q    And was it a plumber's -- did I understand
 8    correctly that a plumber's foreman that basically
 9    had -- that was assigned a truck?
10         A    That's correct.
11         Q    And would they be the people that would drive
12    you around to the various job sites?
13         A    Yes, sir.
14         Q    Were there times when the plumber's foreman
15    would occasionally use the truck for personal use?
16              MR. RAPP:  Object to form.
17              THE WITNESS:  Yes, sir.
18              MR. ALEXANDER:  Okay.  What's the -- I just
19         want to make sure I correct the form of the
20         question if there's an issue.
21              MR. RAPP:  Sure.  Personal use is vague.
22         Q    (By Mr. Alexander)  Okay.  Well,
23    Mr. Patterson, do you understand -- what's your
24    understanding when I say personal use?  Do you
25    understand that to mean using it for something other
```

1    than a business purpose?

2        A    Yes, sir.

3        Q    Okay.  And so when I talk about other foremen

4    who you rode with using Lawson's truck for personal

5    use, I'm talking about using it for a matter other than

6    a business purpose for Lawson, do you understand that?

7        A    I do.

8        Q    Okay, wonderful.  And were there times when

9    you were riding with these other foremen in a Lawson

10   truck where they would use a truck for something other

11   than for personal use or other than a business purpose?

12       A    Yes, sir.

13       Q    And was that something that was generally

14   accepted by Lawson at that time, that foremen could use

15   the truck for personal use?

16       A    Yes, sir.

17       Q    And did you understand that Lawson provided a

18   truck to the plumbing foremen sort of as a perk of the

19   job?

20       A    Absolutely.

21       Q    Now, after you worked for Lawson, I see that

22   you had a stint with Hulsey Environmental?

23       A    That's correct.

24       Q    Did they provide you or assign you a truck at

25   that time?

```
 1        A      Eventually.

 2        Q      Okay.

 3        A      Not at the time of hiring.

 4        Q      Okay.  And when they assigned you -- when they

 5   eventually assigned you a truck, was that sort of

 6   similar to how it was with Lawson's foreman, that the

 7   truck was sort of a perk of the job?

 8        A      Absolutely.

 9        Q      Okay.  And then it looks like you had some

10   period of time working for Gainesville Mechanical?

11        A      Yes, sir.

12        Q      And then my notes look like they show that you

13   went back to work with Lawson a second time in about

14   June of 2012?

15        A      That's correct.

16        Q      Now, when you went back to work with Lawson in

17   June of 2012, did you interview for the job?

18        A      Yes, sir.

19        Q      Now, what was the job that you were

20   interviewing for?

21        A      Plumber's foreman.

22        Q      Okay.  Now, is that a little bit different

23   than the job you had initially with Lawson back in

24   2004?

25        A      Yes, sir.
```

1     Q    Okay.  Can you just briefly tell me what the

2  difference is.

3     A    It holds a lot more responsibility and skill

4  set is required.

5     Q    And did you obtain those additional skill sets

6  from 2004 to 2012 while you were working at Hulsey

7  Environmental and Gainesville Mechanical?

8     A    Yes, sir.

9     Q    And did you interview for the job?  Did I

10  already ask you that?  Did you go to an interview to

11  actually sit down and people from Lawson --

12     A    With Lawson, yes, sir.

13     Q    Okay.  I'm sorry.  And I'm talking about the

14  job in June 2012, the second time you worked for

15  Lawson?

16     A    That is correct.

17     Q    All right.  So did you interview with -- my

18  notes show maybe Matthew Poole and Ottie Rich?

19     A    That is correct.

20     Q    And did they ultimately hire you basically

21  that same day as a plumbing foreman in the commercial

22  plumbing department of Lawson?

23     A    That is correct.

24     Q    Now, did they provide you with any tools to

25  use?

1      A    Yes, sir.

2      Q    Okay.  Did you have tools of your own that you

3  would use for the job?

4      A    Yes, sir.

5      Q    Did you negotiate with them what the pay would

6  be, what your pay would be for Lawson?

7      A    Yes, sir.

8      Q    How did that go?

9      A    I was asking for a starting rate at $20 an

10  hour, $20 an hour.  They was trying to get me to go for

11  $18 or $19.  I believe it was $18.  I wasn't going to

12  go for that.  Mr. Poole said if you'll come on board

13  with us at the lower pay, I'll go ahead and give you a

14  truck off the bat.

15     Q    Okay.  And was that a truck that -- did he

16  indicate that that was going to be just a perk of the

17  job?

18     A    Absolutely.

19     Q    Now, in addition to providing you with the

20  truck -- and I'll talk about that in just a minute --

21  did Lawson also provide you with a cell phone as a perk

22  of the job?

23     A    Yes, sir.

24     Q    And did Lawson provide you permission to use

25  the cell phone for both business purposes and for some

1    personal calls or personal use?

2        A    Yes, sir.

3        Q    And was Lawson aware that you used the phone

4    for both business purposes and also some personal use?

5            MR. RAPP:  Object to form.

6            MR. ALEXANDER:  Okay.

7            MR. RAPP:  Calls for speculation.

8        Q    (By Mr. Alexander)  All right.  Well, you can

9    go ahead and answer this.  Was Lawson aware that you

10   used the phone for both business purposes and some

11   personal calls?

12       A    Yes, sir.

13       Q    And how did Lawson know that?

14       A    From the billing on cell phones for monthly.

15       Q    Okay.  So Lawson would get the bills and they

16   could see whether there were some personal calls on

17   there?

18       A    Yes, sir.

19       Q    Now, they -- kind of like the cell phone that

20   they provided you, did they -- when they provided you

21   this truck, did they provide you the truck as a perk of

22   the job for both business purposes and some personal

23   use?

24       A    Yes, sir.

25       Q    And was it just that you get to use a truck

1    and you just would show up in the morning and pick any

2    truck out of the fleet of trucks or was there a

3    specific truck that Lawson assigned to you?

4        A    Specific.

5        Q    And did they provide -- did they assign and

6    provide you that specific truck shortly upon your

7    beginning to work with them in June of 2012?

8        A    Yes, sir.

9        Q    And my notes look like that truck was a 2005

10   Chevy 2500 pickup truck; does that sound right?

11       A    Sounds right.  I'm not for sure the year of

12   the truck, but it was in that general area.

13       Q    And that's the truck that was specifically

14   assigned to you?

15       A    Yes, sir.

16       Q    Did they give you keys to the truck?

17       A    Yes, sir.

18       Q    Did they -- did you put the keys to the Chevy

19   pickup truck that was assigned to you on your key ring

20   with all your other personal keys?

21       A    That's correct.

22       Q    Is this the same truck that you used basically

23   every day from the time you started with Lawson for

24   about a year until the incident with the Dunns that

25   happened almost a year later?

```
 1      A     It is.
 2      Q     Would you just leave the truck at Lawson's, I
 3  guess, parking lot and drive your own car to Lawson and
 4  then use your truck, or how did that go?
 5      A     No, sir.  I drove that truck full-time from
 6  home to work, to job sites, from job sites to -- yes,
 7  sir, all the time.
 8      Q     Grocery stores occasionally?
 9      A     Yes.
10      Q     Okay.  And did you -- what about over the
11  weekends, would you drive the truck over the weekends?
12      A     Yes, sir.
13      Q     Take it home over the weekends?
14      A     Yes.
15      Q     Use it occasionally over the weekends?
16      A     Yes, sir.
17      Q     What about over holidays?
18      A     Yes, sir.
19      Q     Drive it home over the holidays?
20      A     Yes, sir.
21      Q     It's not a truck you would leave at Lawson,
22  for example, over the holidays or the weekends?
23      A     No, sir.
24      Q     And occasionally use it over the holidays?
25      A     Yes, sir.
```

```
 1        Q    Did you -- you mentioned that you had some
 2   personal tools that you used for the job.  Did you keep
 3   your personal tools in that truck that was assigned to
 4   you?
 5        A    Yes, sir.
 6        Q    Did you keep other personal stuff of yours,
 7   you know, in the truck that was assigned to you?
 8        A    Yes.
 9        Q    Did Lawson provide you with a gas card?
10        A    Yes, sir.
11        Q    And did -- when you used the truck over the
12   weekends or on personal errands, who paid for the gas?
13        A    Lawson's.
14        Q    Okay.  Because it was on the gas card that
15   you -- that they gave you?
16        A    That's correct.
17        Q    So you wouldn't go put your own gas in the
18   truck?
19        A    Absolutely not.
20        Q    All right.  Did anybody from Lawson ever tell
21   you you were spending too much on gas?
22        A    No, sir.
23        Q    Or ever criticize you for buying gas and using
24   the truck for some personal errands?
25        A    No, sir.
```

1          Q     When Lawson provided the truck or assigned the
2    truck to you, did they provide you the truck for your
3    convenience as well as Lawson's?
4               MR. RAPP:  Object to form.  Same, calls for
5          speculation.  You keep asking him why Lawson -- why
6          they did stuff.
7          Q     (By Mr. Alexander)   Let me ask you this way:
8    Are you aware of when Lawson provided you the truck?
9    Did they -- if they provided you the truck for both
10   your convenience and Lawson's?
11         A     Yes, sir.
12         Q     And did Lawson indicate to you that you were
13   to basically treat your respective vehicle as if it
14   were your own?
15         A     That's correct.
16         Q     Now, before this wreck happens -- this wreck
17   happens in June -- on June -- my notes say June 7,
18   2013.  Does that sound about right to you?
19         A     Yes, sir.
20         Q     Okay.  And when I say this wreck or this
21   accident, that's the accident that involves the Dunn
22   Family that occurred at WalMart.  Are you familiar with
23   what I'm talking about?
24         A     That's what I'm understanding, yes, sir.
25         Q     Okay.  And before that time, you had

1    permission from Lawson to use the truck assigned to you

2    for your personal use if you chose to do so?

3         A    Yes, sir.

4         Q    And did Lawson have knowledge that you

5    occasionally would use the truck for your personal use?

6              MR. RAPP:  Object to form.

7              THE WITNESS:  Yes, sir.

8              MR. ALEXANDER:  And the form is what?

9              MR. RAPP:  Exact same thing, does Lawson know

10        who, Lawson the company, how do they know?

11             MR. ALEXANDER:  I'm talking about -- okay.

12        Let me try to get to that a little bit.

13        Q    (By Mr. Alexander)  Does -- when I say Lawson,

14   Mr. Rapp, I think wants me maybe to give a little more

15   detail about who at Lawson has knowledge, okay?  So

16   when I talk about Lawson, I want to know if when you

17   were at Lawson from 2012 to 2013 as a plumbing foreman,

18   did you have some supervisors?

19        A    Yes, sir.

20        Q    And who were the people that were your

21   supervisors that you would report to?

22        A    Field supervisor would be Ottie Rich.

23   Plumbing manager would be Matthew Poole.

24        Q    Okay.  And did those people as well as other

25   managers or supervisors at Lawson have knowledge that

1    you were using the truck for personal use?

2         A    Yes, sir.

3         Q    Now, I saw some -- I think I saw some things

4    in your Interrogatories about that.  How -- can you

5    provide me an example or two of how either Mr. Poole or

6    Mr. Rich or other individuals who worked at Lawson were

7    aware that you would use the truck for personal use?

8         A    Yes, sir, I can.

9         Q    Okay.  Tell me a few.

10        A    For instance, I was building some porches on

11   some trailers that my daddy owns on the weekend, and

12   moving around some lumber, I accidentally backed into

13   one of the decks with the Lawson's truck, put a pretty

14   good dent about the rear fender.

15        Q    Okay.

16        A    Monday morning, I went straight in, told my

17   supervisor, Ottie Rich.  We stepped out and looked at

18   the truck.  He said, not a problem, don't worry about

19   it.

20        Q    Okay.  Did you tell him that you were using it

21   to build a deck --

22        A    Absolutely, yes, sir.

23        Q    -- over the weekend?

24        A    Just as I told you.

25             MR. ALEXANDER:  Do you have a few stickers for

1      me?

2          (Patterson Exhibit 1 was marked for

3      identification.)

4      Q    (By Mr. Alexander)  I'll show you what I've

5  put as Plaintiff's Exhibit No. 1.  And Mr. Patterson,

6  that is a picture of the truck -- my understanding is

7  that's a picture of the truck that you were driving the

8  night of this wreck.  Does that look about right to you

9  there at the WalMart?

10     A    Yes, sir.

11     Q    Okay.  Now, if you look, sir, down on the

12 left-hand bumper of the truck, it looks like there's a

13 little bit of a dent.  Do you see that?

14     A    Yes, sir.

15     Q    Is that what you're referring to?

16     A    In part, sir, yes, sir.

17         (Patterson Exhibit 2 was marked for

18     identification.)

19     Q    (By Mr. Alexander)  Okay.  I got a couple of

20 more pictures.  Let me show you Plaintiff's Exhibit 2.

21 Does that show kind of part of the dent that you're

22 talking about?

23         MR. DOLDER:  Can you repeat the question for

24     him, please.

25         MR. ALEXANDER:  Yes.  I'm going to make it a

1    little bit easier, too.  I'm going to try to make

2    it easier if I can find a Sharpie.

3         MR. DOLDER:  That's fine.  It's just the pause

4    in time.  I want to refresh him.

5    Q    (By Mr. Alexander)  All right.  So on

6    Plaintiff's Exhibit No. 1, is the dent -- you can see

7    part of the dent.  Is that right where my finger is

8    located?

9    A    Yes, sir.

10   Q    Okay.  And have I kind of circled that

11   accurately with the black Sharpie on Plaintiff's

12   Exhibit No. 1?

13   A    Yes, sir.

14   Q    Okay.  Now, on Plaintiff's Exhibit No. 2,

15   that's just a blow up of the same picture, okay?  Does

16   it also show part of that dent on Plaintiff's Exhibit

17   No. 2?

18   A    In the bumper, yes, sir.

19   Q    Okay.  And is it where I'm pointing with my

20   finger?

21   A    It is.

22   Q    And have I circled that correctly with the

23   Sharpie?

24   A    A little wide, but yes, sir.

25        MR. ALEXANDER:  All right.  I got a couple

