IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

AMY DUNN, individually and as the )
natural parent of DANIELLE )
DEMONBREUN, JAMES DUNN )
and RONALD CURTIS )   CIVIL ACTION
PATTERSON, )   FILE NO.: 2:17-CV-00246-RWS
)
Plaintiffs, )
)
v. )
)
COLUMBIA NATIONAL )
INSURANCE COMPANY, )
)
Defendants. )

## DUNN PLAINTIFFS' BRIEF IN SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

This is the story of a horrific wreck caused by an employee of Lawson Air

Conditioning & Plumbing, Inc., co-plaintiff Ronald Curtis Patterson, in a truck

Lawson assigned to him and which Patterson drove as his primary vehicle for over

a year.  Upon learning of the magnitude of the event and fearing liability and

increased insurance costs, Lawson immediately distanced itself from the incident

and Patterson.  In doing so Lawson's owner convinced her insurer, defendant

Columbia National Insurance Company, to rush to the premature decision to deny

Patterson coverage without any investigation and without a full appreciation of the difference between vicarious liability (scope of employment) and coverage (permission to use the truck) under Columbia's insurance policy.

Patterson recently filed his Motion for Partial Summary Judgment. (Doc 59) In support of his motion Patterson filed a thorough 125-paragraph Statement of Undisputed Material Facts.  (Doc 59-28)  In his brief, Patterson sets forth the factual background for his claims and the coverage dispute before this Court.  The Dunn Plaintiffs in moving for summary judgment have also filed a separate Statement of Undisputed Material Facts, which incorporates the facts set forth by co-plaintiff Patterson.  While the Dunn Plaintiffs assert additional legal grounds for *complete* relief on their right to a judgment equal to amounts due under the Columbia policies, they also **join** in Patterson's motion for partial summary judgment.

## II.   <u>STATEMENT OF FACTS</u>

Because they are largely duplicative, the Dunn Plaintiffs adopt and incorporate by reference Patterson's Statement of Facts set forth in his pending motion.  (Doc 59-28)

### III.   ARGUMENT AND CITATION TO AUTHORITY

### A.   Standard of Review

This Court in *Stenger v. World Harvest Church, Inc.*, 2006 WL 870310 (N.D. Ga. 2006) set forth the appropriate legal standard of review as follows:

> Federal Rule of Civil Procedure 56 requires that summary judgment be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. "The moving party bears 'the initial responsibility of informing the … court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.

*Id*. at *2.

### B.   Patterson is Covered.

   1.   The plain language of the policies covered business and personal use.

Lawson purchased two liability insurance policies from Columbia that define an "insured" to include "[a]nyone else while using with your permission a covered auto." (Doc 24-4, p. 47 of 152 and Doc 24-4, p. 75 of 152) The truck

Lawson assigned to Patterson, which he was driving at the time of the incident, was a "covered auto."  (Doc 59-5, RFA No. 7)

Columbia denied coverage to Patterson alleging he "was not a permissive driver" of Lawson's vehicle.  (Doc 59-16)  Columbia's denial letter cited one of Lawson's internal rules as Columbia's only justification for its conclusion.

> Company trucks will not be used for personal use at any time, unless approval has been granted by Lawson Air Conditioning & Plumbing management. NOTE Non-employees of Air Conditioning & Plumbing are NOT covered by insurance coverage if driving OR riding in a company vehicle.

(Doc 1-6, ¶2 and Doc 60, 45:6-8)

Columbia's insurance policy does not distinguish between "personal use" and "business use."  The policy does not require that a "covered auto" be used in the course and scope of Lawson's employment or exclude coverage for personal use. (Doc 60, 149:10-23 and Exhibit AA 39:20-25[1])  Thus, Lawson's internal rules provide no basis in deciding whether Patterson was an "insured" under the terms of the policies.

---

[1] When Louis Frey's deposition transcript is finalized a supplement will be submitted.