```
1         more pictures that might help also.
2              (Patterson Exhibit 3 was marked for
3         identification.)
4         Q    (By Mr. Alexander)  Okay.  I know you got a
5    lot of pictures in front of you there, Mr. Patterson,
6    but I'm going to try to -- as you look at Plaintiff's
7    Exhibit No. 3, there's a picture of the truck on the
8    top and a picture of the truck on the bottom.  Are you
9    with me?
10        A    Yes, sir.
11        Q    Okay.  Now, I guess because of the angle, you
12   don't really see that dent on the top picture, do you?
13        A    No, sir.
14        Q    Okay.  But do you see it a little more on
15   the -- on Plaintiff's Exhibit -- on the bottom picture
16   of Plaintiff's Exhibit 3?
17        A    I see it clearly, sir.
18        Q    I tell you what, since I did a bad job
19   circling, why don't you just circle for me with the
20   Sharpie on Plaintiff's Exhibit Number 3, if you can.
21             MR. DOLDER:  Do you feel comfortable doing
22        that?
23             (At this time, the witness complies with
24        request.)
25             MR. ALEXANDER:  Perfect.
```

1              (Patterson Exhibit 4 was marked for

2       identification.)

3       Q     (By Mr. Alexander)  All right.  And then --

4   now, on Plaintiff's Exhibit No. 4, does that further

5   show the damage to the truck that was assigned to you

6   that was a result of your personal use of the truck

7   that you told Mr. Rich about?

8       A     That's correct.

9       Q     Okay.  Now, in addition to telling Mr. Rich

10  about using the truck to build a deck, did you also --

11  I saw something in here about using the truck and

12  showing the picture of using the truck to purchase a

13  four-wheeler for your son?

14      A     Repeat that, please.

15      Q     Sure.  What I'm looking at is some of your

16  Interrogatories, and they make reference to, it looks

17  like, an instant, for example, where you purchased a

18  four-wheeler as a gift for your son and you used

19  Lawson's truck to purchase the four-wheeler and then

20  you sent a picture of the four-wheeler loaded in the

21  truck to Ottie Rich and Matthew Poole and others?

22      A     And others, yes, sir.

23      Q     Okay.  And so when Matthew Poole and Ottie

24  Rich -- did you talk to them about that, too, by any

25  chance?  Did you tell them, you know, this is my son's

1  four-wheeler I got for a gift, something like that?

2      A    Yes, sir.

3      Q    Okay.  Did Matthew Poole or Ottie Rich or

4  anybody from Lawson ever tell you, hey, you shouldn't

5  be using that truck for personal use like hauling

6  around a four-wheeler for your son?

7      A    No, sir.

8      Q    What about things like -- did you use the

9  truck to -- did you ever coach your son in little

10 league sports or anything, coach ball?

11     A    Yes, sir.

12     Q    Would you take the truck to practice?

13     A    Yes, sir.

14     Q    Did anybody ever from Lawson tell you that's

15 something you couldn't do?

16     A    Never was told that, no, sir.

17     Q    Was that something that you attempted to hide

18 from Lawson?

19     A    By no means.

20     Q    Just pulled the truck up and parked right in

21 front?

22     A    That's correct.

23     Q    Let me just ask, where would y'all practice?

24     A    Some was at the field at Mt. Vernon Elementary

25 Jim Hood Road.

1     Q     Uh-huh?

2     A     A lot of the games were at Laurel Park and

3   other Hall County sports complexes.

4     Q     Sure.  And so for example, you would take the

5   truck to Laurel Park for games with your son and just

6   park it in the parking lot at Laurel Park?

7     A     Yes, sir.

8     Q     I also saw somewhere in here, was there a

9   period of time when you were laid off from Lawson?

10    A     Yes, sir.  I received temporary layoff with

11  Lawson.

12    Q     About when -- can you generally tell me when

13  that occurred?

14    A     I'm not understanding.

15    Q     That was the second time you were working for

16  Lawson?

17    A     Yes, sir.

18    Q     And that's when they had assigned you a truck?

19    A     Yes, sir.

20    Q     Okay.  And who talked to you about that, was

21  that Mr. Rich, Mr. Poole?

22          MR. DOLDER:  Talked to him about what?

23          MR. ALEXANDER:  About being laid off.

24          THE WITNESS:  Yes, sir, both, Poole and Rich.

25    Q     (By Mr. Alexander)  Okay.  And for about how

1    long were you laid off?

2        A    A couple of weeks, ten days, working days,

3    something like that.

4        Q    And what was the purpose of being laid off?

5        A    Lack of work.

6        Q    Now, during -- so they weren't going to keep

7    paying you during that period of time that you were

8    laid off?

9        A    They were offering the temporary layoff so I

10   could draw an unemployment check for the couple of

11   weeks until a job started up.

12       Q    Okay.  And during that period of time, did you

13   say okay, and give them back the keys to the truck?

14       A    No, sir.

15       Q    Was there -- did they talk to you about

16   allowing you to continue to use the truck?

17       A    Yes, sir.

18       Q    What did they tell you?

19       A    Take it home, we'll call you in a couple of

20   weeks, be ready to come back to work.

21       Q    Were they comfortable with you continuing to

22   use the truck during that period of time until they

23   called you back to work?

24            MR. RAPP:  Object to form.  The same -- this

25       is the same thing over and over again.  How does he

1     know if they were comfortable?

2     Q   (By Mr. Alexander)  Did they indicate to you

3 that you could continue to use the truck during this

4 period of time that you were being laid off until you

5 came back -- go ahead, take the truck home, you can

6 keep using it until we call you back?

7     A   That's correct.

8     Q   Okay.  So they were aware during this period

9 of time that you were laid off that you were going to

10 be continuing to use that truck?

11     A   Yes, sir.

12     Q   And they were comfortable with that?

13     MR. RAPP:  Object to form, same.

14     THE WITNESS:  Yes, sir.

15     Q   (By Mr. Alexander)  Now, in addition to

16 providing you with a truck, did Lawson also provide

17 trucks or assign trucks, specific trucks to other

18 foremen or supervisors?

19     A   Yes, sir, every -- yes, sir, foremen and

20 supervisors have company vehicles.

21     Q   Okay.  And they were assigned those vehicles

22 like you were assigned the vehicle?

23     MR. RAPP:  Object to form.

24     THE WITNESS:  Explain that a little bit.  I'm

25    almost following you.

1      Q     (By Mr. Alexander)  Okay, good.  Thanks for

2   clarifying that for me.  So, I don't know, I saw a list

3   somewhere that there were about maybe a little over 30

4   different vehicles assigned to different people.  Does

5   that sound about right to you?

6      A     Give or take the time of the year and what

7   kind of work is going on, yes, sir.

8      Q     Okay.

9      A     It very easily can be 30.

10      Q     So Lawson was assigning trucks to specific

11   individuals and it was more than just one or two or

12   three trucks?

13      A     Oh, yes, sir.

14      Q     It was a whole fleet of trucks?

15      A     Fleets.

16          MR. DOLDER:  Don't talk over each other.

17      Q     (By Mr. Alexander)  Okay.  And when they

18   were -- are you -- and did you know some of the other

19   people that Lawson had assigned a truck to?

20      A     Yes, sir.

21      Q     Okay.  And from your discussions with those

22   people, did they assign -- did Lawson assign a truck to

23   those other people as a perk of the job like they

24   assigned the truck to you?

25      A     Yes, sir.

1        Q    And did they also give a number of those

2   individuals cell phones to use?

3        A    Yes, sir.

4        Q    And did those other field supervisors and

5   foremen who had received cell phones from Lawson, did

6   they use those cell phones for both business purposes

7   and some personal calls?

8        A    I did.

9        Q    Okay.  Do you know if they did?

10       A    I know we had used -- I had spoken to other

11  foremen using company phones and it was after hours and

12  had nothing to do with work.  Other than that, I

13  couldn't tell you.  I don't really know what other

14  people do.

15       Q    Okay.  And let me ask you this:  The other

16  folks that Lawson had assigned trucks to other than

17  you, did Lawson also give them permission to use the

18  truck for some personal use as well as business use?

19       A    Yes, sir.

20       Q    And was Lawson okay with its drivers of those

21  trucks specifically assigned to them using the truck

22  for both business and some personal use?

23            MR. RAPP:  Object to form.

24            MR. ALEXANDER:  You can answer the question.

25            THE WITNESS:  Yes, sir.