2. <u>Columbia charged a premium to insure Lawson's employees' "personal use" of trucks assigned to them.</u>

It is well known that the premium rates for liability insurance are based upon the risk assumed and insured. *Prudential Ins. Co. of Am. v. South*, 179 Ga. 653, 177 S.E. 499, 502 (1934) and *State Auto Prop. & Cas. Co. v. Matty*, 286 Ga. 611, 615, 690 S.E.2d 614, 618 (2010). Columbia charged and Lawson paid a premium to cover risks associated with employees driving trucks assigned to them, whether for business or personal use. Columbia charged Lawson a premium to cover employees, like Patterson, driving the truck Lawson assigned to them 24 hours a day, seven days a week. (Exhibit AA 38:24-39:16) The risk Columbia insured included Lawson employees driving the truck Lawson assigned them to a job site, church, home, or Walmart.

Columbia had no knowledge of Lawson's cited internal rule when Columbia underwrote, issued, or renewed Lawson's insurance coverage. (Doc 59-5, RFA Nos. 20-23) Columbia was not aware of Lawson's internal rule until after the accident on June 7, 2013. (Doc 60, 55:16-19) Patterson had permission to drive the truck Lawson assigned to him, and he was driving that truck when he hit the Dunn Plaintiffs. Patterson did not steal Lawson's truck or swipe its keys from Lawson. Lawson expected its truck would be in Patterson's possession at the time of the accident. (Exhibit BB 123:16 – 124:9) Patterson had been driving the truck as his

Page 5

primary vehicle for approximately one year. (Doc 64, 14:5 – 15:7)  These undisputed facts should end the permissive-use and coverage inquiry.

Columbia attempts to avoid a risk it originally insured based upon the after-the-fact discovery of Lawson's internal rules, which Lawson did not enforce.  (Doc 60, 45:18 – 46:18, Doc 59-3, ¶10 and Doc 65, 78:22 – 79:11)  Because Columbia was unaware of Lawson's internal rules at the time it underwrote the risk, management's approval of an employee's personal use of the truck Lawson assigned to them is irrelevant to whether they are an "insured" as defined in Columbia's policy.  Patterson's use of the truck Lawson assigned to him *for either* business or personal use was a risk Columbia agreed to insure.  To allow Columbia now to use Lawson's newfound internal rules to redefine the risk Columbia agreed to insure would allow Columbia to unjustly retain a premium without liability for its accompanying risk.

> 3.  <u>"Personal use" was *a purpose,* and was *within the initial scope of permission* Lawson granted to Patterson. *Great American v. Anderson*, 847 F.3d 1327 (11th Cir. 2017).</u>

The undisputed facts confirm that *the scope of permission* Lawson originally granted to Patterson included **both** business and personal uses of the truck Lawson assigned to him. Lawson's internal rules however purport to subsequently limit that personal use to a particular type of use, namely only those approved by

management. (Exhibit BB – 2A attached: H)  As discussed below, Lawson's internal rules prohibiting a particular manner of use and management's approval for a particular type of use, are of no consequence to a "permissive use" coverage analysis for employees of Lawson driving Lawson's trucks assigned to them.

An employee's violation of explicit company policies does not foreclose the employee's status as a permissive user.  *Great American v. Anderson*, 847 F.3d 1327 (11th Cir. 2017).  To allow Lawson's internal rules, which require employee obedience to a host of behaviors, to control coverage under Columbia's policy "would defeat the very purpose of the policy." *Strickland v. Georgia Cas. & Sur. Co.*, 244 Ga. 487. (1998). Yet it is a violation of Lawson's internal rule which forms the sole basis for Columbia's denial of coverage.  (Doc 1-6 and Doc 60, 45:6-28, 45:18 – 46:18)

Lawson had a variety of internal rules for company owned vehicles:  B - Valid driver's license, C - Reporting repairs, D - Accumulated trash, E - Obey traffic laws, G - Lock vehicles. (Exhibit BB 113:3-15)  Under Columbia's rationale, Columbia would be able to deny coverage to an employee who, for instance, had an accident while speeding (in violation of rule E) or with accumulated trash in their Lawson vehicle (rule D).