```
 1      Q    (By Mr. Alexander)  Okay.  And are you aware
 2  of some examples when Lawson knew that other folks were
 3  using the truck for personal use?
 4      A    Yes, sir.
 5      Q    Okay.  Give me a for example.
 6      A    Of other trucks being used?
 7      Q    Sure.
 8      A    For instance, a fellow foreman in the plumbing
 9  field needed to borrow a tiller one spring --
10      Q    Okay.
11      A    -- to tiller up his garden.  My daddy has all
12  kinds of stuff like that.  Called my dad, dad said he's
13  welcome, come get it.  He come got it in Lawson's
14  truck, used it all weekend, brought it back on Sunday
15  afternoon in a Lawson's truck.
16      Q    Okay.  Did you -- I saw something about did
17  you ever see Matthew Poole -- I saw something about
18  after hours in Dahlonega in a Lawson vehicle.
19      A    No, sir, not Matthew Poole for sure.
20      Q    Okay.  Did you see somebody -- let me ask you
21  this:  I saw something in one of your responses that
22  said that you recall seeing Matthew Poole at a
23  drive-thru restaurant.
24      A    Oh, yes, sir.
25      Q    Okay.  And at the time, were you in a Lawson
```

1   vehicle after hours and Matthew saw you in Dahlonega at

2   the drive-thru?

3       A    We were in Gainesville.

4       Q    Okay.

5       A    And yes, sir.

6       Q    Okay.  So it was in Gainesville?

7       A    Yes, sir.

8       Q    But it was not for anything that had to do

9   with work?

10      A    I was getting a bucket of chicken at Kentucky

11  Fried Chicken.

12      Q    All right.  Was Matthew Poole at the Kentucky

13  Fried Chicken also?

14      A    No, sir.

15      Q    Where did he see you?

16      A    He was coming down the boulevard there.

17      Q    Did he see you?  I mean, how do you know he

18  saw you?

19      A    We have Nextel radios.

20      Q    Okay.

21      A    Chirped up, what are you doing, boy; getting a

22  bucket of chicken, coming from my daddy's, heading to

23  the house to feed the kids; see you in the morning.

24      Q    Did you see him as he went by?

25      A    I did.

1     Q     Was he also in a Lawson truck?

2     A     Yes, sir.

3     Q     Did other Lawson employees use trucks for

4     personal use like levelling ground for a Matthew Poole?

5     A     Yes, sir.

6     Q     And maybe even I saw something about burying

7     animals.

8     A     Yes, sir.

9     Q     Did Lawson have a problem with any of those

10    employees doing that?

11          MR. RAPP:  Object to form.

12          THE WITNESS:  Not that I'm aware of, no, sir.

13    Q     (By Mr. Alexander)  Did anybody at Lawson ever

14    tell you that you could not use the truck that was

15    assigned to you for personal use?

16    A     No, sir.

17    Q     Are you aware, Mr. Patterson, now, as we sit

18    here now that Lawson is saying it was against their

19    policy for you to use their truck for personal use at

20    any time unless approval had been granted by Lawson's

21    management?

22    A     I haven't had any contact with Lawson's

23    manager.

24    Q     Okay.  But are you aware that Lawson is saying

25    now, our position is that Mr. Patterson never had

1    permission to use the truck for personal use?

2         MR. RAPP:  Object to form.

3         THE WITNESS:  Clarify that one more time.

4    Q    (By Mr. Alexander)  I'll try.

5    A    Okay.

6    Q    Okay.  Now, I know we've talked about -- it

7    seems like you've indicated to me that you had used the

8    truck assigned to you for personal use and that other

9    people at Lawson had used trucks for personal use,

10   okay.  Now that all this litigation has begun and even

11   some of the litigation that happened or lawsuit that

12   happened after this wreck occurred, okay, are you aware

13   now that Lawson is taking a position that it was

14   against their policy to use their truck for your

15   personal use at any time unless you had gotten some

16   prior approval from Lawson's manager?

17   A    Is that what they're saying?

18   Q    I think that's what they're saying.  I'm

19   asking you if you understand that that's what they're

20   saying?

21   A    I understand that, but I haven't spoke with

22   any office management.  I haven't spoke with anybody,

23   them telling me that, but it's obvious that that's what

24   they're trying to say, yes, sir.

25   Q    Okay.  But no one -- had anybody before this

1    wreck ever communicated that policy to you?

2        A    It never came up.

3        Q    And to the extent, do you know was that

4    something that people who were assigned trucks were

5    following?  I can tell by the look on your face you

6    didn't quite follow that one.

7            MR. DOLDER:  Yeah.  I think -- I'm going to

8        object on vagueness.  It's the word "that".

9            MR. ALEXANDER:  All right.

10       Q    (By Mr. Alexander)  No one ever communicated

11   that policy to you?

12           MR. DOLDER:  Asked and answered.

13           MR. ALEXANDER:  All right.

14       Q    (By Mr. Alexander)  Well, let me ask you this:

15   Did you occasionally have safety talks with the

16   management or supervisors with Lawson where they would

17   go over some of your -- some of their policies with

18   you?

19       A    Yes, sir.

20       Q    Okay.  And I think I saw where you had to sign

21   like a little sign-in form when you have a safety talk?

22       A    That's correct, job box safety talks.

23       Q    All right.  And it looks like I had some of

24   them were on eye protection and hand operated tools and

25   back injury prevention.  Does that sound familiar to

1  you?

2      A    Yes, sir.

3      Q    During any of those safety box talks, did

4  anybody from Lawson ever express to you that anything

5  about your use of the truck for -- that you couldn't

6  use the truck for personal use?

7      A    In a safety meeting?

8      Q    Yes, sir.

9      A    No, sir.

10     Q    Were there any systems in place in Lawson if

11 you had to get approval to use the truck for personal

12 use, were there any systems in place that -- how you

13 would go about doing that?

14     A    Not that I'm aware of, no, sir.

15     Q    Was there any designated person that you were

16 aware of that you were supposed to contact if you

17 wanted to use the truck for personal use?

18     A    No, sir.

19     Q    Was there any list or log that you were aware

20 of at Lawson that would identify if and when Lawson

21 would give permission to use the truck for personal

22 use?

23     A    No, sir.

24     Q    All right.  Are you good, Mr. Patterson?

25     A    I'm good.

1      Q    All right.  When you first started with Lawson

2   in June of 2012, okay, during that initial period of

3   time when you started working as a plumbing foreman,

4   that's the period of time I want to talk about.  Did

5   either Ottie Rich or Matthew Poole have you sign a

6   bunch of paperwork before you started for HR purposes?

7      A    Yes, sir.

8      Q    Okay.  Do you recall all the different things

9   that they wanted you to sign?

10     A    I do not.

11     Q    Let me show you what I'm going to mark as

12  Plaintiff's Exhibit No. 5.  I got one for everybody.

13          (Patterson Exhibit 5 was marked for

14      identification.)

15          MR. DOLDER:  There we go.  Feel free to take

16      your time and look at that before you answer any

17      questions.

18     Q    (By Mr. Alexander)  I guess my first question

19  is, Mr. Patterson, do you remember if -- this looks

20  like it was dated June 13, 2012.  Do you know if this

21  was one of the papers that either Mr. Rich or Mr. Poole

22  wanted you to sign for HR purposes?

23     A    That's my signature, yes, sir.

24     Q    And so you think this may have been one of the

25  many pieces of paper that they had you fill out?

1     A    It looks like one, yes, sir.

2     Q    Now, there' -- in the second paragraph on that

3  page, it says:  I have read the policy manual and

4  safety manual belonging to Lawson Air Conditioning and

5  Plumbing, Inc.  Do you see that?

6     A    I do.

7     Q    Prior to June 13, 2012, did Lawson provide you

8  with any policy manual or safety manual to review and

9  read?

10     A    I don't recall ever seeing a safety manual

11  from Lawson's Heating and Air.

12     Q    Did -- so they didn't give you one and say,

13  hey, go back in this room and take a couple of hours or

14  however long you need to go read over this policy

15  manual?

16     A    No, sir.

17     Q    You just sort of signed some paperwork and

18  went to work?

19     A    That's correct.

20     Q    Did they give you any kind of safety manual or

21  policy to take home?

22     A    No, sir.

23     Q    Said here, take this home and read over it?

24     A    No, sir.

25     Q    When you were interviewed by Matthew Poole,

1   did Matthew Poole sit down with you and go over any

2   policy manual page by page as to what all the different

3   policies of Lawson were?

4        A    No, sir, he did not.

5        Q    When you were initially hired by Lawson, did

6   Matthew Poole, as it relates to the truck, go over with

7   you any policies to indicate to you that you could not

8   use the truck for personal use?

9        A    No, sir.

10       Q    Did he ever tell you at any time that you

11   could not take the truck to WalMart if you wanted to?

12       A    He did not.

13            MR. ALEXANDER:   I tell you what, we've been

14       going at it for about 45 minutes.  Let's take a

15       little break.

16            VIDEO TECHNICIAN:  Going off the record.  The

17       time is 10:46 a.m.

18            (Whereupon, there was a recess from 10:46 a.m.

19       to 10:56 a.m.)

20            VIDEO TECHNICIAN:  We're going back on the

21       record.  The time is 10:56 a.m.  Please continue.

22       Q    (By Mr. Alexander)  Okay.  Mr. Patterson, I

23   want to talk a little bit about the day of the accident

24   at WalMart, okay?  At the time that this accident took

25   place that involved the Dunns at WalMart, were you on

```
 1    any kind of painkillers?

 2        A    Yes, sir.

 3        Q    And why was that?

 4        A    I had broke -- I had what's called a boxer's

 5    fracture in my hand.  I injured my hand and was

 6    prescribed from the doctor the medication.

 7        Q    And so the medications that you were on were

 8    medications that had been prescribed to you?

 9        A    Yes, sir.

10        Q    Had you taken those medications the day that

11    this wreck occurred --

12        A    Yes, sir.

13        Q    -- or this accident occurred?

14             Did you think that those medications impaired

15    your ability to drive?

16        A    No, sir.

17        Q    Why did you plead guilty to the DUI offense?

18        A    Because the accident was a hundred percent my

19    fault.

20        Q    After the accident happened, okay, did you

21    speak with anybody from Lawson that weekend?

22        A    No, sir.

23        Q    Then did you go into work that Monday?

24        A    I did not.

25        Q    Why not?
```

```
 1      A     I was ashamed.

 2      Q     Now, did you speak with --

 3            MR. DOLDER:  Hold on one second.

 4            MR. ALEXANDER:  Sure.

 5            THE WITNESS:  It's good.

 6      Q     (By Mr. Alexander)  Did you speak with anybody

 7   from Lawson over the phone maybe the week after the

 8   wreck happened?

 9      A     Over the phone?

10      Q     Yes, sir.

11      A     I know I did in person.

12      Q     And was that Ottie Rich?

13      A     Yes, sir.

14      Q     Okay.  Now, I'm going to tell you this because

15   I don't want you to think I'm trying to trick you,

16   okay.  In the lawsuit that my clients filed against you

17   and Lawson, we talked to Ottie Rich and we asked some

18   questions and went through this process just like we're

19   doing with you, and we asked him if he talked to you

20   after this wreck occurred.  Are you with me?

21      A     Yes, sir.

22      Q     Okay.  And he said he did, he spoke with you

23   at your home?

24      A     That's correct.

25      Q     And then I asked him -- I talked to him about
```

1    when that took place, okay, and he indicated to me that

2    as best he could determine, that if the wreck happened

3    on Friday, June 7th -- are you with me?

4         A    I'm with you.

5         Q    -- then there -- the next week is that Monday,

6    June 10th, and Mr. Rich indicated to me that as best he

7    could tell, he caught up to you for the first time

8    about a week and a half to two weeks after June 10th.

9    Does that sound about right to you?

10             MR. DOLDER:  After June 10th or June 7th?

11             MR. ALEXANDER:  After June 10th.

12             THE WITNESS:  That sounds a little stretched

13        in days to my recollection.

14        Q    (By Mr. Alexander)  Okay.  What's your

15   recollection?

16        A    I would say, you know, my best recollection

17   would be that it was at the end of the following week.

18        Q    Okay.  So sometime the end of the week of

19   June 10th, as best you can recall?

20        A    I could be wrong --

21        Q    All right.

22        A    -- but yes.

23        Q    So it was -- whether you go by Mr. Rich's

24   recollection or your recollection, it was a good week

25   after the wreck took place that you first spoke to

```
1    somebody in person from Lawson?
2         A    Repeat that, please.
3         Q    Yeah.  And I'm sorry, I may be trying to
4    confuse you.  Right now I'm just talking about the
5    timing.
6         A    Uh-huh.
7         Q    Okay.  Let me back up each before I get to the
8    timing.  The first person that you spoke to from Lawson
9    after the wreck was Ottie Rich, as I understand it?
10        A    Yes, sir.
11        Q    And that's when he came out to your house?
12        A    Yes, sir.
13        Q    Okay.  And as best you can recall, that would
14   have taken place sometime in the latter part of the
15   week after the wreck occurred?
16        A    Yes, sir.
17        Q    Okay.  Now, when he came out to your house,
18   did he ask for your phone?
19        A    Yes, sir.
20        Q    And did you give him your phone?
21        A    I did.
22        Q    Did he ask for the gas card?
23        A    Yes, sir.
24        Q    And did you give him the gas card?
25        A    I did.
```

```
 1        Q     Did he ask for keys?

 2        A     Yes, sir.

 3        Q     And did you give him keys?

 4        A     I did.

 5        Q     And was that the first time -- when you met

 6   with Ottie Rich, whatever that time was when you gave

 7   him the keys and the gas card and the phone, was that

 8   the first time that you learned from Lawson that you no

 9   longer had permission to drive the truck that had been

10   assigned to you?

11        A     I don't remember that being even a topic.

12        Q     Okay.  But that's -- all right.  So that

13   wasn't even discussed?

14        A     No, sir.

15        Q     All right.  While you were working with

16   Lawson, did you have any other accidents in a Lawson

17   vehicle?

18        A     Yes, sir.

19        Q     And what happened with that?  What was the

20   nature of that accident?  What was that accident?