Georgia's Supreme Court has made clear that a company's internal rules do not govern the scope of permissive use or coverage when they are not plainly stated in the policy. *Strickland*, 244 Ga. 487. In *Great American*, the Eleventh Circuit affirmed that *Strickland* still bars the use of internal rules to define permissive use. 847 F.3d 1327. "If [Columbia] had intended to bar coverage for violations of [Lawson's] internal rules, it could have included such language in its policies …." 847 F.3d at 1334. Columbia could have plainly stated its policy does not cover an employee's "personal use" of Lawson's truck with an exclusion. (Exhibit AA 39:15-16) Columbia's policy has no exclusion barring coverage for violations of Lawson's internal rules because Columbia had no knowledge of Lawson's internal rules. Columbia's coverage analysis of an employee's operation of the truck *Lawson assigned to them* under the permissive use provision of its policy is misplaced.

Applying the *Great American* and *Strickland* analysis here, Lawson's internal rule requiring management approval for personal use of Lawson's trucks, like Lawson's other internal rules for company owned vehicles, is equivalent to Looper Cabinet's internal rule prohibiting drinking and driving (*Great American*) and Carter's employer's internal rule specifically prohibiting Williams from driving Carter's work truck. (*Strickland*) Lawson's internal rules, like those in *Great*

*American* and *Strickland,* do not determine coverage under the permissive use provision in Columbia's insurance policy.  Because personal use **was a** "permissive use" at the time Lawson assigned the truck to Patterson and gave him the keys, Lawson's internal rule requiring management approval does not control the coverage analysis.  Patterson "was using with [Lawson's] permission a covered auto" and is an insured under Columbia's policy as a matter of law.

> 4.  Lawson did not revoke Patterson's permission until well after the incident.

Alternatively, should the court look to Lawson's internal rules, Lawson concedes personal use of its vehicles does not automatically control Lawson's "permission" to its employees to drive Lawson's vehicles.  As noted in Patterson's brief, Lawson, upon hiring Patterson, assigned Patterson a truck and gave Patterson the keys as "a perk of the job."  (Doc 59-18, 54:10-14; *see also* Doc 59-18, 55:4-12)  Patterson had "permission" and was "authorized" to drive the truck Lawson assigned to him, as well as other Lawson vehicles.  (Exhibit BB 109:13-24)

Patterson's supervisor did not enforce the rules.  (Doc 65, 78:22 – 79:11 and video excerpt filed separately)  Lawson's owner did not do much more, acknowledging that Lawson applied its internal rules on a "case by case basis." (Exhibit BB 117:20 – 123:15).  Lawson's former vice president admitted that Lawson employees would use their Lawson truck for personal errands to travel to

Page 9

the grocery store, convenience store, **Walmart**, Target, or other similar department stores for personal matters (emphasis added).  Lawson allowed employees to use the truck assigned to them for these and similar personal errands without having to ask Lawson management permission to do so.  (Doc 59-3, ¶6 and Doc 65 46:19-47:1)  Lawson's internal rule and how Lawson enforced its rule did not change during Patterson's employment with Lawson.  (Doc 65 17:4-8, 19:19-20:1)  The rule was never enforced on Patterson or his co-workers.  (Doc 59-3, ¶10; Doc 59-4, ¶¶3-4; Doc 59-8, ¶¶3-4; and Doc 59-9, ¶¶4, 5, 7 and 8)  Lawson conceded that its employees still have Lawson's "permission" to use the vehicle Lawson assigned to them even if the employee uses the truck for "personal use".  Lawson further conceded that its employees do use Lawson trucks for personal use:

> Q:    All right. And I'm assuming, like the other policies, if someone fails to follow policy H[2], that they do not automatically lose their permission to use Lawson's truck; is that fair?
>
> **A:    That's fair. But as you see, you read on, it says disciplinary action will be taken against violators.**
>
> Q:    Okay. So if they violate provision H, they don't automatically lose Lawson's permission to use the truck, but they could be subject to Lawson's disciplinary actions; is that correct?
>
> **A:    Right.**
>
> Q:    All right. And I'm assuming that -- that like the other policies, if that became a problem, then -- and Lawson became aware of it,

---

[2] Policy H is the one Columbia relied on in denying coverage.

then Lawson could revoke its permission to allow the employee
to use the truck; is that correct?

**A:    That is a disciplinary action at our disposal. Yes.**

Q:     Okay. And is it fair to say that occasionally, that some of
       Lawson's employees may use some of Lawson's vehicles on --
       for personal use, from time to time?