21        A     What was the incident itself?

22        Q     Yes, sir.

23        A     I hit a teenager on a skateboard.

24        Q     Now, was Lawson's insurance company involved

25   with that?
```

1      A     Yes, sir.

2      Q     And did the insurance company as far as you

3  know just handle that for you?

4      A     They did.

5      Q     Did the insurance company call you then or did

6  they just take care of it?

7      A     I spoke with someone from the insurance on the

8  telephone conference call.

9      Q     And basically did you just tell them what

10  happened?

11      A     I told them my side to the incident, yes, sir.

12      Q     And from there, they just handled it?

13      A     They handled it.

14      Q     Now, in this case, okay -- let me back up.

15  That's not clear.

16            You received -- did you receive -- you

17  received the lawsuit that my firm filed on behalf of

18  the Dunns against you and Lawson, it looks like about

19  April of 2014; does that sound right?

20      A     I suppose.

21      Q     Okay.

22            MR. DOLDER:  Well, don't guess.  If you don't

23      know, say you don't know.

24            THE WITNESS:  I do not know.

25      Q     (By Mr. Alexander)  You don't know the date?

1      A      I do not.

2      Q      Okay.  But you remember somebody coming out

3    and giving you a lawsuit?

4      A      I don't recall.

5      Q      Okay.  At some point in time after you had --

6    were gone from Lawson --

7      A      Yes, sir.

8      Q      -- okay, did you understand that there was a

9    lawsuit against you and Lawson?

10     A      Yes, sir.

11     Q      And did you understand kind of like the

12   skateboarding event, that Lawson or its insurance

13   company were just going to take care of that for you?

14     A      I had no doubt, yes, sir.

15     Q      Did anyone from Lawson ever contact you and

16   tell you that they would not take care of that for you?

17     A      No, sir.

18     Q      Did anybody from an insurance company ever

19   contact you and indicate to you that they would not

20   take care of that for you?

21     A      No, sir.

22     Q      You were under -- you believe they were just

23   handling it?

24     A      Yes, sir.

25            (Patterson Exhibit 6 was marked for

1      identification.)

2      Q    (By Mr. Alexander)  I'm going to show you a

3 letter that's dated August 22nd, 2013 that indicates

4 it's addressed to you.  I just want to ask you a little

5 bit about it, okay?  There you go.

6           So if this wreck took place in June of 2013,

7 this letter would have been written maybe a couple

8 months after that, August of 2013.  Did you get this

9 letter, what is Exhibit No. 7?

10           MR. DOLDER:  I think it's 6.

11           MR. ALEXANDER:  I'm sorry, 6.

12           THE WITNESS:  I did not receive this in the

13      mail.

14           (Patterson Exhibit 7 was marked for

15      identification.)

16      Q    (By Mr. Alexander)  Let me show you Exhibit

17 No. 7, which looks like it's a similar letter dated

18 September 13, 2013, about three weeks later.

19           MR. DOLDER:  Don't answer any questions on

20      that yet.  Do you have another copy?

21           MR. ALEXANDER:  Absolutely.

22           MR. DOLDER:  Thank you.  Let me see real

23      quick.

24      Q    (By Mr. Alexander)  Did you get a copy of that

25 letter, which is Exhibit No. 7?

1      A      No, sir.

2      Q      Mr. Patterson, at some point in time, did you

3  learn that the lawsuit that my clients brought against

4  you and Lawson, that Lawson was no longer a party or

5  your participating in that lawsuit?

6      A      As far as --

7      Q      That lawsuit was gone in the -- that Lawson

8  was gone from the lawsuit and now the lawsuit was just

9  against you?

10     A      Yes, sir.

11     Q      How did you feel about that?

12     A      Not very well.

13     Q      What do you mean?

14     A      I felt like I was hung out to dry.

15     Q      Did anybody from Lawson ever contact you and

16  notify you that they were no longer a part of the

17  lawsuit or were getting out of the lawsuit?

18     A      No, sir.

19     Q      Did anybody from the insurance company or any

20  insurance company ever contact you and tell you that

21  Lawson was getting out of the lawsuit?

22     A      No, sir.

23     Q      Or did anybody from the -- well, let me ask

24  you this:  After you learned that you were in the

25  lawsuit that my clients brought against you and Lawson

1    now by yourself -- are you with me?

2        A    Yes, sir.

3        Q    After you became aware of that, did you speak

4    with a lawyer from Atlanta or a lawyer from an

5    insurance company about wanting to represent you?

6        A    I did.

7        Q    And were you aware that they were hired by the

8    insurance company and wanting to represent you?

9        A    Yes, sir.

10       Q    And did you agree to have that lawyer

11   represent you?

12       A    No, sir.

13       Q    And why was that?

14       A    Because I didn't trust anybody at that point.

15       Q    Did you in the lawsuit that the Dunns brought

16   against you and Lawson that ultimately just became

17   against you, did you participate or go to any hearings

18   or depositions?

19       A    No, sir.

20       Q    Why not?

21       A    Because I was guilty of the accident.  I

22   didn't see anything that I could help or hurt.

23            MR. ALEXANDER:  I think that's all the

24       questions I have at this time.

25            MR. RAPP:  Okay.

```
 1                           EXAMINATION
 2   BY MR. RAPP:
 3       Q    Hi, Mr. Patterson, my name is Steve Rapp.  I
 4   represent Columbia National Insurance Company.  I'm
 5   going to go back a little bit.  Where do you live?
 6       A    6933 Keith Road.
 7       Q    Is that in Gainesville?
 8       A    It's in Clermont, Georgia.
 9       Q    Are you employed right now?
10       A    I am.
11       Q    Where do you work?
12       A    Ingram's Plumbing Contractors.
13       Q    Where is Ingram located?
14       A    Hilton Way, Gainesville, Georgia.
15       Q    How long have you been working for Ingram?
16       A    Five years, maybe.
17       Q    Was it the next job you got out of Lawson?
18       A    Yes, sir.
19       Q    Same position, are you a plumbing foreman
20   or --
21       A    That's correct.
22       Q    Do you have a car as part of that, a truck?
23       A    Yes, sir, I do.
24       Q    Was it -- is it provided by Ingram?
25       A    It is.
```

1      Q     What is it?

2      A     It's a 2000 -- I not sure the year, maybe '11

3  Chevrolet Silverado.

4      Q     Have you had the truck the whole time you

5  worked for Ingram?

6      A     Not this particular truck, no, sir.

7      Q     But you've had a vehicle the whole time you've

8  worked for them?

9      A     I have company vehicle, yes, sir.

10     Q     Do you have a personal vehicle, too?

11     A     I do.

12     Q     What kind of car is that?

13     A     It's a 2000 Chevrolet Silverado.

14     Q     Did you have the Chevy Silverado when you

15  worked at Lawson?

16     A     I did not.

17     Q     Did you have a personal vehicle when you

18  worked at Lawson?

19     A     We had one vehicle, a family vehicle, yes,

20  sir.

21     Q     Is that true for both different times you

22  worked for Lawson?

23     A     Excuse me?

24     Q     Did you have just one family vehicle during

25  both times that you were employed by Lawson?

```
 1      A    I don't recall in '04.  I don't recall.

 2      Q    How long did you work for Lawson the first

 3 time around in '04?

 4      A    Less than a year.

 5      Q    Okay.  Are you married?

 6      A    Yes, sir.

 7      Q    What's your wife's name?

 8      A    Michelle.

 9      Q    How long have y'all been married?

10      A    Almost 15 years.

11           MR. DOLDER:  Just don't ask him his

12      anniversary.

13      Q    (By Mr. Rapp)  Do you have any kids?

14      A    Yes, sir, we do?

15      Q    How many?

16      A    Four.

17      Q    What are their ages?

18      A    15, 13, 12, and 5.

19      Q    Busy house.  So we talked about when you were

20 hired by Lawson the second time.

21           (Patterson Exhibit 8 was marked for

22      identification.)

23           MR. DOLDER:  Could we go off the record for

24      one second.

25           MR. RAPP:  Sure.
```

1          VIDEO TECHNICIAN:  We're going off the record.

2      The time is 11:16 a.m.

3          (Discussion ensued off the record.)

4          VIDEO TECHNICIAN:  We're going back on the

5      record at 11:17 a.m.  Please continue.

6      Q    (By Mr. Rapp)  Mr. Patterson, you received

7  this the day you were hired in 2012, right?

8      A    This?

9      Q    Yes.

10     A    I've never seen this.

11     Q    You didn't go over it with Mr. Rich the day

12 you were hired?

13     A    No, sir.

14     Q    Didn't go over it with Mr. Poole?

15     A    No, sir.

16     Q    If Mr. Poole said he went over it with you,

17 you think he's lying?

18     A    Yes, sir.

19     Q    If you'll go down, see at the bottom right,

20 there's a bunch of numbers that say CP and then there's

21 numbers after it.  If you'll go to the one that ends

22 700, CP00700.  Do you see down there number H or letter

23 H, excuse me?

24     A    Yes, sir.

25     Q    And the first sentence says company trucks

1    will not be used for personal use at any time unless

2    approval has been granted my Lawson Air Conditioning

3    and Plumbing management.  Is that what if says?

4         A    It's what it says.

5         Q    Your testimony today under oath is that you've

6    never seen this document before?

7         A    I do not recall ever seeing this -- handed

8    this.

9         Q    You don't remember it, but it doesn't mean you

10   may not have had it, right?

11             MR. ALEXANDER:  I object.

12             THE WITNESS:  No, sir, I've never --

13             MR. DOLDER:  Yeah, talking over each other.

14             MR. RAPP:  Are you objecting?

15             MR. ALEXANDER:  Yes.  I object to it because I

16        think you guys are both talking at the same time.

17        I just want to make sure we had a clear record.

18        Q    (By Mr. Rapp)  You don't remember receiving

19   this, right?

20        A    That's correct.

21        Q    But it's possible that you received it, right?

22        A    I have never seen this.

23        Q    But it's possible you received it, right?

24        A    No, sir.

25             MR. DOLDER:  Objection.  Asked and answered.

1          You're badgering the witness.

2          Q     (By Mr. Rapp)   Mr. Alexander asked you about

3    the big stack of papers you got, right, and you were

4    just flipping through them the day you were hired.   Do

5    you remember that?

6          A     Yes, sir.

7          Q     It's not possible that this was in that stack

8    of papers?

9          A     No, sir.

10         Q     You're sure about that?

11         A     I'm sure.

12         Q     All right.   I'd like to get back to Exhibit 5,

13   if you can pull that out of your stack.   All right.   Do

14   you see the second paragraph there that says I have

15   read the policy manual and safety manual belonging to

16   Lawson Air Conditioning and Plumbing, Inc., do you see

17   that?

18         A     Yes, sir.

19         Q     And that's your signature, right?

20         A     Yes, sir.

21         Q     So you're telling me you lied when you signed

22   that piece of paper?

23         A     No, sir.

24         Q     Well, it says I have read the policy manual

25   and safety manage belonging to Lawson Air Conditioning

1    and Plumbing.  You're telling me you haven't, right?

2         A    That's correct.

3         Q    So that's not true, you had not read the

4    policy manual and safety manual, right?

5         A    That's correct.

6         Q    But you signed the paper anyway?

7         A    That's correct.

8         Q    Okay.  If you had a family vehicle when you

9    were hired by Lawson the second time, when would you

10   use it?

11        A    It was my wife's car.

12        Q    So you drove the Lawson truck exclusively?

13        A    Pretty much.

14        Q    Did you ever drive your wife's car?

15        A    Very seldom.

16        Q    There was some testimony earlier about your

17   cell phone that you were provided by Lawson.  Do you

18   remember that?

19        A    Yes, sir.

20        Q    And you said Lawson knew that you used it for

21   personal calls because of the numbers on your cell

22   phone bill?

23        A    Partly, yes, sir.

24        Q    Okay.  And how would Lawson know what numbers

25   were personal and what weren't?

1      A      If a bill come in that was extremely high, we

2  would critique it.

3      Q      We, as who?

4      A      Lawson's.

5      Q      Who at Lawson?

6      A      Management.

7      Q      Okay.  Did you ever --

8      A      Matthew Poole specifically.

9      Q      Did you ever critique a bill with Mr. Poole?

10     A      Not with him, but associated with the bill,

11  yes, sir.

12     Q      And that was your cell phone bill?

13     A      Yes, sir.

14     Q      And was there any discussion during that time

15  about you making personal calls on it?

16     A      The discussion was it needs to calm down.

17     Q      Did you tell him which numbers were personal

18  and which were work numbers?

19     A      No, sir.

20     Q      Did you tell him that there were personal

21  calls included in that bill?

22     A      Yes, sir.

23     Q      You testified earlier that someone told you to

24  treat the vehicle as your own.  Do you remember that?

25     A      Testifying earlier, yes, sir.

1    Q    Do you remember saying that someone at Lawson

2  told you that you were to treat the truck as your own?

3    A    Yes.  We were to treat the trucks with respect

4  as if they were our own, yes, sir.

5    Q    Okay.  That's what they said, treat the

6  vehicle with respect as if they were your own?

7    A    Yes, sir.

8    Q    Okay.  And who told you that?

9    A    Lawson's.

10   Q    Which person at Lawson?

11   A    I don't recall.

12   Q    Do you remember when that statement was made?

13   A    I do not.

14   Q    Was it the first time you worked for Lawson or

15  the second, any idea?

16        MR. ALEXANDER:  The first time he didn't have

17     a vehicle, I thought.

18        MR. RAPP:  That doesn't matter.

19        THE WITNESS:  I don't recall.

20   Q    (By Mr. Rapp)  Okay.  You also testified that

21  someone at Lawson gave you permission to use the truck

22  for personal use.  Do you remember that?

23   A    Yes, sir.

24   Q    Who told you that?

25   A    Matthew Poole at the point of hiring.  That

1    was a condition of me signing on at a lower rate per

2    hour.

3        Q    So Matthew Poole told you that you had

4    permission to use the truck for personal and work use?

5        A    Yes, sir.

6        Q    He used those words?

7        A    I don't recall those words.

8        Q    Do you recall what he said?

9        A    I do not.

10       Q    And that was sometime around when you got

11   hired?

12       A    That was the day of the interview, yes, sir.

13       Q    Okay.  Why do you think that he gave you

14   permission to use it for personal use when you don't

15   know what he said?

16       A    Because it was as a perk of the job.

17       Q    So you interpreted the fact that the car --

18   the truck was given to you as a perk of the job as if

19   you could use it for personal use?

20       A    No, sir.  I didn't interpret anything.  That's

21   the way it is.

22       Q    Did anyone ever tell you that?

23       A    Yes, sir.

24       Q    Mr. Poole told you?

25       A    Repeat.

1     Q    Mr. Poole told you that?

2     A    Told me what, sir?

3     Q    That you could use the truck for personal use?

4     A    Yes, sir.

5     Q    Okay.  But you don't remember what he said?

6     A    Not specifically to swear to, no, sir.

7     Q    But you're certain that he gave you permission

8 for personal use the day you were hired?

9     A    Yes, sir.  I was given the truck the day of

10 the interview right off the bat, no --

11     Q    I understand.

12     MR. DOLDER:  He's not -- are you finished with

13    your answer?

14     THE WITNESS:  No, sir.

15     MR. DOLDER:  Please finish.

16     THE WITNESS:  No, you know, probationary

17    period to see if you're up to the par of the job or

18    trustworthy or nothing like that.  I was very known

19    with the company and with the employees and

20    management throughout the field of the company,

21    very familiar.

22     Q   (By Mr. Rapp)  I understand that.  I've heard

23 you were a great employee, I think is what some of the

24 guys testified to.

25     So I understand that on the day you were

1   hired, you were given the keys and given a truck and

2   told you could go, but I'm still trying to get what was

3   said on that day about permission to use the truck for

4   personal use, not what was done, what was done.  Does

5   that make sense?

6        A    Yes, sir.

7             MR. DOLDER:  Objection.  Asked and answered.

8        Go ahead.

9        Q    (By Mr. Rapp)  Okay.  So what was said that

10   day?  Not that someone gave you the keys or gave you

11   the truck or everybody knew you were a good employee.

12   Who told you you had permission to use it for personal

13   use?

14             MR. DOLDER:  Objection.  Compound.

15             MR. RAPP:  You can answer.

16             THE WITNESS:  I don't recall.

17        Q    (By Mr. Rapp)  You testified that you drove

18   your truck to your kids' sporting events.  Do you

19   remember that?

20        A    Yes, sir.

21        Q    Do you know if anyone from Lawson ever saw you

22   drive your truck to a sporting event?

23        A    Not specifically, I do not.

24        Q    There's some testimony that you were laid off

25   from Lawson for ten days when Lawson had a lack of

1    work.

2        A    The ten days could have been a little more.

3    I'm not sure exactly -- recalling the exact amount of

4    days, but yes, sir.

5        Q    Of some period of time?

6        A    Yes, sir.

7        Q    And you testified that you were allowed to use

8    your truck during that time frame?

9        A    Yes, sir.

10       Q    Who did you talk to about using your truck

11   during that time?

12       A    Matthew Poole.

13       Q    And what did Mr. Poole tell you?

14       A    That we were going to have to take a temporary

15   layoff, set you up to draw unemployment until the job

16   kicks off, take the truck home, be ready to come back

17   to work when the job kicks off.

18       Q    Oh, he didn't tell you -- all he told you was

19   to take the truck home, right?

20       A    I don't recall exactly his words.

21       Q    He didn't say anything else other than what

22   you just told me, right?

23            MR. DOLDER:  Asked and answered.

24            (Patterson Exhibit 9 was marked for

25       identification.)

1      Q     (By Mr. Rapp)  Do You want to take a minute to

2   look through.  If you're ready, I'm ready.

3      A     Let's do it.

4      Q     Okay.  Exhibit 9 is responses to

5   Interrogatories, which are questions that we can ask in

6   written form, and these are your responses to those,

7   okay?

8      A     Yes, sir.

9      Q     Will you look through these and tell me if

10  you've ever seen this document before?

11     A     Yes, sir, I have.

12     Q     Okay.  Did you help answer the questions?

13     A     Yes, sir.  I just -- I've read through it and

14  I've seen some about everything, but it's a lot of

15  legal hogwash.  I don't know how to really --

16     Q     It's hard to read, isn't it?

17     A     Yes, sir.

18     Q     Do you think you saw these before April 5th of

19  this year?

20     A     April 5th of this year, no, sir.

21     Q     You saw them recently?

22     A     Yes, sir.

23     Q     Do you remember giving -- never mind.  Never

24  mind.  I'm not going to ask you that.

25            Will you go to page 3 of 30, please.  Are you

1    there with me?

2         A    Yes, sir.

3         Q    Okay.  Let's start from the top.  The second

4    sentence says:  Lawson personnel and management saw

5    Mr. Patterson using the truck during nonworking hours

6    from time to time.  Do you see that?

7         A    I do.

8         Q    And then after it, there's an example.  Do you

9    see that?

10        A    I see it says for example, yes, sir.

11        Q    Okay.  All right.  Well -- so what I want to

12   do is I want to go through these, but I wanted to know

13   who saw you using the truck during nonworking hours and

14   when.

15        A    Okay.

16        Q    So here's what I'm going do.  I'm going to go

17   through some of these examples on here and then I'd

18   like to know if there are other ones, okay, other

19   examples, all right?

20             So the first one, it says:  For example, he

21   recalled seeing Matthew Poole at a drive-thru

22   restaurant after work hours.  We talked about that,

23   right?  That was when you were getting the bucket of

24   chicken?

25        A    It was mentioned, yes, sir.

1      Q     Okay.  And that's the incident that's

2  referenced in that sentence, right?

3      A     I suppose, yes, sir.

4      Q     And that was Mr. Poole that saw you?

5      A     Yes, sir.

6      Q     Mr. Poole wouldn't know if you had permission

7  to use the truck to go get a bucket of chicken, would

8  he?

9      A     I can't answer that.  I'm not sure.

10     Q     The next one says:  Another time he used the

11  truck to go on the weekend to go to Dahlonega on

12  personal business and happened to see another member of

13  management.

14     A     Yes, sir.

15     Q     Who was the member of management you saw?

16     A     I do not recall.

17     Q     Do you know when that was?

18     A     It would be too vague of a guess, no, sir.

19     Q     Did -- well, if you don't know the person or

20  the time, I'm assuming you don't know if that person

21  actually saw you?

22     A     I couldn't tell you if he saw me.  I wouldn't

23  -- no, sir, I couldn't know if you told me.

24     Q     And you said he was driving a Lawson vehicle

25  too?

1    A    Yes, sir.

2    Q    The same kind of truck?

3    A    No, sir.

4    Q    Different?

5    A    Yes, sir.

6    Q    Is it possible that he had permission to drive

7  his truck to Dahlonega on personal business?

8    A    I don't -- I can't answer that.

9    Q    It's possible, right?

10   A    You said that.

11   Q    Well, you would agree with me, right, he could

12 have asked and received permission from someone at

13 Lawson?

14   A    I guess.

15   Q    The next one is -- it says:  Lawson laid off

16 Mr. Patterson.  That's what we just talked about,

17 right?

18   A    Yes, sir.

19   Q    The next one says -- that I want to go to,

20 the second sentence of the next paragraph, it says:

21 Mr. Patterson told Lawson personnel and management that

22 he used the truck for personal purposes.  And then the

23 first example under it is the four-wheeler discussion

24 that you had with Mr. Alexander.  Do you remember that?

25   A    I do.