**A:    It is against policy, but I would -- that could happen, yes.**

Q:     Okay. And just because that happens doesn't mean that Lawson
       automatically revokes its permission to the employee to use the
       vehicle; is that fair?

**A:    That's correct.**

(Exhibit BB 122:16-123:15)

Thus, if an employee fails to follow an internal rule concerning company-owned vehicles, the employee still has Lawson's permission to use the truck.  The employee will not lose permission until somebody from Lawson informs the employee Lawson's permission is revoked.  (See general discussion of each of Lawson's internal rules for company-owned vehicles in Exhibit BB 113:3-123:15) Lawson applied that practice in this case.  Lawson did not revoke Patterson's permission to use Lawson's Truck until almost **two weeks after this incident occurred**.  One of Patterson's supervisors went to Patterson's home and retrieved his keys and company-issued phone and gas card.  (Exhibit CC 24:13 – 25:3 and Doc 59-2, 42:8 – 43:4)

Page 11

Lawson itself has conceded that its employees do occasionally use their Lawson truck for personal use.  Because Lawson evaluates each situation on a case-by-case basis, an employee's personal use of their Lawson's truck does not control their permission to operate the truck until Lawson revokes that permission. Lawson did revoke Patterson's permission to drive Lawson's truck but not until after the incident that gives rise to the Dunn Plaintiff's claims.

### C.   Columbia is Estopped From Denying Coverage.

#### 1.   Columbia elected to deny coverage rather than defend under a reservation of rights.

"When an insurer is called upon to defend an action, it is put to the choice of either undertaking the defense or of refusing to do so. The insurer's election is not without its consequences. 'By refusing to defend, the company loses all opportunity to contest the negligence of the insured or the injured person's right to recover, and exposes itself to a charge of and penalty for breach of contract. By defending, it incurs considerable expense **and may waive the claim of immunity.**'" *McCraney v. Fire & Cas. Ins. Co.*, 182 Ga. App. 895 (1987) (citing *LaSalle Nat. Ins. Co. v. Popham*, 125 Ga. App. 724, 729 (1972) (emphasis added))  "A proper and safe course of action for an insurer in this position is to enter upon a defense under a

reservation of rights and then proceed to seek a declaratory judgment in its favor."
*Richmond v. Ga. Farm Bureau Mut. Ins. Co.*, 140 Ga. App. 215, 217 (1976).

When the Dunn Plaintiffs filed their action against Patterson in April of 2014, Columbia rested on its denial and continued to deny coverage and a defense to Patterson. (Doc 61, 63:3-6, 65:7-13 and 66:19-23)  Columbia did not follow the *Richmond*-prescribed "proper and safe course of action" of defending Patterson pursuant to a reservation of rights and seeking a declaratory judgment.  Instead, Columbia curiously attempted (1) to file an Entry of Appearance and then (2) to intervene.  Both attempts were to address coverage for Patterson, and both were taken without notice to Patterson.  (Doc 59-19 and Doc 59-20)  Neither attempt worked, as the trial court denied both motions.  (Doc 59-5, RFA Nos. 66 and 71)

The fact that Columbia did not follow the procedure preferred by Georgia courts and instead made an unorthodox attempt to litigate coverage in the underlying tort suit has legal consequences that Columbia's later actions did not cure.  These legal consequences include that Columbia (1) no longer had the right to file a declaratory judgment action as to coverage and (2) could no longer defend Patterson under a unilateral reservation of rights.

  2. <u>Columbia no longer had the right to seek a declaration as
to coverage.</u>

In Georgia, an insurer that denies coverage may not seek a declaratory
judgment as to coverage.  Should the insurer change its mind and wish to provide a
defense, it may do so to mitigate its potential damages, but it may no longer
dispute coverage.