```
1        Q    Okay.  So do you know when that occurred?

2        A    I do.

3        Q    When was that?

4        A    It was in the two weeks of Christmas Day.

5        Q    In 2012?  It would have to be '12, right?

6        A    It would have to be, yes, sir.

7        Q    Did you actually talk to anyone about it or

8   did you just send them a picture like it says here?

9        A    There was text along with a multimedia.

10       Q    So you sent a text to someone at Lawson?

11       A    To everybody in the plumbing division.

12       Q    Okay.  And would that have included Mr. Rich

13  and Mr. Poole?

14       A    Yes, sir.

15       Q    Did you send a picture of the four-wheeler on

16  the truck?

17       A    Yes, sir.

18       Q    What did you say in the text?

19       A    I don't recall, something about what I got for

20  Jay Beau for Christmas.

21       Q    Is Jay Beau your son?

22       A    That's my middle boy, yes, sir.

23       Q    Okay.  Did Mr. Rich or Mr. Poole respond to

24  the text?

25       A    I'm sure they -- yes, sir.
```

1     Q    Do you remember what they wrote?

2     A    Something in regards to great job, Merry

3  Christmas, have a good holiday, and that's, you know,

4  vague memory.

5     Q    Next example there is what you talked about

6  earlier about helping do some work on your dad's porch.

7  Do you see that?

8     A    Yes, sir.

9     Q    And you took the truck into work and showed

10  Mr. Rich the dent, right?

11     A    I sure did.

12     Q    And he said don't worry about it?

13     A    He sure did.

14     Q    Don't worry about the dent, right?

15     A    No problem.

16     Q    Any other examples of Lawson personnel and

17  management seeing you using the truck during nonworking

18  hours from time to time?

19     A    No, sir.

20     Q    There's -- on the next page, on page 4, it

21  says that you saw and had knowledge of others at Lawson

22  using Lawson vehicles for personal purposes.  Do you

23  see that?

24     A    I see it.

25     Q    And then it says, for example, James Brown

1   uses Lawson truck on a Saturday to borrow a tiller from

2   Mr. Patterson's dad.  Do you see that?

3       A    Yes, sir.

4       Q    Do you know one way or the other if James

5   Brown had permission from Lawson management to use the

6   truck that day?

7       A    I do not.

8       Q    The next one says Juan used his Lawson truck

9   to borrow Lawson's tractor to level ground for his own

10  Matthew Poole.  Do you know when that occurred?

11      A    No, sir.

12      Q    Do you know one way or the other if Juan had

13  permission from management at Lawson to use the tractor

14  to level the ground for his Matthew Poole?

15      A    I do not.

16      Q    And the next one says Dusty Bryson used Lawson

17  vehicle to bury dead animals.  I have to ask how did he

18  do that?

19      A    Yes, sir.  Mr. Jeff Dale was a big manager,

20  probably a vice-president at the time at Lawson's, had

21  some, I want to say it's Billy goats, lambs something.

22  One passed and he wanted to dispose of the carcass

23  before his child, if I remember correctly, daughter,

24  somebody seen it.  So he paid Dusty to use the company

25  vehicle and the company equipment to go bury it on his

1   property.

2        Q    And same question as the other ones, do you

3   know one way or the other if Dusty got permission from

4   someone at Lawson management to use the vehicles to do

5   the burying?

6        A    No, sir, I don't know.

7        Q    Are there any other examples of Lawson

8   employees using their vehicle for personal use that we

9   hadn't just gone over that you can think of?

10       A    No, sir.

11       Q    You mentioned earlier that on the day of the

12  accident, you were taking medication.  Do you know what

13  the medication was?

14       A    I don't recall.  It was -- no, I don't.

15       Q    You said it was to help you with a boxer's

16  fracture?

17       A    That's what -- yes, that was the jury.

18       Q    How did you get the boxer's fracture?

19       A    I punched a pine tree.

20       Q    Why did you do that?

21       A    I can't recall.

22       Q    After the accident on June 7th, 2013, did you

23  still take that medication?

24       A    I don't recall.  Yes, sir.

25       Q    Do you know how long you took it?

```
 1      A     No, sir.

 2      Q     Do you think it was weeks or months or --

 3      A     No, sir.

 4      Q     -- you don't know?

 5      A     No, sir.  It wouldn't have been months.

 6      Q     Just till your hand healed up?

 7      A     Yeah.  Till I followed up with a doctor, yes,

 8  sir.

 9      Q     The accident happened June 7th, 2013, right?

10      A     Yes, sir.

11      Q     That was a Friday night?

12      A     Yes, sir.

13      Q     Earlier that day, you were working for Lawson

14  on a job at North Hall High School, right?

15      A     I believe so, yes, sir.

16      Q     And you would normally get to work about 7:00;

17  is that right?

18      A     No, sir.

19      Q     What time did you normally get to work?

20      A     I was never later than a quarter till early.

21      Q     6:45?

22      A     Minimum, latest.

23      Q     So you worked till 3:30?

24      A     If that -- yes, sir, that's the general hours.

25      Q     So the day of the accident, 6:45 to 3:30 or
```

1    4:00, is that about right?

2        A    That job was on a big push.  That job was

3    requiring a lot of man hours.  I can't answer that.  I

4    would have to pull the record on that.

5        Q    If the record show that you worked for nine

6    hours that day, would that be about right?

7        A    Yes, sir.

8        Q    And when you got done, you went and picked up

9    the check, right?

10       A    Yes, sir.

11       Q    Did you get paid every Friday or every other

12   Friday?

13       A    Weekly.

14       Q    Okay.  So on Fridays when you got done work,

15   did you always go grab your check?

16       A    Yes, sir, or if we was pulling long hours,

17   they had been brought to me.

18       Q    Who did you pick up your check from?

19       A    It's the office.

20       Q    Okay.  Accounting department or something?

21       A    There's mailboxes, assigned mailboxes.

22       Q    So when you got finished with the job on

23   June 7th, you drove back to Lawson's office?

24       A    I'm not -- I can't recall.  It could have been

25   a day that they were brought to us.  I remember that

```
 1    job now.  It was a very pressed job.
 2        Q    So it's possible someone brought you your
 3    check?
 4        A    It's possible, yes, sir.
 5        Q    Where did you go after you got your check that
 6    day?
 7        A    I don't recall.
 8        Q    Did you eat dinner that night?
 9        A    Most likely, yes.
10        Q    Do you know where?
11        A    I do not.
12        Q    At some point you picked your son up, right?
13        A    That's correct.
14        Q    Do you know where you picked him up?
15        A    Our home.
16        Q    So you went home at some point?
17        A    Yes, sir.
18        Q    But not sure when?
19        A    No, sir.
20        Q    Why did you go pick up your son?
21        A    No specific answer.
22        Q    You don't know?
23        A    He's my boy.  They stay with me all the time.
24    It could have been anything.
25        Q    You just took him to ride with you?
```

```
 1      A     Yes, sir.