> Having taken a legal position to deny coverage and a defense, the insurer has
> fixed its rights, because if there exists coverage under the terms of the
> policy, then it has breached the two duties under the agreement, i.e., the duty
> to indemnify and the duty to defend. *Argonaut Ins. Co. v. Atlantic Wood
> Indus.*, *supra* at 475, 370 S.E.2d 765. In *Drawdy v. Direct Gen. Ins. Co.*, 277
> Ga. 107, 586 S.E.2d 228 (2003), the Supreme Court clearly stated that, when
> the insurance company denies coverage and refuses to defend, the rights and
> duties have become fixed so that there exists no uncertainty for a declaratory
> judgment action to make certain.  As in this case, in point of time, the
> insurer fixed its rights and duties by taking a position by denying coverage
> and a defense before it sought to assert a defense under reservation of rights.
> *Id*. at 109-110, 586 S.E.2d 228. "The law is well established that
> 'declaratory judgment is not available where a judgment cannot guide and
> protect the petitioner with regard to some future act-as where an insurance
> company has already denied a claim. (Cits.)' [Cit.]" Id. at 109, 586 S.E.2d
> 228. Therefore, it cannot subsequently, unilaterally assert that it will defend
> under a reservation of rights and thereby negate its breach of contract; such
> action of defending would only serve to mitigate its damages regarding its
> duty under the insurance contract to defend.

*Vara v. Essex Insurance Co.* 269 Ga.App. 417 (2004), *reversed on other grounds*.

Columbia is confessing its duties under the policy to cover and defend Patterson by

taking the unorthodox steps of attempting to mitigate its damages by hiring

Patterson counsel so late in the Underlying Lawsuit.

<u>3.</u>    <u>Columbia's attempt to reserve its rights was ineffective.</u>

"Where an insurer fails to properly reserve its rights, it may be estopped from later denying coverage." *American Safety Indemnity Co. v. Sto Corp.* 342 Ga.App. 363 (2017)  "The insurer can avoid estoppel by giving timely notice of its reservation of rights which fairly informs the insured of the insurer's position." (Citations and punctuation omitted.) *American Safety Indemnity Co.* citing *World Harvest Church, Inc. v. GuideOne Mut. Ins. Co.,* 287 Ga. 149, 152 (1), 695 S.E.2d 6 (2010).  "An insurer must act reasonably promptly in reserving its rights." *See*, e.g., *Ga. Interlocal Risk Mgmt. Agency v. City of Sandy Springs*, 337 Ga. App. 340, 348 (2), 788 S.E.2d 74 (2016).

For five reasons, Columbia's reservation of rights is defective under Georgia law.

First, it was untimely.  Columbia received notice of the Underlying Lawsuit on or about April 7, 2014.  (Doc 68-2)  It is undisputed Columbia did not defend and that Patterson quickly went into default.  Columbia did not attempt to reserve its rights until February 26, 2016, almost two years after receiving notice of the lawsuit.  (Doc 59-21)  Although *American Safety Indemnity* discusses the timeliness of the insurer's attempt to reserve rights in relation to the assignment of counsel, this Court should rule that Columbia's attempt to reserve rights after years

of litigation and Patterson's default was not timely under the clear intent of *American Safety Indemnity* or *World Harvest*.

Second, the reservation of rights letter did not "fairly inform" the insured of Columbia's position on a declaratory judgment as required by *American Safety Indemnity* or *World Harvest*. As explained above, Columbia no longer had the right to seek a declaratory judgment as to coverage. Yet, the reservation of rights letter purported to reserve the right to file a declaratory judgment action. (Doc 59-21, p. 3) Columbia could not "reserve" a right it did not have. Columbia was attempting to create a right it did not have. Rather than fairly informing Patterson, Columbia was misinforming Patterson of its position.

Third, the reservation of rights letter failed to "fairly inform" Patterson of Columbia's future intent. The letter purports to reserve "the right to withdraw from the defense." (Doc 59-21) Several months later, faced with the prospect of Columbia's chosen defense counsel getting thrown out of court, Columbia's own attorney stated in open court that Columbia would not withdraw its defense. (Exhibit E 36:8-24) Columbia never made such a commitment to Patterson. This Court should rule that the reservation of rights letter did not "fairly inform" as required by *American Safety Indemnity* or *World Harvest*.

Fourth, as Columbia admits in its own brief, Patterson did not accept the terms under which Columbia offered to defend him.  (Doc 68, p. 9)  Columbia's reservation of rights letter was simply an offer to provide Patterson representation in consideration for him agreeing to the terms set forth in the letter.  Patterson never accepted the deal.  (Doc 59-5, RFA No. 78)  A unilateral reservation of rights was not available to Columbia after its unconditional denial.  *Vara* 269 Ga.App. 417

Despite all of these problems with the reservation of rights, Columbia had the Gray Rust firm enter an appearance on Patterson's behalf.  Then, even though Patterson rejected Columbia's belated defense, Columbia made the perplexing decision to continue to defend Patterson for over a year.  (Doc 59-5, RFA Nos. 79-87 and Exhibit FF)  During this year, no effective reservation of rights was in place.