 2      Q     Who how old was he then?

 3      A     How many years has that been now?

 4      Q     A little over five.

 5      A     So he was around ten.

 6      Q     Okay.  And where did you go after you got your

 7  son and left home?

 8      A     Oh, yes, sir, we went and we did, that is

 9  correct.  We ate at Arby's that evening, that is

10  correct.

11      Q     So just you and your son or the whole family?

12      A     Just me and my son.

13      Q     So you left work, at some point went home,

14  picked up your son and went to Arby's for dinner?

15      A     Yes, sir.

16      Q     What about after Arby's, where did you go?

17      A     To WalMart.

18      Q     Okay.  Did you go in WalMart?

19      A     No.  We hadn't made it in, no, sir.

20      Q     Okay.  And in the video I see you were kind of

21  parked in front of the WalMart.

22      A     Yes, sir.

23      Q     What were you doing kind of idle there?

24      A     I was talking with my son and, you know,

25  conversating with him, figuring out -- he was wanting a
```

1   particular -- I can't even remember what brand it was,

2   Big Tens, some kind of hot topic toy at the time, you

3   know.

4        Q    So you had gone to WalMart with your son to

5   get him a toy or something?

6        A    That's correct, a reward.

7        Q    But you hadn't parked the car yet?

8        A    Not parked and got out, no, sir.

9        Q    You said it was a reward for him?

10       A    Yes, sir.

11       Q    What had he done?

12       A    There's no telling.  They're so great.  They

13   get them all the time.  I mean, you could file it.

14       Q    Okay.  And when you hit the Dunns, were you

15   going to park?

16       A    Yes, sir.

17       Q    And you hit them right around 10:55 at night;

18   is that right?

19       A    If that's the record, yes, sir.

20       Q    I can get it real quick.

21            (Patterson Exhibit 10 was marked for

22       identification.)

23       Q    (By Mr. Rapp)  I'm going to hand you

24   Exhibit 10.  This is the accident report from that

25   night?

1    A    Yes, sir.

2    Q    Okay.  I just want to -- if you look up the

3  top here, there's a thing that says time.  Do you see

4  it says 22:55?

5    A    Yes, sir.

6    Q    So 10:55 at night.  Does that refresh your

7  recollection as to when the accident occurred?

8    A    I would say it was earlier than that, but I

9  guess that might be what time that they put down.  I'm

10  not sure.

11    Q    If you go to the third page of the accident

12  report, there's a little paragraph at the top, a

13  description.  If you don't mind, just read that for me

14  and then I want to ask you a question when you're done

15  reading it, okay?

16    A    Okay.

17    Q    Is that how you recall the accident happening?

18    A    No, sir.

19    Q    Tell me what is wrong with that description.

20    A    I did not see anybody.  It was a very freak

21  accident, and I regret it more than a lot of things in

22  my life.

23    Q    Okay.  And it says in the description that you

24  were arrested for DUI of drugs.  Do you see that?

25    A    Yes, sir.

1     Q    Were you taken to jail that night?

2     A    I was.

3     Q    How long were you in jail after that?

4     A    Eight hours, approximately.

5     Q    Did someone pay a bond to get you out?

6     A    That's correct.

7     (Patterson Exhibit 11 was marked for

8  identification.)

9     MR. DOLDER:  Oh, I'm sorry.

10     MR. RAPP:  That's all right.

11     Q   (By Mr. Rapp)  Mr. Patterson, I'm handing you

12  Exhibit 11.  The first page is the certification.  I'm

13  more interested in the second page.

14     A    Yes, sir.

15     Q    If you don't mind flipping there.  You were

16  eventually charged as a result of the accident that

17  we're talking about with reckless driving, DUI drugs

18  and DUI endangerment of a child under the age of 14,

19  right?

20     A    Repeat that.

21     Q    Sure.  So do you see number two right here?

22     A    Uh-huh.

23     Q    You were eventually charged with those three

24  crimes, right?

25     A    No, sir.

1        Q     Tell me what's wrong about that.

2        A     What's wrong?

3        Q     Well, let me ask you this way:  That's your

4   signature at the bottom right, right --

5        A     Correct.

6        Q     -- under defendant?  And this is the plea deal

7   that you struck with the prosecutor, right?

8        A     What is the plea deal?  I'm not understanding

9   you.

10        Q     Okay.  Let me ask you this:  After the

11   accident, you were charged with certain crimes by the

12   prosecutor, right?

13        A     Yes, sir.

14        Q     And eventually you pled guilty to some of

15   them, right?

16        A     Yes, sir.

17        Q     Okay.  And this document is you acknowledging

18   that you were pleading guilty to two of those charges,

19   right?

20        A     Yes, sir.

21        Q     Okay.  That's all I wanted to know, okay?

22        A     Okay.

23              MR. DOLDER:  Are you at a good segway?

24              MR. RAPP:  Sure.  We can take a break.

25              VIDEO TECHNICIAN:  Going off the record.  The

1     time is 11:50 a.m.

2          (Discussion ensued off the record.)

3          (Lunch recess from 11:50 a.m. to 1:02 p.m.)

4          VIDEO TECHNICIAN:  We're going back on the

5     record.  The time is 1:02 p.m.  please continue.

6     Q    (By Mr. Rapp)  Mr. Patterson, you testified

7     earlier that at some point you became aware that the

8     Dunns had sued you and Lawson for injuries from the

9     accident, right?

10    A    Yes, sir.

11    Q    Do you know when you figured that out?

12    A    I don't.

13    Q    Okay.  Do you know how you learned that?

14    A    From court papers, I guess, in the mail.

15    Q    Okay.  So do you think -- I know you mentioned

16    earlier you didn't remember if you received a copy of

17    the Complaint.  Is that what it would have been?  Do

18    you know what court papers you received?

19    A    I turned them all in.  You should have them.

20    Q    Okay.  So just something came in that you saw

21    your name on the --

22    A    Yes, sir.

23    Q    -- first page?  But you don't know when that

24    was?

25    A    Specific date, I do not.

1      Q    Do you know if it was in 2017, 2016, '15.  Can
2  you give me a year?
3      A    I mean, I can't deny what the paper say.
4  Whatever they say there is the date it was.
5      Q    Did you -- you didn't contact Lawson when you
6  got the papers, right?
7      A    No, sir.
8      Q    You didn't contact Columbia National Insurance
9  Company, did you?
10     A    No, sir.
11     Q    Did you contact anybody when you started
12  getting those court papers?
13     A    No, sir.
14     Q    At some point in 2016, did you get a call from
15  a lawyer named Mike Rust?
16     A    I don't remember that name.
17     Q    Okay.  How about David Sawyer?
18     A    I don't remember the name.
19     Q    Okay.  But you'll agree that in 2016, you got
20  a call from a lawyer who said he'd been hired to
21  represent you in the lawsuit that you were getting
22  court papers for, right?
23     A    If that is after the date of me being the sole
24  name on there, then yes, sir.
25     Q    Okay.  When you said being the sole name, you

1    mean being the defendant in that case where you were

2    getting the court papers?

3        A    I mean, it only had Ronald Curtis Patterson on

4    it.

5        Q    Sure.

6        A    That's what I mean.

7        Q    Okay.  So down there -- this is from a

8    different case.  Did it look like this, the Court

9    papers?

10       A    Yes, sir, similar to that.  My eyes aren't

11   real good.

12       Q    No, that's fine, but your name was the one

13   underneath where if said defendant?

14       A    Yes, sir.

15       Q    Okay.  But you're not sure when that

16   happened --

17       A    No, sir.

18       Q    -- when you first figured that out?

19            Did you know that you were the only defendant

20   from looking at it or did somebody tell you?

21       A    From looking at it.

22       Q    Okay.  Did it look different than the other

23   court papers you had got?

24       A    They're all hard for me to understand, so you

25   know....

1    Q    But something in the paper that you got made

2  you think that you were the only defendant in the case?

3    A    Yes, sir.

4    Q    Okay.  And then you got a call from a lawyer

5  who said he was hired to defend you in that case,

6  right?

7    A    Yes, sir.

8    Q    And you talked to him a little bit, right?

9    A    No, sir, on the telephone.

10    Q    That's what I mean.  You talked to him on the

11  phone, right?

12    A    Yes, sir.

13    Q    And scheduled a meeting to go in and talk to

14  him, right?

15    A    No.  I refused to meet with him.

16    Q    Okay.  And tell me why you refused to meet

17  with him?

18    A    Because at that point, I didn't see anybody

19  that I could trust.  I didn't feel like I was -- I was

20  scared to talk to anybody.

21    Q    And why did you feel like you couldn't trust

22  anybody?

23    A    Well, because initially, you know, everybody

24  was taking care of everybody as far as the insurance or

25  whatever in the case, just like the previous time.  Now

1    I'm out there on my own, the sole name on there and I

2    didn't know if they were there to trick me or to hurt

3    me or to help me.

4        Q    What made you think they weren't calling to

5    take care of you, like they said they were going to

6    defend you?

7        A    Just the way I felt.

8        Q    Okay.  For no other reason than your name was

9    the only one on the defendant?

10       A    Yes, sir.

11       Q    Okay.  So then when -- you testified before

12   that you had had an accident and Lawson and the

13   insurance company took care of it for you?

14       A    Yes, sir.

15       Q    And the insurance company was trying to take

16   care of it for you this time, right?

17       A    I'm not sure who it was.  All I know is it was

18   someone I had never met before.

19       Q    Okay.  And so you refused to meet with the

20   lawyer that said he'd been hired to represent you in

21   the case?

22       A    Yes, sir.

23       Q    Did you live at 301 Lake Hill Drive in

24   Gainesville in 2016?

25       A    Yes, sir, or '17, '18, yes, sir.

```
 1              (Patterson Exhibit 12 was marked for
 2       identification.)
 3       Q    (By Mr. Rapp)  Exhibit 12 is a letter dated
 4  February 26, 2016.  It's addressed to you at 301 Lake
 5  Hill Drive.  Do you see that?
 6       A    Yes, sir.
 7       Q    That's where you were living at the time?
 8       A    February 26th, yes, sir.
 9       Q    Okay.  And so do you remember receiving this
10  letter?
11       A    They all look the same.
12       Q    Okay.
13       A    Specifically, no, sir.
14       Q    Okay.  Do you have any reason to believe you
15  didn't receive it?
16       A    No, sir.
17       Q    Okay.  In the third paragraph down, the very
18  last part of the last sentence, it says:  Columbia
19  National Insurance Company has agreed to provide a
20  defense for you in the above-referenced case.  Do you
21  see that?
22       A    Yes, sir.
23       Q    And that is the first time since the accident
24  that you had heard directly from Columbia Insurance
25  Company, right?
```