Finally, Columbia admits the "number one" reason Columbia continued to defend without Patterson's consent and without timely and properly reserving its rights is that Columbia was trying to protect Columbia's interests, not Patterson's. (Doc 61, 44:24-45:25, 149:3-10)  Having denied coverage to Patterson for over two years, Columbia no longer had the right to seek judicial direction pursuant to a declaratory judgment action, nor the ability to provide Patterson with counsel

Page 17

while also denying him coverage.  Indeed, the trial court asked Columbia for its

justification for the untimely reservation and defense:

> THE COURT:     What's the justification for Columbia waiting two and a
> half years -- specifically more important to us seven days
> after mediation with the other person to afford Mr.
> Patterson counsel?

Columbia's eventual response:

MR. WILLIAMS:  … "I can't tell you."

(Exhibit DD 32:6-15)

> The trial court prophetically observed:

> Columbia National may, through its course of action and potentially
> untimely reservation of rights, be estopped from asserting the defense
> of noncoverage or be deemed to have waived its right to deny liability
> under the policy. …In sum, by failing to follow the "proper and safe
> course of action," Columbia National may find itself in an unfavorable
> position in future litigation, but that would be a determination for a
> different court.

(Exhibit EE, pp. 6-7)

This Court is that court. To allow Columbia to hire counsel for Patterson, as

it did without consequence in this case, renders the spirit of *Richmond*

meaningless.  Columbia's conduct "encourages insurers to unconditionally deny

claims, based on the calculated risk that an uninformed insured or tort plaintiff may

be discouraged thereby from contesting the issues, with the insurers secure in the

knowledge that bad faith penalties for their course of conduct may be avoided or

minimized…"  *Drawdy v. Direct Gen. Ins. Co.*, 277 Ga. 107, 586 S.E.2d 228

(2003)  Columbia's hiring of counsel for Patterson to try to shield itself "from the

adverse consequences of actions already undertaken" is contrary to the Georgia

policy promoted in *Drawdy* 277 Ga. 107, at 109.

Because Columbia did not effectively reserve its rights but defended

Patterson for approximately one year, Columbia is estopped from denying

coverage as a matter of law.

### C. The Available Policy Proceeds Include Remaining Policy Limits and Post-Judgment Interest.

#### 1. The remaining policy limits are $3.875 million.

The primary policy limits are $1 million.  (Doc 24-4, p. 7 of 152)  The

umbrella policy limits are $3 million.  (Doc 24-4, p. 63 of 152)  Total policy limits

are $4 million.  Columbia acknowledges that it paid $125,000 of those limits to

settle the claims against Lawson.  (Doc 68-2, ¶38)  Thus, $3,875,000 of the policy

limits remain.  The Dunn Family is entitled to an immediate judgment against

Columbia for at least that amount.

#### 2. Policy proceeds include all post-judgment interest accruing until policy limits are paid.

The primary policy provides coverage for "Supplementary Payments" that

include the following:

> We will pay for the "insured": [¶] **All interest on the full amount of any judgment** that accrues after entry of the judgment in any "suit" against the "insured" we defend, but our duty to pay interest ends when we have paid, offered to pay or deposited in court that part of the judgment that is within our Limit of Insurance.

(Doc 24-4, p. 48 of 152, §2.a(6) (emphasis added))  The umbrella policy has a substantially similar provision.  It provides coverage for "[a]ll interest on the full amount of any judgment."  (Doc 24-4, p. 73 of 152, §1.g)

The plain language of the policy states that Columbia will pay "[a]ll interest on the full amount of any judgment," not just the interest accruing on the amount of the judgment within policy limits.  *See*, *S. Gen. Ins. Co. v. Ross*, 227 Ga. App. 191, 194, 489 S.E.2d 53, 56 (1997) (interpreting similar policy language to require payment of interest on amount of judgment in excess of policy limits).