```
 1       A     I don't recall reading this, so I have to say
 2   no.
 3       Q     Okay.  So you think you'd spoken or heard from
 4   someone from Columbia Insurance Company before
 5   February 2016?
 6       A     No, sir.
 7       Q     Okay.  So if you received this letter, that
 8   would have been the first time you heard from Columbia,
 9   right?
10       A     I don't recall reading this letter.
11       Q     Okay.  But you live at 301 Lake Hill -- you
12   lived at 301 Lake Hill Drive, right?
13             MR. DOLDER:  Asked and answered.
14       Q     (By Mr. Rapp)  Well, we're going to go through
15   a whole bunch of letters.  So do you remember receiving
16   any letters about the lawsuit?
17       A     I do.
18       Q     Okay.  You'll agree with me that in
19   Exhibit 12, Columbia National Insurance Company was
20   offering to defend you in the lawsuit that you were
21   receiving court papers for, right?
22             MR. DOLDER:  I'm going to object on the rule
23        of completeness because you left out the large
24        number of conditions to that.
25             MR. RAPP:  Okay.
```

1    Q    (By Mr. Rapp)  I'm going to read this sentence

2   to you, okay?  You'll agree that this sentence is in

3   the letter dated February 26th:  Even though there are

4   provisions in the policy that may restrict or preclude

5   coverage for the claim and/or damages asserted, subject

6   to the following reservation of rights and subject to

7   all the terms and conditions of the Columbia National

8   Insurance Company policy, until further notice,

9   Columbia National Insurance Company has agreed to

10  provide a defense for you in the above-referenced case.

11  Does the letter say that?

12       A    The letter makes no sense to me.

13       Q    Okay.

14       A    You read it.

15       Q    Okay.  Do you understand that in a lawsuit, if

16  you get sued, you get to be defended by a lawyer?

17       A    Yes, sir.

18       Q    Okay.  And in your criminal case, did you have

19  a lawyer that defended you?

20       A    No, sir.

21            (Patterson Exhibit 13 was marked for

22       identification.)

23       Q    (By Mr. Rapp)  Mr. Patterson, Exhibit 13 is a

24  letter dated March 1st, 2016.  Do you see that?

25       A    Yes, sir.

1    Q    And it's addressed to you at 301 Lake Hill

2  Drive?

3    A    Yes, sir.

4    Q    Do you remember receiving this letter?

5    A    No, sir.  It looks just like the previous

6  letter.

7    Q    And you're not sure if you ever reviewed it

8  before?

9    A    Excuse me?

10   Q    You're not sure if you ever received this

11  letter?

12   A    I don't understand what you said.

13   Q    You're not sure if you ever got this letter in

14  the mail?

15   A    In the mail?

16   Q    Yeah.

17   A    I'm not sure, no, sir.

18   Q    Okay.  And this is a letter from a lawyer for

19  Columbia National Insurance Company, right?

20   A    Strickland & Schwartz is what I see, sir.

21   Q    And in the second paragraph, it says:  This

22  law firm has been retained by Columbia National

23  Insurance Company with respect to the coverage issues

24  which exist under the above-referenced policies.  Do

25  you see that?

1      A      I see it.

2      Q      Okay.  And then the next sentence says:

3  Columbia National Insurance Company has received a

4  notice of the above-referenced lawsuit which has been

5  filed against you.  Do you see that?

6      A      Yes, sir.

7      Q      So you agree this is from Columbia National

8  Insurance Company, right?

9      A      No, sir.

10     Q      What makes you say that?

11     A      It's got a Strickland & Schwartz letterhead.

12     Q      Did you understand that this came from a

13  lawyer that represents Columbia National Insurance

14  Company?

15     A      People say a lot of things, sir.

16     Q      Is that a yes or a no?

17            MR. DOLDER:  It's an answer.  You're being

18     argumentive.

19            MR. RAPP:  Well, I'll ask again.

20     Q      (By Mr. Rapp)  Did you understand that this

21  came from a lawyer who represented Columbia National

22  Insurance Company?

23     A      People say a lot of things, sir.  It stated a

24  lot of things, I suppose.

25     Q      Okay.  So what -- it says what it says, right?

1      A      Correct.

2           MR. ALEXANDER:  Before you go in the substance

3      of this document, has this been produced?

4           MR. RAPP:  No.  It's not responsive to

5      anything we got.  I got these from Gray Rust.

6           MR. DOLDER:  So you're saying that --

7           MR. ALEXANDER:  You're producing this exhibit

8      and it's not been disclosed in either the initial

9      disclosures or any of the discovery responses?

10           MR. RAPP:  It's not responsive to --

11           MR. ALEXANDER:  It's not what?

12           MR. RAPP:  It's not a part of any claim

13      filing, anything like that.  I got it from Gray

14      Rust.

15           MR. DOLDER:  But you're questioning the

16      witness on it in order to support your claims,

17      correct?

18           MR. RAPP:  I'm questioning the witness to show

19      that he received these letters that are sent to

20      him.

21           MR. DOLDER:  And that helps to support

22      Columbia's claims, correct?

23           MR. RAPP:  Possibly.

24           MR. DOLDER:  Okay.

25           MR. ALEXANDER:  Well, let me ask you this:

1      Before we go further and examine this witness, are

2      there any other documents that you anticipate

3      presenting to this witness that you're producing to

4      counsel for the first time?

5           MR. RAPP:  There is going to be a series of

6      letters just like this.

7           MR. ALEXANDER:  Okay.  Could I review those

8      letters and take a break to review those letters?

9           MR. RAPP:  Sure.

10          MR. DOLDER:  Yeah.  I'd like to see them too,

11     please.

12          MR. RAPP:  Okay.  Can we go off the record.

13          VIDEO TECHNICIAN:  We're going off the record.

14     The time is --

15          MR. ALEXANDER:  Let's stay on the record for

16     just a minute or two.

17          Were these documents that you're identifying

18     now, were they part -- were they documents that

19     were referenced in a privilege log?

20          MR. RAPP:  No, they're not privileged.

21          MR. ALEXANDER:  And they're not privileged

22     because why?

23          MR. RAPP:  Because they're letters sent from

24     Gray Rust to Mr. Patterson.

25          MR. ALEXANDER:  Okay.  So the communications

1          between Mr. Rust and Mr. Patterson -- the Rust firm

2          to Mr. Patterson, Columbia does not consider to be

3          privileged?

4               MR. RAPP:  That's what the Court in the

5          underlying held they didn't represent him based on

6          your motion.

7               MR. ALEXANDER:  Okay.  Just so I'm clear,

8          they're not a part of the privilege log because

9          communications between the Rust firm and

10         Mr. Patterson are not considered privileged by

11         Columbia?

12              MR. RAPP:  They're not a part of the privilege

13         log because they're not responsive to any requests

14         for prosecution that were served in the case.

15              MR. ALEXANDER:  Or any documents that are used

16         to support your claims.  I mean....

17              MR. RAPP:  I don't believe there was a request

18         for that.

19              MR. ALEXANDER:  Let me ask you this:  Isn't

20         that part of the initial disclosures?

21              MR. RAPP:  I don't know off the top of my

22         head.

23              MR. ALEXANDER:  I think it is.

24              MR. RAPP:  Okay.  Why don't we take a break

25         and you can review them.  If you want to dispute

1     that the letters or have an argument about a letter

2     that was sent to the witness, that's fine.

3          MR. ALEXANDER:  I would like to take a break

4     to do that, but I'm also concerned that we're

5     sitting in a deposition and we're getting a

6     document produced to us for the first time, which I

7     believe would be responsive to the initial

8     disclosures.  I think they should have been

9     produced at the initial disclosures.  Just so while

10    we're on the order, the time to respond to initial

11    disclosures was extended, once, if not twice, as

12    well as the period of time to respond to discovery.

13    So I take issue -- if these documents are not

14    responsive to either the initial disclosures or

15    document request, then I don't know why you're

16    asking him questions about them.

17         MR. RAPP:  Well, remember, too, there's a

18    continuing duty to supplement, so they don't have

19    to be -- just because they're not identified if

20    they're even supposed to be in the initial

21    disclosures doesn't mean they don't ever get

22    produced.

23         MR. ALEXANDER:  Okay.  But you don't

24    supplement them for the first time when you produce

25    them at a deposition.

```
 1          MR. RAPP:  We can take a break and you can

 2     look at them if you want.  I just don't feel --

 3          MR. ALEXANDER:  I will.

 4          MR. RAPP:  -- there's really a lot to

 5     discuss.  And just to be clear, you don't represent

 6     Mr. Patterson, right?

 7          MR. ALEXANDER:  I do not.

 8          MR. RAPP:  Do you share the same concern with

 9     your witness?

10          MR. DOLDER:  I absolutely do, and I've --

11     that's why I asked if they were to support your

12     claims and you said that that was -- the answer to

13     that question was maybe, which would mean they are

14     responsible to initial disclosures.

15          MR. RAPP:  Okay.  And so -- well, let's take a

16     break and you can look at them.

17          MR. DOLDER:  They should have been produced.

18          VIDEO TECHNICIAN:  We're going off the record.

19     The time is 1:19 p.m.

20          (Whereupon, there was a recess from 1:19 p.m.

21     to 1:34 p.m.)

22          (Patterson Exhibits 14 through 23 were marked

23     for identification.)

24          VIDEO TECHNICIAN:  Stand by, please.  We're

25     going back on the record at 1:34 p.m.
```

1          MR. DOLDER:  Okay.  Well, I am going to allow

2     the deposition to proceed only because I don't want

3     Mr. Patterson to have to come back and to reconvene

4     the deposition.  It is under objection.  I believe

5     that these letters that you have shown should

6     have -- I'd have to go over discovery request to

7     see if they're responsive to a discovery request,

8     but I can see very clearly how they are -- the

9     questioning will be designed to support Columbia's

10    defenses.  That makes them responsive to initial

11    disclosures and there should have been a prompt

12    supplemental disclosure, and it seems like we're

13    getting sand bagged, but go ahead.

14         MR. RAPP:  Just to be clear, there's 11 pages,

15    ten, one-page letters.  I'll tell you what --

16         MR. DOLDER:  Is there any that hasn't been

17    produced besides these?

18         MR. RAPP:  Not that are responsive, no?

19         MR. DOLDER:  Okay.

20         MR. ALEXANDER:  You say not that are

21    responsive.  I guess that's where we kind of run

22    into a little bit of a question about whether it's

23    responsive or not responsive.

24         MR. RAPP:  Well, the question is are there

25    other documents that we are going to use or might

1     use to support our defenses and the answer is not

2     that I'm aware of right now.

3          I'll make it actually easier and just ask a

4     couple of questions.  You can just -- I'm just

5     going to give him the whole stack.

6          MR. DOLDER:  Oh, let me see 14, please.

7          MR. ALEXANDER:  The March 16th record starts

8     with number 14 and just go through?

9          MR. RAPP:  Yes.

10         MR. ALEXANDER:  Okay.  And just for purposes,

11    I, on behalf of the Dunns join in Mr. Dolder's

12    concerns about the document.

13         MR. RAPP:  Okay.

14    Q    (By Mr. Rapp)  Mr. Patterson, if you could

15 just take a look at the stack of documents I gave you

16 right there, if you haven't already.

17    A    Okay.

18         MR. DOLDER:  And these are -- just for the

19    record, these are marked as Exhibits 14 through 23.

20    Q    (By Mr. Rapp)  Would you agree with me that

21 Exhibits 14 through 23 are a series of letters that are

22 addressed to you at 301 Lake Hill Drive?

23    A    Yes, sir.

24    Q    Do you remember receiving any of these

25 letters?

```
 1      A    I can't be specific because I can't remember
 2  reading any of them.
 3      Q    So you're not sure if you did or did not
 4  receive them; is that right?
 5      A    I'm not sure that I did receive every page
 6  that you've handed me.
 7      Q    Okay.  But from March 16th, 2016 to May 1st,
 8  2017, were you residing at 301 Lake Hill Drive?
 9      A    Yes, sir.  Through what --
10      Q    Through May 1st, 2017.
11      A    Yes, sir.
12      Q    Let me ask you another question.  You
13  mentioned earlier that after the accident, Mr. Rich
14  came and talked to you at your house?
15      A    That's not how I would word it, no, sir.
16      Q    Okay.  Well, when he came to your house, you
17  said he took your gas card and your cell phone and the
18  keys to the truck, right?
19      A    That happened, yes, sir.
20      Q    Okay.  And so you didn't have an extra set of
21  keys to the truck, did you?
22      A    I had one set of keys to the pickup.
23      Q    And those are the ones that Mr. Rich took that
24  day, right?
25      A    Yes.
```

1      Q    Okay.  So you couldn't use the truck anymore?

2      A    No, sir.

3      Q    Okay.  You talked about another accident where

4    you ran into a skateboarder?

5      A    He ran into me, but yes, sir.

6      Q    Did the police find that it was his fault or

7    your fault?

8      A    I have no idea.

9      Q    Okay.  Was it during the daytime?

10      A    Late afternoon, yes, sir.

11      Q    Okay.  Were you working for Lawson at the time

12    when -- were you employed by Lawson when you hit the

13    skateboarder?

14      A    I hit him in the Lawson truck.

15      Q    That's what I mean.  At the time, you work for

16    Lawson when that happened?

17      A    I was not on the clock, no.

18      Q    Okay.  Was it after you had completed a job on

19    your way home?

20      A    It was after I completed a workday, yes, sir.

21      Q    Were you on your way home?

22      A    No, sir.

23      Q    Were you on your way to get your check?

24      A    No, sir.

25      Q    Where were you headed?

1    A    I was at -- to my mother's house.

2    Q    You were going to your mother's house?

3    A    Yes, sir.

4    Q    Okay.  Where did she live at the time, if you

5  remember?

6    A    She's at 911 Charleston Court.

7    Q    In what town?

8    A    Gainesville, Georgia.

9    Q    Okay.  At some point during the lawsuit that

10  the Dunns filed against you and Lawson, did you

11  understand that the court was ordering you to appear at

12  a hearing to talk to the judge?

13    A    No, sir.

14    Q    Did you understand that the judge had ordered

15  you to do anything in the underline -- in that case,

16  excuse me?

17    A    I was not understanding of anything, no, sir.

18    Q    Did you ever talk to anybody about what was

19  happening in that case after that initial conversation

20  you had with the lawyer?  So in other words --

21    A    What conversation?

22    Q    Sure.  Let's go back.  So you were receiving

23  papers, you said --

24    A    Yes, sir.

25    Q    -- that had to do with the lawsuit, right?

```
 1        A     Yes.

 2              MR. DOLDER:  Let him finish his question.

 3        Q     (By Mr. Rapp)  And did you ever call and talk

 4   to anybody about those papers?

 5        A     Regarding who?

 6        Q     Well, you said you noticed that you were a

 7   defendant in those court papers, right?

 8        A     Yes, sir.

 9        Q     Did you ever call and talk to anybody about

10   that, the clerk, the judge?