Although the supplemental payment provision states it applies only to judgments rendered in suits Columbia defends, Georgia law does not allow insurers who breach the duty to defend to rely on such a technicality in avoiding the contractual obligation to pay all post-judgment interest.  *Occidental Fire & Cas. of N. Carolina v. Goodman*, 339 Ga. App. 427 (2016).  In *Occidental*, the insurer denied coverage and refused to defend an underlying lawsuit, contending the insured was not an "insured" under the policy.  *Id*. at 428.  A judgment resulted in the underlying lawsuit.  In the subsequent lawsuit against the insurer, the trial

court ruled the insurer should have defended and entered judgment against the insurer for post-judgment interest on the judgment. *Id.* at 430. On appeal, the insurer argued post-judgment interest should not be awarded because the terms of the policy stated that post-judgment interest was covered only with respect to lawsuits the insurer defended. *Id.* Since the insurer did not defend, it argued, the coverage for post-judgment interest was never triggered. The Georgia Court of Appeals rejected this argument:

> In this case, rather than defend the action with a reservation of rights as to coverage, Occidental simply denied coverage and refused the request to provide a defense to the lawsuit based on its incorrect belief that the claim against R & R was not covered by the policy. Under these circumstances, Occidental must bear the consequences of its decision not to defend the suit and must pay for its breach of the contract. Accordingly, the trial court correctly awarded post-judgment interest as provided for in the policy.

*Id.* at 431. *See also*, *Miller v. Secura Ins. & Mut. Co. of Wisconsin*, 53 S.W.3d 152, 155 (Mo. Ct. App. 2001) (ruling that it would be "untenable" if an insurer could "put itself in a better position by breaching its contract"). *Occidental* applies in this case, and the fact that Columbia breached its duty to defend should not benefit Columbia.

Furthermore, Columbia did defend the Underlying Lawsuit. It is undisputed Columbia defended Lawson. Also, Columbia defended Patterson for a limited time, albeit without his consent. The plain language of the provision does not state

it applies when Columbia defends only some parties or only for a limited period of time.  This Court should rule that Columbia must pay all post-judgment interest accruing on the entire amount of the judgment, including amounts of the judgment in excess of policy limits.

        3.      <u>Post-judgment interest due is $1,235,063.20 on the day this motion is filed, but it continues to mount daily.</u>

Columbia admits that under Georgia law post-judgment accrues at an annual rate of seven percent (7%).  (<u>Compare</u>, Doc 1, ¶66 <u>with</u> Doc 9, ¶66)  The judgment was rendered on June 8, 2017, in the amount of $11.5 million.  (Doc 1-12)  Thus, post-judgment accrues annually at $805,000 or daily at approximately $2,205.47, rounded down to the nearest cent.  As of December 20, 2018, 560 days will have passed from the date of the judgment.  The daily rate multiplied by the number of days is $1,235,063.20.[3]  Of course, post-judgment interest continues to accrue each day.  The Dunn Family respectfully requests that the Court add such interest at the time judgment is entered.

---

[3] Here is a link to a website that counts days:
https://www.timeanddate.com/date/duration.html

Respectfully submitted this December 20, 2018.

*/s/ Mark W. Alexander*
Mark Alexander
Georgia Bar: 008930
Stewart, Melvin & Frost
PO Box 3280
Gainesville, Georgia 30503
770-536-0101 Phone
malexander@smf-law.com

*/s/ Mark W. Alexander* (with express permission)
Daniel Sammons
Georgia Bar: 623545
Sammons & Henneke
PO Box 3157
Gainesville, Georgia 30503
770-535-8488 Phone
mtnlawdog@yahoo.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing **Dunn Plaintiffs' Brief in Support of Their Motion for Summary Judgment** was filed electronically with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the attorneys of record for all parties.  I further certify that the foregoing was prepared in Times New Roman 14pt font and otherwise complies with Local Rule 5.1.

Respectfully submitted this December 20, 2018.

Stephen J. Rapp      Richard Dolder
Attorney at Law      Attorney at Law
3344 Peachtree Rd, NE,      352 Sandy Springs Circle
Ste 2400      Atlanta, Georgia 30328
Atlanta, Georgia 30326