11        A     Oh, no, sir.  I've talked to my father and my

12   mama.

13        Q     Sure.

14        A     Nobody legally, no, sir.

15        Q     Okay.  Other than your family members or your

16   friends, you didn't talk to anybody about that, the

17   Court papers?

18        A     At what time, what timeline?

19        Q     Before this case that we're all here about.

20        A     Well, before this, that could have been last

21   December.  You're talking about how far after the

22   accident?

23        Q     So how about any time in 2016 or --

24        A     No, sir.

25        Q     -- the first half of 2017?
```

1      A      No, sir.

2      Q      Okay.  Did you -- in the skateboard incident,

3  you said you understood that Lawson or the insurance

4  company or somebody was taking care of it for you,

5  right?

6      A      You're jumping into too much of a timeline.  I

7  can't be accurate on my answers because you're going

8  from one thing to another.  I don't understand exactly

9  what you're saying.

10     Q      Okay.  Do you remember when we talked about

11  the incident where you hit the skateboarder?

12     A      I do.

13     Q      And do you remember when you testified that

14  Lawson or the insurance company took care of that

15  incident for you?

16     A      The skateboarder?

17     Q      Yes, sir.

18     A      Yes, sir.

19     Q      Okay.  How did you know that either Lawson or

20  the insurance company was taking care of that

21  skateboard incident for you?

22     A      Direct contact from Ms. Davis.

23     Q      Okay.  And Ms. Davis works for Lawson's,

24  right?

25     A      She owns Lawson's.

1      Q    Why didn't you think that Lawson or the

2   insurance company was taking care of the lawsuit that

3   the Dunns sued you in?

4           MR. ALEXANDER:  Object.

5           MR. DOLDER:  Object to the form and object

6       that it conflicts with prior testimony.

7      Q    (By Mr. Rapp)  Did you think that Lawson or an

8   insurance company was going to take care of the lawsuit

9   that the Dunns filed against you and Lawson?

10     A    Yes, sir.

11     Q    And so when the attorney that you spoke to on

12  the phone called you, didn't you think that was Lawson

13  or the insurance company trying to take care of that

14  lawsuit for you?

15     A    No, sir.

16     Q    Okay.  And tell me again why.

17     A    Because it was after the fact of I was the

18  single one hung out to dry there.

19     Q    And what made you think you were hung out to

20  dry?

21     A    Because I was no longer married with Lawson's

22  company on the paperwork, letterheads or whatever, the

23  court papers.

24     Q    And did you understand that because you were

25  no longer married to Lawson on the paperwork, that it

1    was somehow too late for someone to take care of you in

2    that lawsuit?

3        A    That never occurred.  I never thought that

4    way, no, sir.

5        Q    Okay.  So then why didn't you agree to meet

6    with the lawyers to try to defend you in the case?

7        A    Because I didn't trust them.  They were too

8    pushy and badgering, just continuous.

9        Q    Okay.  As a result of your plea agreement for

10   the accident in the WalMart parking lot -- do you know

11   what I mean when I say plea agreement?

12       A    I assume -- no, sir.  You tell me.

13       Q    Do you remember the document we looked at that

14   indicated that you pled guilty to DUI and DUI and

15   endangerment of a child under the age of 14?

16       A    Yes, sir.

17       Q    As a result of that plea agreement, did you

18   serve jail time?

19       A    Yes, sir.

20       Q    How long were you in jail?

21       A    A week or so.  It was days.  It wasn't -- it

22   was a number of days.

23       Q    Since that time, have you been arrested?

24       A    Yes, sir.

25       Q    How many times?

1       A     I don't recall.

2       Q     What were you arrested for?

3       A     Probation.  I was on probation.

4       Q     Were you on probation in connection with the

5  plea agreement from the WalMart accident?

6       A     Yes, sir.

7       Q     Okay.  And did someone allege that you

8  violated your probation?

9       A     I can't recall exactly, but it was some type

10  of violation or I wouldn't have been locked up.

11       Q     So you went back to jail for a probation

12  violation?

13       A     I have, yes.

14       Q     Okay.  How many times?

15       A     One time.

16       Q     Okay.  How long were you in jail?

17       A     I can't recall.  It's all documented, though.

18  We can find out.

19       Q     Any other arrests other than the probation

20  violation since 2013?

21       A     Not that I -- yes.

22       Q     What was the other one or ones?

23       A     It was -- I was locked up in Jackson County.

24       Q     And what were you locked up for?

25       A     For a domestic dispute.

1    Q    Okay.  Were you ever charged with a crime

2  arising out of that domestic dispute?

3    A    No, sir.

4    Q    Okay.  Did you -- so you were never convicted

5  of any crime arising out of that domestic dispute,

6  right?

7    A    No, sir.

8    Q    Okay.  And you didn't plead guilty to anything

9  like the sheet we looked at earlier for the domestic

10  dispute?

11       MR. DOLDER:  I'm just going to instruct the

12    witness, my client, because just I can tell from

13    your face you look confused --

14       THE WITNESS:  I'm very confused.

15       MR. DOLDER:  Don't speculate or guess as to

16    the answers to these questions.

17       THE WITNESS:  Yes, sir.

18       MR. DOLDER:  Okay.  Just answer the questions

19    that you know the answer to.

20       THE WITNESS:  Yes, sir.

21    Q    (By Mr. Rapp)  To the best of your knowledge,

22  the prosecutor didn't charge you with any crimes for

23  the domestic dispute incident?

24    A    I don't recall.

25    Q    Okay.  Did you serve any jail time for the

1    domestic dispute?

2         A    No, sir.

3         Q    Okay.  Did you -- were you placed on probation

4    as a result of that domestic dispute?

5         A    No, sir.

6         Q    Okay.  Any other arrests since 2013 that we

7    haven't talked about?

8         A    Not that I can recall.

9         Q    Okay.  Are you taking any medication today

10   that might affect your memory?

11        A    No, sir.

12             MR. RAPP:  Okay.  That's all I have.

13                           EXAMINATION

14   BY MR. DOLDER:

15        Q    I have just a few questions.  Mr. Patterson,

16   did Ottie Rich use a Lawson vehicle for personal

17   purposes?

18        A    Yes, sir.

19        Q    How do you know that?

20        A    He kept a booster seat and car seat in the

21   company vehicle pretty much all the time.

22        Q    Okay.  He had a car seat in the Lawson

23   vehicle?

24        A    Yes, sir.

25        Q    All right.  Now, your youngest is five years

1  old, correct?

2      A     Yes, sir.

3      Q     All right.  Was -- and that's a boy?

4      A     Yes, sir.

5      Q     Was he born while you worked at Lawson?

6      A     He was.

7      Q     All right.  Did you use the Lawson truck to

8  take your wife to the hospital?

9      A     I did.

10     Q     And while you were at the hospital, where did

11 you park the Lawson truck?

12     A     In front of the emergency room.

13     Q     All right.  And how long were you in the

14 hospital?

15     A     Around three days.

16     Q     Was the Lawson truck out in the parking lot

17 the whole time?

18     A     Yes, sir.

19     Q     Did anyone at Lawson -- let me reword that.

20 Did you tell anyone at Lawson that you had your truck,

21 your Lawson truck parked at the hospital?

22     A     I did.

23     Q     Okay.  Who did you tell?

24     A     Ottie Rich, James Brown, Billy Blankenship.

25     Q     Okay.  Why did you tell them?

1      A     Oh, because in case I had any of the tools

2  that might be needed while I was absent, to just holler

3  at me and I'll meet them down in the parking lot and

4  make sure that they get anything that I had access to

5  that might be needed on the jobs.

6      Q     Now -- so you have testified that you drove a

7  Lawson truck for about a year, correct?

8      A     Yes, sir.

9      Q     All right.  And are you able to remember all

10  of the examples of seeing Lawson personnel driving

11  Lawson vehicles for personal purposes?

12      A     No, sir.

13      Q     And why is that?

14      A     Because it's too many to comprehend at one

15  time.

16         MR. DOLDER:  That's all I have for you.  Thank

17      you.

18                         EXAMINATION

19  BY MR. RAPP:

20      Q     When you parked your truck in front of the

21  hospital and you told the folks at Lawson, did they say

22  that was okay to leave the truck at the hospital?

23      A     It was not mentioned.

24      Q     I thought you just said they told you it was

25  okay to leave the truck there so they could come get

```
 1   your tools?
 2       A    I'm not understanding how you're twisting my
 3   words.
 4       Q    You said you parked the truck in front of the
 5   hospital and you told someone at Lawson that that's
 6   where the truck was in case they needed the tools,
 7   right?
 8       A    Yes, sir.
 9       Q    And they said that was okay, right?
10       A    They had no problem with it, yes, sir.
11            MR. RAPP:  That's all I have?
12            MR. DOLDER:  Anything else?
13            MR. RAPP:  I think we're done.
14            MR. ALEXANDER:  No.
15            MR. RAPP:  Thank you.  Appreciate it.
16            VIDEO TECHNICIAN:  This concludes the
17       deposition of Ronald Patterson.  We're off the
18       record at 1:52 p.m.
19            COURT REPORTER:  Would you like me to produce
20       a transcript?
21            MR. ALEXANDER:  Yes.
22            COURT REPORTER:  Would you like a copy of the
23       transcript?
24            MR. RAPP:  Yes, please.
25            MR. DOLDER:  Yes.
```

1      (Whereupon, the deposition concluded at 1:52 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              DISCLOSURE

2    STATE OF GEORGIA
     COUNTY OF HALL
3    DEPONENT: RONALD CURTIS PATTERSON

4         Pursuant to Article 10.B of the Rules and
     Regulations of the Board of Court Reporting of the
5    Judicial Council of Georgia, I make the following
     disclosure:
6
          I am a Certified Court Reporter.  I am here as an
7    independent contractor to Appalachian Court Reporting.

8         Appalachian Court Reporting was contacted by Mark
     Alexander, Esq. to provide court reporting services for
9    this deposition.  I am not disqualified for a
     relationship of interest under the provisions of the
10   O.C.G.A. 9-11-28(c).  Appalachian Court Reporting will
     not be taking this deposition under any contract that
11   is prohibited by the O.C.G.A. 15-14-37(a) and (b).

12        Appalachian Court Reporting has no
     contract/agreement to provide court reporting services
13   with any party to the case, any counsel in the case or
     any reporter or reporting agency from whom a referral
14   might have been made to cover this deposition.
     Appalachian Court Reporting has charged its usual and
15   customary rates to all parties in the case.

16

17

18        _____
          AURORA GUTIERREZ
          Certified Court Reporter (CCR #2599)
19

20

21

22

23

24

25

109

1                    C E R T I F I C A T E

2    STATE OF GEORGIA

3    COUNTY OF HALL

4       I hereby certify that the foregoing deposition was

5    taken down, as stated in the caption, and the

6    colloquies, questions and answers were reduced to

7    typewriting under my direction; that the foregoing

8    transcript is a true and correct record given to the

9    best of my ability.

10      The above certification is expressly withdrawn upon

11   the disassembly or photocopying of the forgoing

12   transcript, unless said disassembly or photocopying is

13   done under the auspices of Absolute Court Reporting,

14   LLC and the signature and original seal is attached

15   thereto.

16      I further certify that I am not a relative,

17   employee, attorney, or counsel of any of the parties;

18   nor am I financially interested in the action.

19

20   _____

21   AURORA GUTIERREZ
     Certified Court Reporter (CCR #2599)

22

23

24

25

```
1                          ERRATA

2    Reporter:  Aurora Gutierrez

3       I, RONALD CURTIS PATTERSON, have read the transcript

4    of my deposition given on the date of June 20, 2108,

5    consisting of numbered pages 1 through 106, and (please

6    initial one of the blanks below and sign on the last

7    page):

8    _____I desire to make no changes;

9    _____I desire to make the following changes in the

10   transcript and have stated my reason for each change:

11

12                          CHANGES

13    Page___Line___should read:_____

14    Reason for change:_____

15    Page___Line___should read:_____

16    Reason for change:_____

17    Page___Line___should read:_____

18    Reason for change:_____

19    Page___Line___should read:_____

20    Reason for change:_____

21    Page___Line___should read:_____

22    Reason for change:_____

23    Page___Line___should read:_____

24    Reason for change:_____

25    Page___Line___should read:_____
```

1   Reason for change:_____

2   Page___Line___should read:_____

3   Reason for change:_____

4   Page___Line___should read:_____

5   Reason for change:_____

6   Page___Line___should read:_____

7   Reason for change:_____

8   Page___Line___should read:_____

9   Reason for change:_____

10      (Note:  Additional pages may be attached hereto.)

11          Signed by me, this _____ day of _____, 2018.

12

13

14                                _____

15                                RONALD CURTIS PATTERSON

16

17          Sworn to and subscribed before
            Me, this ___ day of _____,
18                       2018.

19

20          _____
                   Notary Public
            _____County, Georgia
21      My Commission Expires_____.

22

23

24

25