# EXHIBIT A

Expert Report of Louis G. Fey Jr. CPCU, CIC, CRM, AIC

RE: Dunn / Patterson v Columbia

# EXPERT REPORT OF
# LOUIS G. FEY JR, CPCU, CIC, CRM, AIC
# FEY CONSULTING LLC

## November 19, 2018

AMY DUNN, INDIVIDUALLY AND AS THE NATURAL PARENT OF DANIELLE DEMONBREUN, JAMES DUNN AND RONALD CURTIS PATTERSON,

## PLAINTIFFS

## VS.

COLUMBIA NATIONAL INSURANCE COMPANY,

## DEFENDANTS

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

GAINESVILLE DIVISION

CIVIL ACTION NO. 2: 1 7  -CV -00246-R WS

1. I will act as an expert witness with regard to the insurance industry standards, customs, and practice applicable to insurance claim handling. Specifically, I have been retained by Plaintiff Ronald Curtis Patterson to evaluate the handling of the underlying claim by Columbia  National Insurance Company (hereinafter referred to as "Columbia"), and to compare that claim handling to the universally accepted insurance industry standards that apply to such matters.

2. I have been asked, based upon my review, and with the benefit of my qualifications and expertise, whether I have certain opinions, as will be more fully set forth below. Where such an opinion is stated, it is provided based upon information provided to me that I consider reliable and of the type of information reasonably relied upon by one in my profession. All of my opinions are given with a reasonable degree of certainty based upon the use of a reliable methodology which includes my review of Columbia's claim handling and the information provided by the documents and depositions listed below, and then by comparing that information to the applicable insurance industry standards that apply to the property casualty insurance industry.

## MY QUALIFICATIONS IN THE FIELD OF INSURANCE:

3. Attached as "EXHIBIT A" to this opinion is my curriculum vitae, which contains my work history, positions held on various state boards, my accomplishments in the field of insurance, my continuing education, a list of courts which have deemed me qualified to testify on insurance matters, a partial list of seminars I have given, and a complete list of my past testimony over the past four years.

4. I have over thirty-seven (37) years of practical experience handling complex property casualty claims and related litigation, directing and overseeing insurance company defense counsel, managing and directing claim, underwriting, and insurance agency operations. As Vice President of Risk Management at a top 35 U.S. insurance agency, I assist insurance carriers and insured entities by intervening and or advising on complex or problematic claims. In addition to my role as a licensed insurance producer, I assist insurance producers and clients with insurance coverage analysis, insurance program analysis, and the management of corporate and personal risk.

5. I have spent many years instructing and training insurance company and insurance agency personnel, as well as reviewing, auditing, and both conducting, and supervising, multi-line claim investigations. I have personally handled and supervised thousands of liability insurance claims and was previously in charge of underwriting for the Southeast United States for an insurance company. I regularly advise industry representatives and legislative authorities with regard to insurance matters, and I am deeply involved in legislative initiatives related to

the Property Casualty Insurance industry. I also regularly conduct seminars for the insurance industry which are recognized for continuing education credits.

6. In my role at Fey Consulting LLC, I assist with insurance claims, coverage issues or disputes, coverage investigations, improper denials, underwriting concerns, or issues related to insurance procurement. I evaluate and provide litigation support and or expert testimony with regard to claim handling, allegations of agency errors and omissions, underwriting disputes, and a variety of other insurance related issues.

7. I currently serve as Chairman of the State of Louisiana Property Casualty Insurance Commission (LPCIC), a blue-ribbon committee appointed by the governor, comprised of members of the Legislature, representatives of public and consumer groups, designees from various state agencies, as well as representatives from law enforcement and the insurance industry. The Commission's directive is to study and recommend ways to reduce insurance rates in our state. I am the Immediate Past President of the Professional Insurance Agents of Louisiana (PIA), serve on the State of Louisiana's Auto Insurance Premium Reduction Task Force, and on its Cyber Security Commission.

8. The summer of 2009 edition of the ABA Tort Trial Insurance Practice Insurance Coverage Litigation Committee Newsletter contained an article entitled "The Use of Experts in Insurance Bad Faith Litigation". The article concludes that the most effective experts are those who are qualified by true experience in the insurance industry and who support their position with case facts. As you can see from my qualifications, I have ample industry experience, and I base all of my opinions on the documented facts of the case, coupled with my experience.

9. I have been deemed qualified as an expert on insurance matters by:

- The Superior Court of Fulton County- State of Georgia – (twice)

- The United States District Court of Mississippi - Southern District (twice)

- United States Bankruptcy Court, Eastern District of Louisiana

- 19th Judicial District Court, Parish of Baton Rouge, State of Louisiana

- The United States District Court for The Northern District of Georgia, Atlanta

- 40th Judicial District Court for The Parish of St. John the Baptist, State of Louisiana

- The United States District Court Eastern District of Louisiana (three times)

- The United States District Court Northern District of Florida

- The Civil District Court for The Parish of Orleans, State of Louisiana

- The Circuit Court of Jefferson County, State of Alabama

## BASIS OF MY OPINIONS

10. I have considered the following documents in preparing my opinion(s):

- The Dunn v Patterson complaint with exhibits A - N

- Columbia's Answer to Dunn v Patterson complaint

- Columbia's Responses to Plaintiff Ronald Curtis Patterson's First Request for Production of Documents

- Columbia's Responses to Ronald Curtis Patterson's First Interrogatories

- Ronald Curtis Patterson's Responses  to Columbia's First Requests for Production of Documents

- Ronald Curtis Patterson's Responses to Columbia's First Interrogatories

- Dunn Family's Responses to Columbia's First Requests for Production of Documents

- Dunn Family's Responses to Columbia's First Interrogatories

- COL-002186 to COL-002201

- The Dunn Notice of Appeal Re: Columbia's Partial Summary Judgment

- Affidavit of Debbie Lawson Davis as Representative of Lawson Air Conditioning and Plumbing, Inc.

- Dunn Family Production

- All Deposition Exhibits

- 13307115-0001 to 13307115-1717

- 14303760-0001 to 14303760-2461

4

- 16300492-0001 to 16300492-1470

- COL-000001 to COL-000139

- Lawson Document Production

- Yates' Document Production

- Columbia's Response to Patterson's First Request for Admissions

- Deposition testimony of Dr. Edward McDonald

- Deposition testimony of Amy Dunn

- Deposition testimony of John Barczykowski with exhibits

- Deposition testimony of Preston Burroughs with exhibits

- Deposition testimony of Ronald C. Patterson with exhibits (6-20-18)

- Deposition testimony of David Hubbard with exhibits

- Deposition testimony of James Dunn

- Deposition testimony of Debra Lawson with exhibits

- Deposition testimony of Matthew Poole (1-29-15)

- Deposition testimony of Matthew Poole (10-24-18)

- Deposition testimony of Ottie Rich

- Deposition testimony of Vince Davis

- Deposition of Matthew Poole in this case, with exhibits

- Affidavits of William Blankenship and Charles Bryson

- Surveillance videos depicting the accident scene.

- The unredacted version of Barczykowski's claim log

- April 18, 2014 email memo from John Barczykowski to David Hubbard

11. In addition to the above, my opinions are also based upon information contained in industry textbooks I have studied, have used to teach other adjusters, and which I refer to often, including but not limited to:

- Casualty Claim practice – Donaldson 4th addition
- Claims Operations: A Practical Guide
- Casualty Claim Practice – Hirsch & Donaldson - Fifth edition
- Principles of Risk Management and Insurance – Williams, Head, Horn, & Glendenning – Volumes I & II
- James J. Markham, et al., The Claims Environment (1st ed., - Insurance Institute of America 1993
- Doris Hoopes - The Claims Environment (2nd ed., - Insurance Institute of America 2000)
- Property Loss Adjusting (Vol. I & II) (2nd ed.) By James J. Markham and Insurance Institute of America (Jul 1995)
- General Insurance  - Bickelhaupt – Tenth Edition
- Issues in Insurance – Randall
- Commercial Liability Risk Management and Insurance – Malecki, Horn, Wiening, Donaldson – Volumes I & II
- Claims Operations: A Practical Guide Explanations and Illustrative Examples of Technical Claim Issues, Practices, And Management - by Michael T. Murdock, CPCU, ARE, ARM, ACI, ASLI
- An Introduction to Liability Claims Adjustment by Corydon T. Johns
- Human Relations in Handling Insurance Claims – Irwin Series in Insurance and Economic Security – by Willis Park Rokes
- Casualty Claim Practice by James H. Donaldson - Revised Edition

12. In addition the above texts and documents, my opinions are based upon a broad spectrum of education, training, research, and over three decades of experience.  I have access to various industry resources in addition to the above, such as Sage, Silver Plume, FC&S, and IRMI.  I research industry writings, and the above textbooks daily. I apply and draw from my actual multi-line claim handling, underwriting, agency, and insurance management experience in arriving at my conclusions.

**INDUSTRY STANDARDS**

13. With regard to the origins of these insurance industry standards, these are universal insurance industry standards that have been developed over many years that apply to claim handling in all jurisdictions. The standards are universally accepted industry principles all adjusters, agents, underwriters and insurance companies are expected to follow, understand, teach, and apply to their everyday professional practice. While state statutes will sometimes impact these standards, and these standards must always comply with such statutes, invariably, these well-founded standards are at least as stringent as those placed upon the industry by each individual state. Some standards were developed as reasonable methods of addressing insurance matters through years of

industry study, discussion and practice, while others were developed over time as a result of court decisions or other industry developments impacting common practice. All state unfair claim practice standards are in line with these industry standards. Obviously, insurers must have a justifiable reason to deny a claim and must treat an insured's interests with at least the same regard as its own. An insurer must handle claims in accordance with these standards.

14. These industry standards can be seen in various documents and books. Many insurers have internal Best Practices that are protected from general circulation and are only produced through court order subject to confidentiality agreements. Some can be found posted on the Internet such as "State Farm's Claim Handling Standards", and they can also be found in the above books and related study guides created for teaching these standards to all insurance professionals through formal study programs such as the CPCU, CIC, and AIC curriculum of the National Alliance for Insurance Education and Research and the Institutes. The National Association of Insurance Commissioners (NAIC) has also created a formal list of minimum fair claim practice standards, which was developed from common practice and these often-cited industry standards.

15. I have helped to develop these standards for insurers over the years and I have also been able to review many different insurer claim standards, Guidelines, and or Best Practices through my work as an expert witness. While protected by confidentiality agreements, I can state that these standards are all essentially the same. While some are more comprehensive than others, the industry closely protects these documents and they are usually only produced in conjunction with a protective order.

16. Adjusters are taught to be honest and forthright when handling claims and to treat the interests of the insured with at least the same regard as the interests of the insurance company. Just as one would need to understand the training and expectations of other professionals (for example doctors, lawyers, and accountants) in order to be able to evaluate their actions, one must also be able to understand the expectations and training received by insurance agents, underwriters, and adjusters in order to be able to evaluate how they should act, as compared to how they have acted in handling a particular situation, issue, or claim. These are insurance industry standards and practice that would not be common knowledge or fully understood by those outside the insurance profession.

17. These industry standards set the tone for how insurers approach claims. Any material deviation from these standards is either a failure by the insurer to properly train and supervise its claim handlers, or the result of a corporate culture that deviates from industry expectations.

18. For example, in the James J. Markham book, The Claims Environment, which is used in the Associate in Claims curriculum, Markham outlines some of the following well-founded and long-standing industry standards:

*Page vii - "Claims representatives….are the people responsible for fulfilling the insurance company's promise."*

7

*Page 5 -* "*A special relationship is formed between the insurance buyer and the insurance company in an insurance transaction.*"

*Page 6 -* "*When a covered loss occurs*, **the insurance company's obligation under its promise to pay** *is triggered. The claim function should ensure the* **prompt, fair, and efficient delivery of this promise.**"

*Page 9 -* "*. . . the primary function of a claim representative is to pay promptly and fairly . . .*"

*Page 13 -* "*"The primary duty of the claim representative is to deliver the promise to pay. Therefore,* **the claim representative's chief task is to seek and find coverage, not to seek and find coverage controversies or to deny or dispute claims***.*" "*Because of the personal relationship formed in an insurance transaction, the insurance company should not place its interests above the insured's.*" "*The claim professional handling claims should honor the company's obligations under the implied covenant of good faith and fair dealings.*"

*Page 18 -* "*It is to the insured that the insurance company owes the contractual obligation of utmost good faith and fair dealing.*"

*Page 19 -* "*Claim representatives handling first-party losses should promptly pay all amounts they know the insurer owes and should negotiate in a forthright, honest, and flexible manner over any amounts that are in dispute.*"

*Page 29 -* **"*An investigation must often be undertaken to fully develop the facts needed to determine coverage. Good faith claim practices require that this investigation be objective, thorough, and timely.*"**

*Page 274 -* "*No honest and reputable insurer has either explicit or implicit "standing orders" to its claim department to delay or underpay claims.*"

*Page 300 -* "*Upper management also has a responsibility to maintain proper claim-handling standards and practices.*"

In the Second Edition of The Claims Environment, (Appendix 3) the author explains some of the requirements of good faith claim handling, such as an unbiased investigation:

"*Claim representatives should investigate in an unbiased way,* **pursuing all relevant evidence, especially that which establishes the legitimacy of a claim***. Claim representatives should avoid using leading questions that might slant the answers. In addition, they should work with service providers that are unbiased…Investigations should seek to discover the facts and consider all sides of the story.* **Claim representatives should not appear to be looking for a way out of the claim or for evidence to support only one side.**"

In The Claims Environment, (2nd Edition, Doris Hoopes, 2000, Insurance Institute of America, AICPCU/IIA), Page 9.2:

"***Insureds purchase insurance to pay for losses, for peace of mind,*** *and to benefit society by reducing social burdens. When insurers do not provide those benefits of insurance , they cause just the opposite: unpaid losses, great stress, and burdens on society.*"

19. Insurance Companies are expected to comply with these universal industry standards, along with any applicable State requirements. I am using these universal standards to evaluate Columbia's actions in handling the underlying matters.

## OPINION:

### Background

20. Just before 11:00 PM on Friday June 7, 2013, Ronald Curtis Patterson ("Patterson"), while driving his employer's (Lawson Air Conditioning and Plumbing, Incorporated's ("Lawson")) Chevy 2500 pick-up truck, which had been assigned to him for almost a year, struck Amy Dunn, Danielle Demonbreun, and James Dunn (hereinafter jointly referred to as "Dunn") while they were traversing a marked cross walk in a Wal-Mart parking lot.

21. At the time of the accident Mr. Patterson was found to be under the influence of prescription medication he was taking for a hand injury. From an insurance claim perspective, liability was clear, the damages were significant, and punitive damages were an element of damage to be evaluated.

22. Amy Dunn sustained a hematoma or Traumatic Brain injury (TBI) and claimed to have lost her sense of taste and smell. In short, this was a serious matter that deserved Columbia's full attention and a full, prompt and thorough investigation.

23. Columbia received its first notice of loss (FNOL) the following Monday, at which time adjuster John Barczykowski was assigned to handle the claim. After its initial evaluation, Columbia unequivocally denied coverage to Patterson on the basis that Patterson was not a permissive user of the truck at the time of the accident. Since Patterson was not being defended, and since he was left with no insurance coverage, the case eventually went to trial wherein a verdict was rendered against Patterson for $11,500,000. As a result, the Dunn's and Patterson have now sued Columbia for bad faith claim handling and other claims.

### Coverage

24. At the time of the accident Columbia provided Business Auto Insurance coverage to Lawson under a commercial auto Policy No. CAPGA0000026827 effective July 1, 2012 to July 01, 2013 (hereinafter referred to as the "policy" or "underlying

policy"), subject to a $1,000,000 policy limit. Columbia also issued to Lawson an Umbrella policy No. CUPGA0000026827 subject to a $3,000,000 policy limit, applicable as excess to the underlying policy limit, for a total of $4,000,000 in coverage.

25. Importantly, the underlying policy was subject to "symbol 1" liability coverage, indicating that *"Any Auto"* was covered for liability by the policy, the broadest coverage grant available under a standard commercial auto policy. The policy specifies that Columbia *"will pay all sums an "insured" legally must pay as damages because of bodily injury to which"* the policy applies, *"caused by an accident and resulting from the ownership, maintenance or use of a covered "auto"".*

26. Since liability coverage applies to "any auto", the Lawson Chevy 2500 pick-up truck assigned to Patterson qualified as a covered auto under the policy at the time of the accident. The policy further outlines that anyone using a Lawson vehicle with Lawson's *"permission"* also qualifies for insured status under the policy.

27. The bottom line on coverage for Patterson is: If Patterson was a permissive user of the Truck Lawson assigned to him, he is covered by the policy. If he was not a permissive user, he would not be covered.

28. Columbia denied coverage to Patterson a second time via a letter dated May 17, 2017, almost 4 years after its initial denial in August 2013. In that letter, Columbia denied coverage under its Umbrella Policy for the first time and **misrepresented coverage** by asserting an exclusion that does not even arguably apply to the claim (exclusion 2. F. entitled Auto Coverages). Besides being years late, Columbia attempted to manufacture a basis for denial by taking the position that the truck at issue did not qualify as a covered auto at the time of the accident. Since the umbrella policy follows the underlying coverage, *"any auto"* covered by the underlying policy is considered a covered auto in the Umbrella Policy. There is no question that the Lawson truck qualified as a covered auto in the Umbrella Policy since as already discussed, *"any auto"* was covered by the underlying policy.

29. The original complaint was filed after Columbia's first unequivocal denial of coverage. Notably, the complaint alleged that Patterson was within the course and scope of his employment (among other allegations) at the time of the accident. Based upon that allegation alone, Columbia was under an obligation to at least defend Patterson since Lawson's documented position was that Patterson had permission to use his work truck while in the course and scope of his employment. However, rather than offering Patterson a defense under a reservation of rights, or even attempting to contact Patterson to discuss the allegations, Columbia was steadfast in its denial and did nothing.

30. Since doubts regarding an insurer's duty to defend are always resolved in favor of the insured, Columbia should have defended Patterson under a reservation of rights even if it felt the covered allegation was inaccurate or false. Likewise, since permissive use is a concept that is not concrete, and can include both expressed and implied permission, Columbia was under an obligation to fully investigate the claim prior

to its denial, especially in view of the aggravated fact pattern and serious injuries. Once the complaint was filed,  a finding that Patterson was in fact a permissive user at the time of the accident was a possibility.  In fact, it was  declared by the presiding judge to be a question of fact for the jury, meaning there was always a potential for coverage under the policy, triggering Columbia's duty to, at the very least, defend Patterson under a reservation of rights (ROR). The prudent approach, which is the standard approach used in the insurance industry when handling claims involving coverage issues that are not clear cut such as scope of employment and permissive use, would have been for Columbia to initially reserve it rights, continue its investigation, and once suit was filed defend Patterson under a reservation of rights and file a separate Declaratory Judgement action so that a judge could rule on coverage.

31. However since Columbia breached the insurance industry standards by unequivocally denying coverage prior to conducting a thorough investigation, by not making the denial equivocal so that it might be able to reevaluate its position once suit was filed, and by effectively abandoning Patterson, it may be deemed to have waived all rights under the policy, including its right to defend Patterson, since the effect of its unequivocal denial was to make Patterson a *"free agent"*. This is a concept well known in the insurance industry, that even Columbia's Litigation Manager David Hubbard acknowledged in his deposition testimony:

(Hubbard Depo Page 101 line 15 through Page 102 line 3 (emphasis added))

*Q. Okay. Well, in fact, after Columbia sent the letters denying coverage, wouldn't you agree that Mr. Patterson had every right to enter into any agreement that he wanted to with the Dunn family?*
*A. Yes, I would agree with that.*
*Q. Okay. And why would you agree with that?*
*A. Oh, in that he -- you know, coverage was denied to him and, you know, **in a sense he's -- he's a free agent** to -- to do what he likes and enter into agreements with whoever he wants.*
*Q. And is no longer bound by the policy conditions?*
*A. Right, at that point.*
*Q. And that's how things work in your industry?*
*A. Generally, yes.*

**Claim Handling**

32. Upon being assigned the claim, adjuster John Barczykowski contacted Debbie Lawson Davis, an owner of Lawson. The file notes reflect that  Davis informed Barczykowski in that conversation that while Patterson was allowed to drive his vehicle home from work, he was not allowed to use it for personal use. Lawson followed up that conversation by emailing Barczykowski a copy of a form signed by Patterson acknowledging Lawson's Employment Practices & Policy Manual and a single page of Lawson's internal rules (13307115-0160), which states (in pertinent part - emphasis added):

*"VEHICLES - COMPANY OWNED*

*Company trucks will not be used for personal use at any time, unless **approval** has been granted by Lawson Air Conditioning & Plumbing management. NOTE: Non-- employees of Lawson Air Conditioning & Plumbing are NOT covered by insurance coverage if driving OR riding in a company vehicle. Disciplinary action will be taken against violators."*

Significantly, the rule was different than described by Davis to Barczykowski.

33. After obtaining Debbie Lawson Davis's email with the attachments, Barczykowski entered the following file note (emphasis added): *"No personal use of company vehicle w/o **permission** of insd. Signed page from insd driver;"*. Note that while Lawson' written rule or policy is that the employee should obtain **"approval" and** says nothing about revoking the employee's **permission to drive the truck,** Barczykowski uses the term "permission" in his file note. Since approval is not the same as permission, Barczykowski's note, a note that would have been relied upon by his supervisor overseeing his work, was misleading. Adjusters are trained to be very precise when entering notes like these, especially when the misuse of a term can alter the note's impact on coverage. This reflects either very sloppy claim adjusting or an intentional misrepresentation of a pertinent fact impacting coverage. In fact, Debra Lawson testified in her deposition that Lawson employees assigned trucks had permission to use the trucks and that such permission had never been withdrawn as a result of a truck being used after hours without approval. A huge difference.

34. That is the entirety of Columbia's coverage investigation with regard to permissive use, upon which it relied to deny coverage. While Barczykowski attempted to reach Patterson by phone and by mail, the phone number he called was not a working number and it appears that the contact letter never reached Patterson. Even though we know that it was possible for Columbia to easily make contact with Patterson since Lawson's Ottie Rich was able to retrieve Lawson's truck keys, cell phone, and gas card, from Patterson, at Patterson's home, Columbia failed to make any effort to locate Patterson or to otherwise properly investigate the claim, nor did it contact Lawson to determine how Lawson was able to get in touch with him or to obtain an alternative phone number. When having trouble contacting employees during any claim investigation adjusters are trained to contact the employer for assistance.

35. On June 20, 2013, just 10 days after FNOL, Barczykowski noted in Columbia's claim file that the Dunn's had serious injuries including visible injuries, possible internal injuries and a serious head injury, which included a reference to Amy Dunn receiving 11 staples in her head and having a pocket of blood on her brain. Columbia was aware that this was a serious case from which its insureds needed protection.

36. Other than obtaining a copy of the police report, after learning of the seriousness of the Dunn's injuries, and after not hearing back from Patterson in response

to the contact letter, Barczykowski conducted no additional coverage investigation before denying coverage.

37. We know that Lawson's Ottie Rich, one of Patterson's supervisors, was able to contact Patterson at his house within one and a half weeks of the accident by merely showing up. Columbia failed to assign a field adjuster, retain an Independent Adjuster, or even retain a Private Investigator to attempt to locate Patterson. These are all common claim investigation practices that are required, especially when faced with a claim involving serious injuries and coverage questions. These are routine investigative steps an insurer should take prior to even contemplating a denial of coverage. Instead, Columbia merely denied coverage to Patterson on August 22, 2013, just 72 days after Columbia's FNOL. Here is that denial letter:

(Exhibit F) (13307115-0138)

*"Our  investigation of the  above captioned claim  has revealed that **there is no coverage available for you under our insured's policy, as you were not a permissive driver at the time of the accident.***

*According to our insured's policy manual, "Company trucks will not be used for personal use at any time, **unless approval has been granted** by Lawson Air Conditioning & Plumbing management. Note: Non-employees of Lawson Air Conditioning and Plumbing are NOT covered by insurance coverage if driving OR riding in a company vehicle." It is my understanding that you acknowledged reading the Policy Manual and Safety Manual belonging to Lawson Air Conditioning and Plumbing, Inc. on June 13, 2012."*

*Please report this matter to your insurance carrier for possible coverage under your personal automobile policy.*

*If you have any questions, please feel free to contact me.*

*Sincerely,*

*John Barczykowski*
*Staff Adjuster*
*Columbia Insurance Group*

38. This was an unqualified denial of coverage without any reservation and is contrary to the industry standard approach to such matters. Besides the fact that a claim should never be denied unless or until a full and thorough investigation is complete, Columbia knew or should have known that a lawsuit would be filed against Patterson, especially after Columbia denied coverage. If after completing a full and thorough investigation, Columbia still felt it was entitled to deny coverage, at a minimum, it should have prefaced any denial with a request that it be allowed to reconsider if and when suit was filed, since the allegations of the complaint are really what Columbia would need to

see in order to be able to properly evaluate coverage. Because the duty to defend is controlled by the terms of the policy as it compares to the allegations of the complaint, a prudent liability insurer will always reserve final judgment on coverage until receiving the actual complaint.

39. Since Columbia failed to reserve its right to reconsider if suit was filed, failed to let Patterson know that he could submit additional documentation or information for reconsideration, and failed to thoroughly investigate prior to denial, in accordance with industry custom and practice, it may be found to have waived all policy defenses other than the only one stated in its denial (permissive use).

40. Denial of coverage is a drastic step and should never be taken lightly. In the event of a decision to deny coverage, all basis for denial must be clearly and distinctly stated in the denial letter. An insurer is required to get it right the first time and cannot reinforce its denial by conducting additional investigation after the fact. Likewise, especially when issuing an unqualified denial, the insurer must be certain its position is correct.

41. "Permissive use" is not a defined phrase in the policy and should therefore be interpreted "loosely". The insurance industry standard practice is to interpret undefined terms broadly to provide coverage wherever possible not narrowly to limit coverage. Not only does the Columbia policy not define "permissive use", it also makes no distinction between personal and business use. For example, there are many instances reflected in the deposition testimony and affidavits where Mr. Patterson and other Lawson employees used their assigned vehicles after hours on personal business without prior management **approval**, yet even after Lawson management became aware, it failed to reprimand those employees or to revoke permission to use the vehicle. The insurance industry recognizes that such "knowledge" without reprimand can be considered implied approval. This is sometimes also referred to as implied permission, however here, **no one ever withdrew Patterson's permission to use the vehicle, until after the accident, at which time Ottie Davis took his keys.** While these employee may have used these vehicles without obtaining approval, nothing was stated in Lawson's rule book about employees not having permission to use these vehicles after hours, only that they should seek approval first. Similarly, while employees were told not to use their company issued cell phones for personal reasons, personal use appears to have been common practice. The fact that the cell phone policy was not enforced creates even more confusion as to the enforcement of Lawson's internal rules. Here is what Ottie Rich, Patterson's direct supervisor had to say with regard to Patterson's personal use of his company cell phone, credit card, and the truck:

 (Deposition of Ottie Rich - Page 54 line 15 through 25, page 55 line 14 through page 56 line 14)
*Q All right. Did you have any conversations after Mr. Patterson was hired about the use of a cell phone?*
**A Only when I would remind everybody -- everybody at work that phones were for company use only.**

*Q Okay. Is that part of some policy of Lawson Heating and Air?*
*A That cell phones are for company use only?*
*Q Yes, sir.*
*A That's policy. Also, and you can talk to Miss Davis about this, **but when we talked to Miss Davis, we talked about whether or not employees could use company phones for their own personal use, and I thought she said to me that that was okay as long as it didn't get out of hand.***
*A **See, as long as it doesn't get out of hand. I preach to my guys that we use our cell phones for company use only.** See, **that doesn't mean if there's an emergency** or if they need to call somebody. We just don't do it all the time, and that's -- **not saying that's policy. That's me.***
*Q All right. Do you review the cell phone records?*
*A See, unless it gets out of hand, no.*
*Q All right. I guess when Mr. Patterson was hired, he was also given permission to use a company credit card, too, for purposes of getting gas?*
*A It's a company gas card.*
*Q **So he was given permission to use a company gas card, is that right?***
*A **Yes.***
*Q **And he was also given permission to use a company truck, is that right?***
*A **Yes.***

42. So from this testimony we can see that it would be hard to fault Lawson's employees if they didn't quite follow or understand Lawson's internal rules since they were told not to use the cell phones after work, but then told that it was OK to use them after work, they were told they should never use the cell phones after work, but then were told that could use them in the case of an emergency. It seems that Lawson's internal rules may have been: *It's OK to use the company cell phone after hours as  long as it doesn't get out of hand.* This raises the question: Was this was the same philosophy applicable to the personal use of Lawson's company trucks? Keep in mind that this was Mr. Rich's' explanation, the supervisor that was tasked with explaining Lawson's internal rules to its employees. The point is, internal rules such as these are never as hard and fast as the black and white rule book. In fact, **Matthew Pool confirmed in his deposition testimony that Lawson's truck usage policy was not enforced.**

(Deposition of Matthew Poole (10-24-18) page 79 lines 5 – 1)

*Q: So do you agree that Lawson did not enforce that rule or do you agree that they did not enforce that rule?*
*A. I would agree that they did not enforce that rule.*
*Q: **Did you enforce that rule?***
*A: **No, sir.***

43. These are the questions Columbia could have and should have asked before denying coverage.  If Columbia had asked these simple questions, it would not have denied coverage and the judgment against Patterson could have been avoided by settling the claim. The affidavits of Jeff Dale and William Blankenship indicate that even a

cursory investigation would have produced information sufficient that coverage would not have been denied, since at the very least there was evidence of employees' after-hours personal use of trucks assigned to them. Columbia was in possession of a list of Lawson drivers and could have identified drivers in like positions as Patterson within Lawson, or preferably, former employees to interview. The seriousness of this claim cried out for a thorough investigation, the standard practice for all claims, but in this claim, it was mandatory since a denial was being contemplated. Permissive use is rarely clear cut, and the fact that Lawson allowed its drivers to take the vehicles home after hours was enough to require additional information and to at least talk to Patterson. Instead, Columbia cut corners and just denied coverage to Patterson based upon Debbie Lawson Davis's say so.

44. Claim professionals who handle commercial auto claims know that personal use of company vehicles is common within commercial fleets that are taken home by employees. Experienced claim professionals and underwriters are very skeptical of any representation by a corporate officer to the contrary. It is always preferable to interview similarly situated employees since corporate management may not be informed as to actual real-life practice verses written corporate internal rules. Likewise, while direct supervisors should be able to discuss real life practice, they have a self-interest in protecting themselves from allegations of improper supervision or for lax controls, just as we have here. Former employees are a good source of information since former employees tend to be less constrained in detailing how a company operates on a daily basis. As a Risk Manager at top 35 U.S. insurance agency where one third of the book of business is heavy industrial and commercial construction, I can state with certainty that personal use of company fleet vehicles is the rule, not the exception. While many fleet safety manuals prohibit personal use, as Jeff Dale's affidavit documents, these vehicles are used as perks to attract and retain talented employees, and experienced claim professionals know that personal use is common practice, even if limited by internal rules.

45. Personal use of fleet vehicles is a recognized exposure when dealing with commercial fleets from an insurance underwriting, risk management, loss control and fleet safety perspective. Most insurers closely underwrite commercial fleet exposures and most companies with commercial fleets that entrust vehicles to employees, require those employees to provide proof of insurance to protect the employer, at least to some degree (a primary layer of coverage), from personal use after hours. Coverage can be endorsed onto the employee's personal auto policy to provide primary personal insurance coverage for business vehicles while being used after hours for around $150 a year. Most employers merely add a few dollars to the employee's paycheck to offset this small cost. It is very unusual to see a situation where employees are allowed to take their vehicles home each day, but then not be allowed to use them, at least occasionally, for personal use.

46. Personal use is common, underwriters recognize this exposure, consider it during the underwriting process, and the premium reflects this risk of loss. There was nothing from an underwriting or policy perspective to preclude coverage for Patterson. It

was only Debbie Lawson Davis's assertion that personal use was forbidden that triggered a coverage concern. Since there can be ulterior motives, coverage cannot be denied to one insured merely based upon another insured's assertions, without a full and thorough investigation.

47. It is very important that Patterson and these other employees were not reprimanded for personal use, a fact confirmed by Patterson's direct supervisor (Poole), who testified that he did not enforce the rule. In fact, Debbie Lawson Davis, Ottie Rich and Matt Poole all testified that they would not reprimand an employee for personal use of a company vehicle after hours. Regardless of Ms. Davis's position, it is possible that a judge or jury could come to the conclusion that Patterson had implied permission to occasionally use his assigned truck after hours. Therefore, a denial of coverage based upon a phrase that is open to interpretation, without additional investigation, reflects very substandard, lazy, and just poor claim handling. It also reflects a complete lack of concern for Patterson's interests, who otherwise qualified as insured under the policy. Columbia made no attempt to find coverage for Patterson and left Patterson unprotected. While Barczykowski acknowledged that he was taught to try to find coverage, the industry standard practice mentioned above, he failed to apply that standard to his coverage evaluation.

48. Since permissive use is an issue that is rarely clear cut, subject to many factors and gray areas, it would be extremely unwise for an insurer to deny coverage based upon permissive use unless or until a full and thorough investigation is complete, and until it has been determined that there is no dispute between the involved parties who may have competing interests. Here is a list of the investigatory steps Columbia should have taken prior to considering denial:

49. To properly investigate coverage, Columbia should have taken statements taken from:

- Ronald C. Patterson regarding the accident and use of company vehicles

- Debbie Lawson Davis to document her position – For example, she stated in her deposition that she **would not have revoked permission** to use the vehicle had she known that Patterson used it for personal reasons

- Matthew Poole – Patterson's manager who was allegedly aware of Patterson's personal use the Lawson truck. Poole testified in his depositions that he **would not have disciplined Patterson for personal use and that in fact, neither he nor Lawson enforced the personal use rule**

- Ottie Rich – Patterson's supervisor – who also allegedly witnessed Patterson using the Lawson truck for personal use, and who also testified in his deposition that **he would not have disciplined Patterson for personal use**

- Vince Davis – The owner of Lawson

17

- Billy Blankenship (foreman) - Similarly situated employee – his understanding of the Lawson vehicle use policy verses customary practice

- Franklin Bridges (foreman) - Similarly situated employee – his understanding of the Lawson vehicle use policy verses customary practice

- Jeff Dale (the former V.P. that hired Patterson in 2004) – his understanding of the company vehicle use policy. Former employees are always important sources of information as they will be less biased or influenced

50. Additional investigation should have been conducted such as:

- Columbia should have obtained and preserved all time sheets and records as part of its coverage investigation, which would have preserved the same information demanded by Dunn's counsel (spoliation)

- Obtain the underwriting file and determine if there were any loss control inspections, fleet safety training, or operational evaluations that could be reviewed as they would most likely discuss actual vehicle usage by employees verses company policies

- Retain an independent adjuster or send a company field adjuster to take statements from the above parties, to make contact with Patterson, and to otherwise assist with the investigation

- Retain a Private Investigator to locate anyone that could not be located or to meet with anyone who failed to cooperate with the above investigation

- Conduct a Social Media check to locate Patterson if needed

- Ask Lawson to allow Patterson to keep the company cell phone (at least temporarily) so that he could be contacted as needed

- Identify the location where Ottie Rich met with Patterson (where Patterson was currently living) after the accident when Rich was able to recover Lawson's keys, cell phone, and gas card

- Check with Lawson regarding Patterson's cell phone being disconnected and to obtain his cell phone records

- Contact Lawson for an alternate phone number or information regarding how to contact Patterson

- Review other Lawson auto claims previously handled by Columbia, to see if they involved the personal use of Lawson vehicles after hours

18

51. While the depositions of some of the above persons were eventually taken, it was long after the denial. In fact, these deposition were not taken by Columbia in an effort to investigate coverage for Patterson, they were taken due to the discovery requests of Dunn's counsel. Of course, by the time these depositions were taken, memories were foggy at best, and there were many *"I don't remember,"* and similar responses. Time has erased much of these witnesses recollection. Of course, by the time they were deposed, Lawson's people were already familiar with the issues being investigated . Here is what Hubbard had to say about obtaining statements after a loss:

(Hubbard deposition testimony Page 153 line 23 through page 155 line 11)
*Q. And why was it important for Columbia to communicate with Mr. Patterson?*
***A. I think that we have a duty to at least attempt to contact any insured or potential insured to – if they're involved in an accident to -- or at least – at least it's certainly within our internal procedure, I'll put it that way, to get a hold of them and get, you know, their version of what happened.***
*Q. Okay. Is this internal procedure documented someplace?*
*A. No.*
*Q. Is it --*
*A. It's just -- I'm sorry. Yeah. Yeah. It's just -- it's a verbal -- we have -- for example, we have a contact -- we insist on contact within the first business day of, you know, any -- any insured or potential insured who is involved in an accident, and that's one -- one of the things that we really monitor in file review.*
***Q. And why is that important?***
*A. Just for -- I mean, good public -- good public service and good customer service, you know, for one thing, chiefly. And then, of course,* ***you can hopefully nail down the relevant evidence as quick as possible.***
*Q. And when you say relevant evidence, what do you mean by that?*
*A. Getting, shall we say, versions of accidents. Just one example, you know,* ***before people have the chance to have their memories change or fade, you know, it's great to get a statement early on, you know, of what happened, what do they remember.***
*Q. And that's for purposes of performing an investigation into the claim?*
*A. Yes.*
*Q. For investigating facts of liability?*
*A. Yes. Yeah, often.*
*Q. And potentially damages?*
*A. Yes.*
*Q. And also coverage?*
*A. Yes.*

52. While they were never deposed, Columbia failed to interview any similarly situation employees at Lawson to determine their customary practice with regard to the personal use of their assigned trucks.

53. There were many issues that surfaced during these depositions that would have been uncovered had Columbia properly investigated the claim prior to its denial. For example:

- Lawson provided gas cards for employees to fuel the trucks
- Patterson sent photos of an ATV he bought for son, while it was in back of his company truck, to Poole and Davis – clearly, they were aware, or should have been aware of his personal use of the vehicle
- Patterson had a prior accident involving his personal use of his assigned Lawson truck after hours, at his dad's house, wherein it was damaged. He reported the accident to Ottie Rich
- There was still damage on the truck associated with the accident at Patterson dad's house, which should have been an area of inquiry by Columbia
- Patterson reported seeing other employees using Lawson trucks after hours
- There was no investigation as to exactly who at Lawson had authority to authorize personal use or to document that the personal use policy was not enforced
- Reportedly Patterson was getting dinner after hours at a KFC when he was spotted by Poole, who then called him to chat
- Patterson maintained the truck keys on his personal key chain
- Patterson was told to keep the truck during a period of time when he was laid off due to a lack of work

54. In fact, to illustrate how little effort Columbia put into its investigation, even after Dunn's counsel sent Lawson and Columbia a letter demanding that they protect Patterson's records, Lawson disposed of Patterson's time sheets and allegedly its system crashed, and all the data was lost. Had Columbia really been interested in trying to find coverage for Patterson as insurance industry standards require, it would have already obtained copies of those records for its own evaluation. Here is the letter dated June 28, 2013 from Alexander to Lawson and Columbia:

(Exhibit D) (13307115-0078):

***My clients believe that certain electronically stored information ("ESI") in Lawson's possession is likely to lead to information concerning the facts and circumstances of this vehicle/pedestrian collision.*** *This ESI includes information such as **time records,** dispatch records and communications, reports, emails, damage estimates, photographs, personnel files and material, and company policies and procedures that may be stored in Lawson's computers and electronic devices. This ESI also consists of information stored in Lawson's cell phones, including call logs, text messages, voicemails, internet usage and other electronic communications. My clients specifically request that Lawson and retain all ESI in its possession or to which Lawson may have access and take every reasonable step necessary to preserve this information.*

***To help ensure that this ESI is preserved, my clients specifically request that Lawson suspend all automatic data deletion of information concerning Mr. Patterson or this incident. Also, do not erase any hard drives, recycle any back-up tapes, or delete any data, ESI or other information pertaining to Mr. Patterson or this incident.***

*I have forwarded a copy of this letter to John Barclasky with Columbia Insurance : Company.*

55. There are other signs of Columbia doing less than the bare minimum on this claim. For example, while Alexander repeatedly demanded a copy of Columbia's auto policy so that he could evaluate coverage due to Columbia's denial, Barczykowski ignored these requests. Alexander also sent other correspondence requesting information which Barczykowski ignored. However, even though we have all of the above short comings, when Burroughs and Hubbard were asked to rate Barczykowski's handling of the claim, Burroughs rated it as excellent, and Hubbard gave it a 7.5 on a 10 scale.

(Burroughs deposition testimony Page 155 line 3 – 7)
*Q. As it relates to Mr. Barczykowski's handling of this claim for the purposes of making a coverage determination, how would you rank that, one being poor, ten being excellent?*
**A. Ten, excellent.**

(Hubbard deposition testimony Page 140 line 25 through page 142 line 12)
*Q. And based upon what you know as far as the gathering, investigation of the facts concerning the coverage determinations made by Mr. Barczykowski, on a scale of one to ten, how would you rate his efforts, one being very, very poor, ten being excellent?*
*MR. RAPP: Object to form.*
*BY MR. ALEXANDER:*
*Q. Do you understand the question?*
*A. I do, sir. Yeah, and forgive me. I'm – want to, of course, give you a correct answer. Yeah, the -- I would say 7.5. You can always do more, but -- but if I -- as I understand it, plenty was done in the investigation and the -- you know, again, I -- this is from my vantage point and what I know.*
*Q. And from your vantage point and what you know, what you say -- what more could have been done?*
*A. I mean, it's always possible to -- which is, as I understand it was done later, to, oh, let's say, hire a private investigator, but I believe that was tried later with no success. That's the chief thing that I was -- that had occurred to me.*
*Q. So when you reviewed and -- obtained the file and reviewed the file in, I guess, April of 2014, you had some pause that a private investigator could be used to try to, what, communicate with Mr. Patterson?*
*A. Yeah. And I really don't know if that even occurred to me at that time. I think it -- I think it only occurred to me later when one was actually used. But, again, based what I know, it looked like plenty of effort had been -- had been used. The reason I didn't give him a nine or a ten was, you know, there's always more you can do, or typically.*
***Q. Well, before Columbia denies coverage to a potential insured, wouldn't you want Columbia's investigation efforts to be a nine or a ten?***
*MR. RAPP: Object to form.*
***THE WITNESS: Yeah. That would -- that would certainly be my goal about.***

56. While Burroughs refuses to admit that Patterson should have been contacted prior to Columbia even considering a denial, at least Hubbard recognized the failure, although downplaying it.

57. There are other signs that Lawson, like many companies, did not uniformly enforce its own internal rules that should have triggered further investigation. While use of the company cell phones for personal use was discouraged, employees apparently used these cell phones regularly for personal calls. Merely requesting cell phone records would have confirmed this. Likewise, while the company rule was to obtain each driver's motor vehicle report, Lawson failed to follow that written procedure and only required a valid driver's license. As a claim professional investigating commercial liability claims, it is very common for companies to put together handbooks to satisfy various regulatory and insurance underwriting requirements and then to simply ignore them. We can see from the deposition testimony of Matthew Poole, one of Patterson's supervisors, that employees did in fact regularly use their trucks for personal errands. While Poole testified in his original deposition that his employees would always call him prior to using trucks for after hours, in his October 2018 deposition he admits that **the personal use rule was not enforced.** Had Columbia merely asked Poole this question prior to its denial, this would have created a red flag, requiring additional investigation. Note the inconsistencies in Poole's testimony:

(Matthew Poole deposition testimony – Page 89 lines 20 through page 90 line 21)
*Q Okay. Are you aware of whether or not Lawson's employees occasionally use company vehicles for their personal use?*
*A If an employee has to use it for personal use, the employees usually come to their direct supervisor, which in my case in the plumbing department would be me or Ottie. Normally it's, hey, I got to stop by and grab something on the way home from work. My guys are good about that. As far as I recall, I don't remember Curt ever asking us to stop anywhere after work or to use the truck on the weekends. **Most of my guys know to ask us if they're going to -- if they need it --** I had a couple of guys like clean their trucks on Saturdays, for example. They'll say, hey, we're going to be taking our truck to get it washed and cleaned, and usually -- I mean, nobody's ever stepped out of line on that. If one of them is running late and needs to stop by and pick up something, a gallon of milk for their family or something, my guys are usually pretty good about saying, hey, I'm going to stop. Most of them have to stop and get gas anyhow so they usually grab a drink or something there. But as far as anything else like that after hours, I'd have to say I never -- knock on wood -- my guys have always been responsible enough to let Ottie or I know.*

(Matthew Poole deposition testimony of October 2018 – Page 67 lines 16 – 24, Page 78 lines 22 through Page 79 line 21)

*Q Okay. And you never denied anyone permission?*
*A No, sir.*
*Q And you never disciplined anyone for personal use of the vehicle?*
*A No, sir.*
*Q And you don't know of anyone at Lawson ever being disciplined for using their vehicle for a personal errand?*
*A Not that I remember.*

(Poole testimony of 10-24-18)

*Q So on paragraph ten of Mr. Dale's exhibit, he says that, "As a practice Lawson did not enforce internal rule H." Do you know what internal rule H he's talking about is?*
*A Just -- I mean, I'm reading it off that right there. Other than that, I mean, it was always – we always addressed that the truck was only used for business purposes and not personal use.*
**Q So do you agree that Lawson did not enforce that rule or do you agree that they did not enforce that rule?**
**A I would agree that they did not enforce that rule.**
**Q Did you enforce that rule?**
**A No, sir.**
**Q But you understood it was a company policy?**
**A Yes, sir.**
*MR. DOLDER: Objection. Leading.*
*BY MR. RAPP:*
*Q We went through a long list of people here that you supervised. And -- and correct me if I'm wrong, but* **you don't remember anyone ever asking – or do you remember anyone ever asking you if they could use their truck for personal use?**
**A No, sir, I do not remember.**

58. Columbia failed to investigate Lawson's compliance with its own internal rules, a very important issue in this case since Columbia was relying upon these same internal rules to deny coverage. As another example, while most commercial operations conduct internal investigations any time there is an incident, not to mention a serious accident, and while Lawson's own corporate rules (Exhibit 1 to Debra Lawson's deposition, page 7 – testimony page 80) require an investigation of any accidents, even though this accident involved a company truck with serious bodily injury claims directly against Lawson, Lawson took the position that this rule only applies to accidents involving company business/projects. Since this was after hours, the rule did not apply. This selective enforcement of numerous company internal rules is a real problem that required attention. Had Columbia truly wished to follow the insurance industry standard practice of finding coverage for Patterson, it would have been very easy to do in this case.

59. As discussed, Columbia was required to investigate the use of these trucks after hours by not only Patterson, but also by any similarly situated (and preferably at least one former) employees with assigned vehicles and could have easily done so by using the list of drivers it possessed.  Since Patterson was not on call and was required to come to the office each morning to pick up his crew, if one were to merely accept Debra Lawson's position, this arrangement was very suspect and raised the following question: If Patterson was required to pick up his crew at the office each morning and then drop them off at the office at the end of the day, why would he need to drive the vehicle  home each night? For what purpose? While it could be argued that the ability to drive to and from the office was a perk of the job, such limited use is of little value and is not the common practice with such commercial operations. If Lawson was trying to attract and retain talented employees, such a limitation on the use of assigned vehicles

would have put them at a competitive disadvantage. Similarly, why was Patterson allowed to take the truck home and keep it for two weeks while he was laid off? From a claim perspective, the conflict between Debra Lawson's position and these actual practices begged further investigation.

61. A claim professional handling this claim should have found Lawson's rush to terminate Patterson after the accident very disturbing based upon what Lawson knew at the time. If Patterson was the solid and dependable employee Lawson claims, why would they terminate him without any discussion or even a meeting? I found other things that seem to show a "circling of the wagons". Notably, there is an inordinate amount of communication between Lawson's agent Yates, Columbia, and Lawson, with exchanges wherein Columbia's Hubbard referred to Patterson as an *"idiot"* (Yates 1521 dated 9/21/2017), used the term *"conspiracy"* (Yates 0085 dated 10/31/2016) and wherein Debra Lawson expressed "REALLY!!!" when discussing the nature of Patterson's claim against Columbia (Yates 1523 dated 2/26/2018). There was obvious pressure by Lawson and Yates on Columbia to continue its denial of coverage to Patterson. Here is what Hubbard had to say about his interactions with Yates and Lawson.

(Hubbard depo testimony Page 143 line 13 through page 145 line 22)
*Q. You made some reference that the Angela Parson and the Yates Insurance Agency, I guess, seem pretty actively involved in the following of the status of this claim?*
*A. Yes.*
*Q. Okay. Are you aware of whether or not the Yates agency or any representative of Yates or Lawson expressed any preference about whether coverage should or should not be provided to Patterson?*
*A. Yes. Am I aware if they expressed a preference?*
*Q. Yes.*
*A. They -- they and, I understand **Ms. Lawson felt strongly that -- that Mr. Patterson should not be afforded coverage.***
*Q. Okay. And how was that communicated to Columbia?*
*A. And I'm -- I am only going with my own communications that I -- **and I got some phone calls and emails from this Angela Parsons.** So, I don't know who else she talked to or if she did.*
*Q. Okay. Is that something that it's important to you?*
*A. The feedback from the agent --*
*Q. Well, yeah --*
*A. -- for your --*
*Q. -- no, the agent or the insureds expression, their strong expression that coverage should not be afforded?*
*A. Oh, no. No. I see what you are saying. It's important only in the sense that public relations are important, so I will listen politely. I'll hopefully listen nicely, but we really can't let that influence our coverage or liability decisions.*
*Q. Tell me why.*
*A. Because then you get in the position of having, **let's say the agents or the insureds, you know, who are often highly emotional at this point** really directing the claim file and we just can't have that. So, I listen politely to them and, you know, communicated with them, as you could see, but really that didn't have any effect on, you know, my handling of the claim.*

*Q. And would it be improper to deny coverage to an insured just based upon the expression of an agent or the customer?*
*MR. RAPP: Object to form.*
*THE WITNESS: Yes, I think it would be improper if it was based on that alone. In other words, it really -- if it's a case that you're -- really should -- should be covered or there's adequate – inadequate information to deny coverage and it's based on pressure from the agent, yeah, that would be improper.*
*BY MR. ALEXANDER:*
*Q. So the pressure from the agent or from the insured about whether to provide coverage or not play any role in the insurance company's decision as to whether or not they deny or afford coverage for a potential insured?*
*A. No. Very fair question. And it should play no role, and it certainly played no role with me. I have dealt with many agents over the years and have, you know, often get some fairly extreme demands.*

62. The standard in the insurance industry is for an insurer to make an independent informed decision based upon a prompt and thorough investigation of the facts, and not to be swayed by employers/insureds who are commonly worried about a claim's impact on premium and angry at employees who cause accidents while driving company vehicles.  We also see this phenomenon in Workers Compensation (WC) claims wherein otherwise solid and dependable employees that are injured on the job, are suddenly terminated due to the WC claim's impact on insurance premiums. In fact, "can we terminate him" is one of the most common questions I get after employees are injured on the job. This employer bias is known to adjusters and there was clearly extreme involvement in the claim process by Yates and Lawson, much more than typical. In fact, by the time the first email cited above was sent, Lawson had been dismissed from the lawsuit for almost a year and Hubbard's involvement was supposed to have been over. It would be extremely odd for the agent and the Named Insured to be this involved in any claim, let alone a claim where the client/Named Insured had already been released and where there was a coverage dispute regarding a fired employee. Extremely bad optics. Here is Debra Lawson's testimony regarding her feelings about the accident:

(Page 91 line 10 through 25)
*A. I tell you, at that particular point, **the only thing I was concerned about was** -- let me rephrase that. At that point, my intent to contact them was, **how do I get the vehicle repaired?** Because again, this was not a Lawson incident. I had no clue that there would be any level of Lawson responsibility in this.*
*Q. Okay.*
*A. My vehicle was damaged. It had to be repaired to be in use again. The insurance company needed to provide me with that assistance to get the vehicle repaired.*
*Q. Okay.*
*A. **Lawson had done nothing to cause the incident,** so I had no thoughts at all about anything beyond this happened. I'm terribly sorry it happened. **I had nothing to do with it happening. My vehicle is damaged. I need it back on the road. I need to get the vehicle fixed.** I contacted the insurance*

63. This reveals Debbie Lawson Davis's lack of understanding of insurance and insurance claims. While I do not fault her for trying to protect her company, I do fault

Columbia if it allowed her lack of understanding to impact its coverage investigation and evaluation. Based upon all the facts and circumstances, it appears Columbia acceded to her angry wish to deny coverage to Patterson. Employer bias is common in these situations, and it is incumbent on the claims professional to ensure it is factored out of any coverage evaluation. Of course, it is a lot easier for an adjuster to merely deny a claim rather than to find coverage and to protect the insured, if the claim actually goes away after denial, as many do. In fact, while Columbia should have known that even with a denial of coverage, a claim was still going to be pursued directly against Lawson, it appears that Columbia was under the mistaken impression that by denying coverage to Patterson, the claim would just go away, and it would not be forced to pay a dime. Here is Barczykowski's direct supervisor, LaBlanc's, file note entry (in pertinent part):

(14303760-2325)

*"Increased reserves per prior remark. Will continue to monitor file for any communication from c/a. **Will not initiate any calls, as claim was denied for insd Driver."***

64. What I found very telling is that Columbia has no claim handling guidelines or Best Practices. An insurer that does not make its policies and procedure clear to its employees, and that does not teach insurance industry standards to its adjusters, especially in this day and age, is bound to have issues with its employees deviating from these standards.

65. While there is evidence of supervisory involvement in the claim file, the supervisor failed to instruct Barczykowski to thoroughly investigate the claim, to give him any guidance, and may have actually encouraged him to issue the denial without qualification. While there was documentation in the claim file that Patterson had not received either denial letter and that both had been returned, there was no discussion of that fact or direction by the supervisor for Barczykowski to make sure Patterson was contacted. The failure to interview Patterson before denying coverage is a serious breach of insurance industry standards, custom and practice.

66. Insurance industry standards require an insurer to attempt resolution once liability becomes reasonably clear, and while we know that liability was certain from the start, Columbia hid its head in the sand hoping that the claim would go away by denying coverage to Patterson, a very serious violation of insurance industry claim handling standards and practice on this very serious claim. As a result of this substandard behavior, **the Dunn's were forced to institute suit to collect sums owed under the policy**. Part of the problem may have been that the Columbia adjusters have incredibly heavy claim loads, with Burroughs estimating his pending claim count at 240 files. Based upon my 37 years in the industry, during which time I have set up, supervised and managed claim divisions, the insurance industry standard for a pending claim count is between 80 and 120 claims, the high end of which is exactly half of Burroughs pending claim count.

67. During this same time frame, **Columbia misrepresented pertinent facts, was less than forth coming, and was dishonest, in an obvious attempt to avoid payment** by omitting to tell the North Georgia Medical Center that while coverage had been denied to Patterson, it had acknowledged coverage for Lawson as the owner of the involved vehicle. Here is the file note of March 24, 2014 that documents this exchange:

(14303760-2327)
*"Received call from Alisa w/ N GA Med Ctr requesting status for James Dunn.* **Explained that coverage was denied for insd driver.** *Faxed copies of denials to (678) 718-2415. File # 501352893"*

68. When **suit was filed on April 7, 2014,** it was clear from the allegations that Columbia owed Patterson a defense, since it was being alleged that Patterson was within the course and scope of his employment at the time of the accident. Yet, Columbia made no effort to contact or locate Patterson or to investigate coverage. In **December 2014, Debra Lawson Davis admitted that while it would be against company policy for employees to use company trucks for personal reasons, she knew of the possibility that it happened from time to time, and that while Lawson reserved the right to revoke permission to use the trucks, it never did.** Debra Lawson's testimony also reflects a lack of understanding with regard to coverage in that she was of the opinion that coverage was dependent on whether or not Patterson was within the scope and course of his duties at the time of the accident, which is clearly not the case. Debra Lawson's testimony speaks volumes. Here is that testimony:

(Page 122 line 16 through Page 123 line 15)
*Q. All right. And I'm assuming, like the other policies, if someone fails to follow policy H, that they do not automatically lose their permission to use Lawson's truck; is that fair?*
*A. That's fair. But as you see, you read on, it says disciplinary action will be taken against violators.*
*Q. Okay. So, if they violate provision H, they don't automatically lose Lawson's permission to use the truck, but they could be subject to Lawson's disciplinary actions; is that correct?*
*A. Right.*
*Q. All right. And I'm assuming that -- that like the other policies, if that became a problem, then -- and Lawson became aware of it, then Lawson could revoke its permission to allow the employee to use the truck; is that correct?*
*A. That is a disciplinary action at our disposal. Yes.*
*Q. Okay. And is it fair to say that occasionally, that some of Lawson's employees may use some of Lawson's vehicles on -- for personal use, from time to time?*
*A. It is against policy, but I would -- that could happen, yes.*
*Q. Okay. And just because that happens doesn't mean that Lawson automatically revokes its permission to the employee to use the vehicle; is that fair?*
*A. That's correct.*

(Page 233 lines 3 through 9)

*A. No. It's very simple. When -- and I don't know. I don't have exact dates or anything, but **once it was clear that we were looked towards to provide coverage for Mr. Patterson's poor choices in this whole matter, then I called Columbia with concern about that.** And, you know, they've had our policy manual on file. We've had them as coverage for probably three years. They've had our policy manual on file --*

*(Page 236 line 14 through 21)*
*A. I think it was commonly deducted when they asked me, was he in the course of work when the incident occurred. And when I said, no, absolutely not. Then I think, you know, I think it was a common deduction on both of our parts that we, Columbia/Lawson, is not responsible for this incident. There is no coverage extended to Mr. Patterson because he was not acting as an agent of Lawson Air Conditioning at the time this incident occurred.*

*(Page 229 lines 9 15, Page 231, Lines 11 – 25, Page 232 line 1)*
*Q. So let me ask my question again. Have -- has Lawson had discussions with Columbia Insurance Company about the coverage for Mr. Patterson?*
*A. I have. And to the extent that there should be none, because Mr. Patterson is not covered by Columbia. My vehicles driven in the course of my work scope is covered by Columbia.*

*Q. All right. And so when did you have conversations with Columbia about that?*
*A. I didn't have Columbia -- converse -- I mean, we've talked about the case. We've talked about the claim.*
*Q. All right. And I don't want you --*
*A. Columbia's insurance is with Lawson, with me and my vehicles driven in the course of our employment. In my understand -- **in my opinion and logical thought, Mr. Patterson is not covered when he violates company policy, violates multiple items in company policy and happens to be in my vehicle when this incident occurs. Mr. Patterson is not covered. He is not an eligible driver at that point. He is not in the course of work and Columbia should only cover my vehicle in the course of my employees producing through a normal course of work. He was not. Clearly, he was not. There should be no coverage for Columbia to Mr. Patterson.***

69. This is when things really got interesting. At this point Columbia realized the predicament it had created for itself by its unequivocal denial of coverage, rendering Patterson a *"free agent"*. Within 6 days of the Lawson depositions, knowing that it was too late to file a Declaratory Judgement action to have a court determine coverage, Columbia's counsel attempted to enter an appearance  in the lawsuit, to  *"urge certain Requests to Charge"*, and when that failed, Columbia sought to intervene in the Underlying lawsuit which was also denied. Since Columbia was aware that Patterson had defaulted and was not participating in the litigation, it realized that its own interests were in jeopardy, and therefore attempted to get judicial rulings on coverage in a case in which it was not a party, rulings that were not in Patterson best interests, without ever consulting him. Clearly **Columbia placed its own self-interest ahead of Patterson's, in what is probably the most egregious of all possible violations of insurance industry standards and practice. The protection of an insured is paramount.**

70. An insurer has 4 options when handling a claim with regard to coverage:

1.  Accept coverage

2. Accept coverage subject to a reservation of rights
3. Accept coverage subject to a reservation of right and then file a Declaratory Judgement action to have a court determine coverage
4. Denial

71. Since Columbia denied coverage without any hesitation or qualification, the most aggressive and punitive of these four options, it found itself on the outside looking in, and was desperately trying to figure out how to make sure it would not end up responsible for any verdict against Patterson due to its mishandling. While Columbia no longer had any involvement or interest in the underlying action between the Dunns and Patterson, it attempting to interfere with those proceedings, even going to the extreme of appointing counsel to appears on Patterson's behalf without Patterson's consent. Clearly Columbia was placing its own self-interest ahead of Patterson's.

72. After completely ignoring the fact that it had already issued an unqualified denial of coverage, Columbia opened a new claim file for Patterson on February 26, 2016, a full two and a half years after its denial, and then issued two reservation of rights (ROR) letters attempting to force Patterson's cooperation.

73. The insurance industry understands that where a reservation of rights (ROR) letter is issued untimely, the insurer may be deemed to have waived its policy defenses. Here Columbia not only issued its ROR untimely and after it had already denied coverage, it failed to offer the insured the opportunity to retain counsel of his own selection to avoid any conflict with Columbia's coverage investigation and its admitted self-interest aimed at defeating coverage.

Here is what the industry instructs with regard to reserving rights:

### Claims Operations: A Practical Guide

© 2000-2015 International Risk Management Institute, Inc. (IRMI). All rights reserved.

#### Reservation of Rights Letter
*A reservation of rights letter (sometimes referred to as an "R of R letter") reserves the insurer's right to deny coverage and/or withdraw from the defense of the claim at a future date. The letters should be comprehensive and cite all the applicable policy language, including the insuring agreement, definitions, exclusions, exceptions, and conditions. The letters should always be sent certified mail, return receipt requested, with a separate letter to the named insured, along with a copy to the insurance agent or broker as well as the applicable additional insureds requesting coverage under the policy, if that's the case. **The reservation of rights letter should be sent as soon as the adjuster is in a position to formulate a coverage opinion. This should be no longer than 30 days from the initial claim report date or receipt of the summons and complaint.** Be careful in the issuance of reservation of rights letters and know the jurisdiction and state laws. Here are some important points relative to reservation of rights letters:*

- *Failure to cite the applicable policy language, or issuance of an ineffective letter, may result in a flawed defensible coverage position, resulting in the waiver of coverage defenses and being estopped from raising any other future coverage defenses.*
- ***A late reservation of rights letter could result in a waiver of any policy defenses.***
- ***In some states, a reservation of rights letter triggers the insured's right to retain its own counsel to defend the insured for the non-covered causes of action, i.e., detailed allegations within a writ, petition, or complaint.***

*A reservation of rights letter is not forever!* *Claims adjusters must eventually take a coverage position to accept coverage, partially deny coverage for certain aspects of the claim only, or deny coverage for the total claim.*

74. As these IRMI instructions make clear, claim professionals are expected to understand these well established and long settled industry standards as well as any applicable law with regard to RORs and waiver.  Columbia's claim professionals should have understood that in Georgia, an unequivocal denial and refusal to defend can lead to a waiver of any coverage defense not referenced in that denial, **especially with an unequivocal denial as we have here.** Columbia appears to have attempted to use these RORs in an attempt to cure its previous missteps and to protect and position itself only to once again deny coverage to Patterson at a later date. These were clearly self-serving maneuvers in recognition of its violations of industry standards as a result of its substandard investigation, claim handling, and improper denial. If Columbia had been confident in its decision to deny coverage, it would not have felt a need to attempt any of these maneuvers and would have stayed clear of the lawsuit against Patterson in which it had no interest. The fact that it was trying everything it could to correct its mishandling, speaks volumes. **Coverage should never be denied unless or until the insurer is confident in its position and until its position is supported by ample evidence.**

75. Even though Columbia clearly recognized the issues it had created for itself (and Patterson), after being presented with a demand well within its policy limit, giving Columbia an opportunity to not only get itself out of its predicament, but to at the same time obtain a full release for Patterson, Columbia, after criticizing the form of the demand, rejected it out hand without informing Patterson. **When presented with a time limit demand within policy limits on a claim where the insurer has already improperly denied coverage, has recognized its many missteps, where it has no intention of indemnifying for any resulting judgment, it is completely unethical to reject a policy limits demand without first discussing it with the defendant/allegedly non-insured person.** While Columbia made many mistakes and blunders in its handling of this claim, the rejection of this demand without consulting Patterson was a critical error. Here is that August 23, 2016 rejection:

(Exhibit N) (13307115-0116)
*"Please let me point out that your "time limited settlement demand" letter of August 18, 2016 does not comply with statutory requirements for such a time demand.*

*Despite this fact Columbia National Insurance Company now responds to your letter prior to your self-selected date of September 1, 2016.*

*As you are aware Columbia has denied Coverage to Mr. Patterson"*

*"Therefore Columbia National Insurance Company respectfully rejects your settlement demand of August 18, 2016."*

In view of all the missteps identified above, and in view of Columbia's recognition of its missteps, the demand was reasonable, and any reasonably prudent insurer finding itself in this same position would have merely accepted the demand and secured a release and dismissal with prejudice.

76. After failing in its attempt to force Patterson's cooperation, to influence the jury verdict form for its own benefit, and to intervene into the lawsuit, Columbia appointed counsel to make an unauthorized appearance on Patterson's behalf almost 2 years after the lawsuit was filed. In my opinion, the only explanation for Columbia's attempt to provide a defense at this point in time, since it had already unequivocally denied coverage, was so that it could attempt to influence the outcome and potentially findings that might impact coverage for the claim, as with its prior failed attempts, in order to mitigate its own exposure.

Here is what the court had to say about this maneuver on October 12, 2016:

*"While this court disapproves of Columbia National Insurance's procedural handling of this case, whether there are legal ramifications as a result of their contradictory positions is a question for another court."*

77. We also know that Columbia's offer to defend Patterson had nothing to do with coverage for Patterson, nor was it an attempt to protect Patterson. Columbia's motivation in entering a defense was solely for the purpose of protecting Columbia. Here is Preston Burroughs's deposition testimony:

(Page 45 line 1 through 25)
*A. We had settled the Lawson case -- when I say "we," I'm referring to Columbia, had settled the Lawson's case. The only pending case was the Patterson case, to the best of my recollection. And in retaining counsel for Patterson, we believe that we would have been able to keep down any damage award against Mr. Patterson for the injuries sustained to the Dunns. **And in doing so, in keeping down the damages, it would probably decrease the likelihood that the attorneys for the Dunns would try to file suit against Columbia to try to collect on a small award, or a smaller award.***
*Q. Okay. So at least one purpose of providing Mr. Patterson a defense was to protect Columbia?*
*A. Absolutely.*
*Q. All right. Any other reasons other than to protect Columbia?*
*A. It would have protected Patterson. It would have protected Patterson, yes.*

*Q. But that wasn't the real purpose, was it?*
*A. Sir, there were -- if you're asking what was the primary purpose, it would be to*
*collect -- protect Columbia.* *It would also have protected Patterson.*

(Page 46 line 25 through page 47 line 3)
*Q. And your decision in February 2016 had nothing to do with new facts regarding*
*whether or not Mr. Patterson was covered?*
*A. No.*

(Page 65 lines 7 through 16)
*Q. Well, it would have been your job to decide whether to defend Mr. Patterson; correct?*
*A. That is correct.*
*Q. Okay. And did you ever make a decision?*
*A. Yes.*
*Q. And what was that decision?*
*A. Not to defend.*
*Q. And why?*
*A. Because he was not an insured under our policy at the time of this accident, or this*
*event.*

78. Since there was an allegation in the complaint that Patterson was using his truck while in the course and scope of his employment, and the Columbia policy provided coverage for "any auto", coverage was triggered by this allegation, yet Columbia just ignored this allegation and failed to reconsider its coverage position or to defend Patterson until it was too late. While Hubbard stated that Lawson's opinion would not influence Columbia's handling of the claim, I'm skeptical.

(Page 79 line 15 through page 80 line 3)
*Q. No. Did you ever consider whether Mr. Patterson had implied permission to use the*
*vehicle for personal use?*
**A. No, because that was not the position of Lawson.**
**Q. Now, have you ever heard the phrase "implied permission" before today?**
**A. I have heard the term. I can't define the term.**
*Q. Okay. But you know it can be relevant to your coverage analysis; correct?*
*A. I -- again, I have heard the term. I can't define it. That's something I would use counsel*
*to respond to or to help me understand.*

(Burroughs's deposition - Page 80 line 20 through page 81 line 2)
**Q. Would it have mattered to your decision if you knew Mr. Patterson believed he was**
**entitled to use the truck for a personal errand?**
**A. I can't say that it would.**
*Q. Probably not; correct?*
*A. I can't say that it would because **I don't know why he would reasonably believe he**
**could use the vehicle for personal use.***

79. To compound its previous errors, Columbia decided to deny coverage again, adding policy defenses to its initial basis for denial that **misrepresented** the policy by asserting that the Lawson truck was not a covered auto under the policy, and by adding the non-cooperation provision.

80. All of these attempted maneuvers begs the question: If Columbia was so confident in its position, why was it paying two law firms post settlement to defend coverage and Patterson? If it was confident in its denial, Columbia had nothing to fear, yet its actions suggest to an experienced claim professional that it was extremely worried that its denial was improper, that it might be held accountable, and therefore Columbia went to great lengths to try to minimize Columbia's exposure for Patterson's conduct. Columbia's behavior was contrary to the insurance industry custom and practice of acknowledging errors when they are discovered or suspected (especially errors involving a failure to defend a clear liability claim with allegations of TBI, seeking punitive damages with aggravated circumstances) and to rectify the situation honestly and promptly by using the available policy limits to settle the claim in order to secure a release. While Columbia clearly made many mistakes, rather than correcting them, it focused on protecting its own self-interest. To this day, Burroughs and Hubbard refuse to admit Columbia's mistakes.

81. As noted above in paragraph 18: *""The primary duty of the claim representative is to deliver the promise to pay. Therefore, **the claim representative's chief task is to seek and find coverage, not to seek and find coverage controversies or to deny or dispute claims**." "Because of the personal relationship formed in an insurance transaction, the insurance company should not place its interests above the insured's." "The claim professional handling claims should honor the company's obligations under the implied covenant of good faith and fair dealings." **"Insureds purchase insurance to pay for losses, for peace of mind,** and to benefit society by reducing social burdens. When insurers do not provide those benefits of insurance , they cause just the opposite: unpaid losses, great stress, and burdens on society*."

82. Contrary to these standards, we can see from Columbia's claim file and deposition testimony that Columbia took the opposite approach. Stunningly, Burroughs even testified that he had never heard of the concept that insurance provides peace of mind, documenting either a severe lack of training, even though he has been in the industry for over 40 years, or his intentional refusal to admit Columbia's short comings, and the obvious:

(Burroughs deposition Page 17 lines 4 – 7, page 18 lines 20 – 25)
*Q. All right. And wouldn't you agree that a primary purpose of insurance is to provide peace of mind?*
**A. I have never heard it phrased that way.**

*A. -- I don't know if I give them peace of mind or not.*
*Q. Fair enough. Do you try to give them peace of mind as part of your job?*
*A. Sir, I try to handle the claims as best as they can be handled.*

33

83. Here is a list of the insurance industry standards that Columbia violated in its handling of this claim:

- An adjuster must approach coverage in a way that finds coverage, not in an effort to defeat coverage.
- Where a policy provision can be interpreted in more than one way, the interpretation that results in coverage must be applied.
- Undefined terms in the policy must be given their broadest meaning resulting in coverage, as long as that meaning does not lead to an absurd result.
- An adjuster must never begin a coverage evaluation with a preconceived opinion as to the outcome. Each claim must be evaluated based upon its own merits.
- An adjuster must make coverage determinations for insured employees independent of the wishes of the employer, even though the employer is the Named Insured that paid the premium.
- An insurance company must never misrepresent coverage or the facts of a claim.
- An insurer has an obligation to accurately disclose all pertinent facts that might lead to coverage for the claims presented.
- An adjuster must acknowledge with reasonable promptness all pertinent communications with respect to claims.
- Adjusters have a duty to conduct a prompt and thorough investigation of all claims.
- Adjusters must settle all claims in a prompt, fair and equitable manner once liability becomes reasonably clear.
- An adjuster should never refuse to pay claims or to deny coverage without conducting a prompt, thorough and reasonable investigation.
- Reservation of Rights letters must be **prompt, accurate, and only contain pertinent policy provisions.** Each policy defense should be accompanied with an accurate explanation of how the provision applies to the claim at issue. **A failure to inform the insured of any identified policy defense timely, risks waiver.**
- All available coverage must be clearly identified and explained so that the insured may avail itself of the benefits available under the policy.
- Any coverage related investigation and handling must be separate, apart, and without influence from the handling of the underlying liability claim.
- A denial of coverage should give a full, accurate, and complete explanation of why coverage is not being provided, with all relevant policy defenses accurately outlined with an explanation of how they apply to the facts of the claim.

84. The following are the guiding principles of property and casualty insurance claim handling that Columbia violated. An insurer is required to:

- Conduct claim investigations in a diligent search for facts as promptly as possible.
- Give a prompt, courteous, and forthright explanation to each claimant as to the Company's position with respect to his/her claim.
- Conclude each claim on the basis of its own merits in the light of facts, the law, and the coverage afforded.

- Pay meritorious claims promptly.
- At the management level, carefully supervise and direct all claim activity to ensure compliance with all claim handling standards.
- Listen, be fair, be open, and carry out the insurer's part of the bargain under the contract in good faith.
- Be familiar and in compliance with those laws and regulations that impact claims in the appropriate state and treat policyholders consistent with the requirements of the law.
- Explain all relevant coverage under the policy. Encourage policyholders to report all losses and avail themselves of all benefits under the policy.
- Diligently investigate the facts to determine if a claim is valid, reasonably evaluate the claim and act promptly in resolving the claim. If it is necessary to reject a claim for coverage or damages, it should be done promptly and courteously, with an accurate explanation for the decision.
- Make an objective evaluation of the facts and circumstances supporting the policyholders' claim. Doing so helps ensures the policyholder obtains all benefits provided by the insurance policy.

85. The National Association of Insurance Commissioners has promulgated a set of minimum standards based upon the insurance industry's custom and practice. These standards were developed with input from, and in consultation with, not only various state insurance commissioners from across the country, but also representatives from the insurance industry. These standards are used to train adjusters and are the part of adjuster training curriculum. They are considered minimum standards of behavior, far below the standards for which most reputable insurer strive. These standards are referred to as the NAIC "Unfair Claims Settlement Practices". It is my opinion that the documents reflect that Columbia violated the following NAIC standards.

- Knowingly misrepresenting to an insured relevant facts or policy provisions relating to the coverage at issue;
- Failing to adopt and implement reasonable standards for the prompt investigation and settlement of claims arising under its policies;
- Not attempting in good faith to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear;
- Compelling insureds or claimants to institute suits to recover amounts due under its policies;
- Refusing to pay claims without conducting a reasonable investigation;

## Conclusion

- Columbia breach insurance industry standards by unequivocally denying coverage without completing a prompt and thorough investigation;

- Columbia failed to make any effort to find coverage for Patterson or to give him the benefit of the doubt;

- There is ample evidence regarding Patterson's permissive use. An unequivocal denial was improper;

- Columbia misrepresented coverage by asserting that Patterson's truck was excluded because it was not a covered auto at the time of the accident;

- Columbia breached the insurance industry standards by not giving Patterson an opportunity to submit additional information for reconsideration, or by asking that it be allowed to reconsider its position once suit was filed;

- The standard insurance industry approach when handling claims involving questionable and fact intensive coverage issues is to reserve rights, continue the investigation, and once suit is filed, defend under a reservation of rights and file a separate Declaratory Judgement action so that a judge can decide coverage;

- Once Columbia denied coverage, Patterson was a *"free agent"*;

- Columbia failed to make any effort to timely locate Patterson or to otherwise properly investigate the claim;

- Denial of coverage is a drastic step and should never be taken lightly;

- In the event of a decision to deny coverage, all basis for denial must be clearly and distinctly stated in the denial letter. An insurer is required to get it right the first time and cannot reinforce its denial by conducting additional investigation after the fact;

- Since the insurer is required to complete a thorough investigation and to diligently search for coverage prior to denial, any policy defense not identified in a denial letter may be deemed to have been waived;

- The insurance industry standard practice is to interpret undefined terms broadly to provide coverage wherever possible;

- Columbia has no claim handling guidelines or Best Practices, a substandard practice;

- An insurer that does not make its policies and procedure clear to its employees, and who does not teach industry standards to its adjusters is bound to have issues with its employees violating insurance industry standards;

- Columbia's supervisor failed to instruct Barczykowski to thoroughly investigate the claim, to give him any guidance, and merely allowed him to issue the denial without qualification;

- While there was documentation in the claim file that Patterson had not received either denial letter as both were returned, there was no discussion by Barczykowski's supervisor of that fact, nor any direction to make sure Patterson was contacted;

- Columbia failed to attempt resolution once liability became reasonable clear, a very serious violation of insurance industry claim handling standards and practice on a very serious claim;

- The Dunn's were forced to institute suit to collect sums owed under the policy, another very serious violation of insurance industry claim handling standards and practice;

- Part of the problem may be that the Columbia adjusters have an incredibly heavy claim load, with Burroughs estimating his pending claim count at 240 files, twice the maximum recommended pending claim count;

- Columbia misrepresented pertinent facts by omitting to tell the North Georgia Medical Center that while coverage had been denied to Patterson, it still had coverage for Lawson as the owner of the vehicle, misleading North Georgia Medical Center;

- While it was clear from the allegations that Columbia owed Patterson a defense, Columbia made no effort to contact or locate Patterson or to provide a defense once suit was filed ;

- Debra Lawson admitted that while it would be against company internal rules for employees to use company trucks for personal reasons, she knew it happened from time to time, and that while Lawson reserved the right to revoke permission to use the trucks, it never did;

- While Columbia no longer had any involvement or interest in the underlying action between the Dunns and Patterson, it attempting to interfere in those proceedings, even going to the extreme of appointing counsel to appear on Patterson's behalf without Patterson's consent;

- Columbia placed its own self-interest ahead of Patterson's, a serious violation of insurance industry claim handling standards;

- Columbia was given a reasonable opportunity to resolve the claim for well within its policy limit, but unreasonably rejected the demand, and in doing so failed to inform Patterson, allowing him an opportunity to respond;

- When presented with a time limit demand on a claim where the insurer has already denied coverage, it is unethical to reject the demand without discussing it with the tortfeasor to whom coverage was denied;

37

- After failing in its attempt to force Patterson's cooperation, to influence the jury verdict form for its own benefit, and to intervene into a lawsuit in which it denied any involvement, Columbia appointed counsel to make an unauthorized appearance on Patterson's behalf, clearly inappropriate behavior;

- Columbia obviously knew that it had seriously mishandled the claim and that its denial was improper, or it would not have gone to such great lengths to try to get involved in the Dunn v. Patterson lawsuit having settled Lawson's claim;

- 86. My compensation is based on an hourly rate. My hourly compensation is $375 per hour.

87. As discovery of far from complete, I reserve the right to supplement this disclosure with additional opinions, or to update these opinions to the extent new information or evidence is discovered, disclosed, and given to me for review.  I reserve the right to rebut the opinions and testimony of other experts and witnesses presented at trial.

November 19, 2018            *Louis G. Fey Jr.*
Date:                              Louis G. Fey Jr. CPCU, QIC, AIC

38

# CURRICULUM VITAE

**LOUIS G. FEY JR, CPCU, CIC, CRM, AIC**                    **FEY CONSULTING LLC**

Address:           2136 N Woodchase Court
                   Baton Rouge, Louisiana 70808
                   (225) 362-0018
                   Lfeyjr@yahoo.com

## BUSINESS

Insurance consulting, expert testimony, litigation support, licensed insurance producer and adjuster
   – Industry practice (claims, underwriting, agency and company operations), standards, means, methods, errors and omissions
   – Coverage expert
   – Multi-line claim issues and disputes
   – Business Interruption Coverage
   – Fair Claim Handling Standards and Practice
   – Insurance Industry Standards and Practice
   – Insurance Underwriting Standards and Practice
   – Defense strategy with regard to insurance issues
   – Contractual provisions and CRT analysis as it relates to insurance as well as additional insured concepts
   – Insurance Agency Errors and Omissions

## EDUCATION

1981  **B.B.A. Bachelors of Business Administration –** University of Cincinnati

1985  **Certificate in General Insurance -**  INS

1994  **Associate in Claims -** AIC

1995  **Chartered Property Casualty Underwriter -** CPCU

2003  **Certified Insurance Counselor –** CIC

2014  **Certified Risk Manager** – CRM

Each of the above designations is the result of countless hours of study and classroom participation.  For example, the Chartered Property and Casualty Underwriter (CPCU) designation is awarded upon completion of ten (10) courses of study covering every facet of the property casualty insurance industry.  The classes are very comprehensive

and the CPCU designation is the highest and most respected designation in the industry.  The Certified Insurance Counselor (CIC) designation is a five (5)-course program encompassing very technically advanced studies of commercial property and casualty insurance coverage and agency operations.  The Associate in Claims (AIC) designation is a multi-course program whose course work includes property and casualty coverage and claim handling.  Lastly, the Certified Risk Manager (CRM) designation is a five (5)-course program covering every facet of the Risk Management Process. These are all graduate level studies and each course is approximately 20 hours in length. These designations are granted only after the successful completion of all courses and the related examinations. These programs have been recognized as graduate level studies by major universities.

**EXPERIENCE:**

2007 – Present     **FEY CONSULTING LLC**

- Consultation on Risk Management opportunities
- Assist clients on claim, coverage, and insurance disputes
- Act as a liaison and consultant for insureds and insurers
- Contractual Risk Management and CRT assistance
- Technical resource for producers, insureds, and insurance companies
- Expert witness testimony
- Litigation strategy
- Mediation assistance and negotiation

2007 – Present     **BancorpSouth Insurance Services, Inc., Baton Rouge, LA**
**Vice President of Risk Management**

- Consultation on Risk Management opportunities
- Licensed P&C and L&H producer
- Assist clients on claim, coverage, and insurance issues
- Act as a liaison and consultant for clients and carriers
- Contractual Risk Management and CRT assistance
- Technical resource for producers, clients, and carriers
- Agency E&O Risk Management resource

2000 – 2007        **St. Paul/Travelers Insurance, Atlanta, GA**
**Director of Major Case – Construction Claims Services**

- Handled very large exposure and complex liability cases
- Mentored, directed, and oversaw multiple Construction Claim Regions

2

- Directed investigation and litigation, negotiated settlements, attended trials and mediation; coverage and contract analysis and interpretation

**1996 – 2000**   **Lumber Mutual Ins. Co., Greer, SC**
**Regional Claims and Underwriting Manager, Southern Region**

- Trained, organized, and implemented this start-up claims operation
- Oversaw claims for Southern Region
- Oversaw Underwriting Department in the Southern Region
- Managed a staff of over 40 people
- Handled large exposure cases, all lines
- Handled large exposure lawsuits; including mediations, negotiations, and trials
- Negotiated and implemented managed care program
- Implemented a WC telephonic nurse program for in-house managed care
- Developed a triage program to reduce the frequency of surgery on W.C. claims

**1981 – 1996**   **Ohio Casualty Ins. Co., Hamilton, OH**
**Senior Claims Supervisor**

- Oversaw  litigation and claims in both Home Office and Branch Office settings
- Oversaw Hurricane Andrew cleanup
- Developed and implemented training for adjusters
- Conducted various instructional seminars for adjuster training
- Member of the company's "Swat Team" (Cleanup of distressed offices)

While with Travelers and Lumber Mutual, I personally handled all major case liability claims for the Southeast United States which included complex losses involving catastrophic injuries and property damage. While at Ohio Casualty, I was a member of the company's "SWAT" team charged with cleaning up distressed claim offices across the country, instituting sound claims practices based upon industry standards, re-training the staff, and returning those claim operations to acceptable levels of operation in compliance with those industry standards. While at Travelers, I was also responsible for mentoring, overseeing, and training the claim staff.

**RELATED EXPERIENCE**

- Chairman of the State of Louisiana Property Casualty Insurance Commission

- Member of the State of Louisiana Insurance Commissioner's Advisory Council

- Member of The State of Louisiana Cyber Security Commission

- Member of the State of Louisiana Auto Insurance Task Force

- President of the State Board of the Professional Insurance Agents of Louisiana (PIA)

- Member of the Governmental Affairs Committee of the PIA of Louisiana

- Named PIA of Louisiana's Agent of the Year 2013/2014

- Licensed Adjuster for over 37 years

- Licensed Property Casualty Producer

- Licensed Life & Health Producer

- FEMA/NFIP Licensed Flood Adjuster

- Certified WIND Umpire

- Faculty (former) - The National Alliance for Insurance Education and Research

- Assisted in authoring the Claims Manual for Ohio Casualty's Claim Department in the mid 1980's

- Assisted in authoring various coverage endorsements for Lumber Mutual Insurance and Travelers Insurance

- Participated on the Louisiana Citizen's subcommittee which addressed numerous operational and claim processes within that operation and offered recommendations for improvements.

I have been acting as an insurance consultant and expert witness since September 2007 and have evenly balanced my litigation support efforts between insurance defense, and plaintiff's work. Much of my efforts have been as a claim consultant

4

on both litigated and non-litigated matters assisting both clients and insurers with coverage interpretation, claim handling, defense strategy, negotiations, contract interpretation, insurance underwriting, policy placement, procurement, and agency operations.

**Seminars given on insurance coverage and related issues**

- ♦ Commercial General Liability Coverage –CGL Coverage, Conditions, Exclusions and Endorsements

- ♦ Occurrence Law – Various Jurisdictional Interpretations and Their Effect on CGL Coverage

- ♦ Occurrence Law – Manifestation, Multiple or Continuous Triggers

- ♦ Additional Insured Endorsements and Related Issues

- ♦ Certificate of Insurance Issues

- ♦ Contractual Defense and Indemnity Provisions, The Anti-Indemnity Statutes of Various Jurisdictions and How They Interact With The Contractual Related Provisions of The CGL Policy

- ♦ Contractual Provisions to Look for: What To Include in Contracts and How They Impact One's Liability Exposure and Insurance Coverage

- ♦ Waiver of Subrogation Contractual Provisions and Policy Endorsements

- ♦ Professional Liability Endorsements

- ♦ WC Immunity, The Statutes Regarding Statutory Employer Status; How They are Treated in Various Jurisdictions and their Impact on CGL Coverage

- ♦ Excess/Umbrella Coverage and Related Issues

- ♦ Litigation Management

- ♦ Negotiations and Mediation

- ♦ Claim Operation Policy and Procedures – Fair Claims Practice

- ♦ Business Interruption issues and considerations

- ♦ Louisiana Indemnity

- ♦ Effectively Managing The Claims Process

- ♦ Perils & Pitfalls with Additional Insured (AI) Endorsements

- Coverage "Gaps" and "Traps" – August 19, 2013 – Jackson Mississippi

- Cyber Liability: Could You Be At Risk?  June 6,2013 – Baton Rouge, Louisiana

- Professional Liability Insurance for Engineers – Engineering Law Seminar – Half Moon Education – June 20, 2013  - Baton Rouge, Louisiana

- Managing Cyber Risks, Threats & Insurance Implications – April 30, 2013 – Gulfport Mississippi

- Do You Have A Cyber Liability Exposure? June 6, 2013 - Baton Rouge, Louisiana

- Agent's Duty – August 8, 2013 – Jackson, Mississippi

- Cyber Liability: What You Need to Know – November 14, 2013 – Webinar

- Certificates of Insurance – February 26, 2013 – Baton Rouge, Louisiana

- Employee Leasing: A Construction Industry Perspective (For the ABC – New Orleans, Louisiana)

- Cyber Liability: What You Need To Know (Jackson Ms.)

- Contractual Indemnification and Additional Insured Issues (Jackson Ms.)

- Insurance For Vetrepreneurs – LSU Entrepreneurship Boot Camp For Veterans With Disabilities – Stephenson Entrepreneurship Institute

- Essentials of Cyber Insurance

- No Driver No Pilot, Who Can We Sue?

- Agent's E&O – (For the Louisiana Department of Insurance & Southern University) (August 2018)

- Cyber Insurance - A Growing Concern

**ARTICLES**

- IRMI Update: Risk Management & Insurance Commentary, Tips, and Tactics February 6, 2013 I Issue 287 I ISSN: 1530-7980 - "Don't Use ATIMA in Builders Risk Policies"

6

- ♦ Droning On About Drones – The Agent's Voice - Vol. XLII. No. 10 December 2015
- ♦ What Has Happened to the Insurance Industry? PIA Agents Voice December 2007, republished by the CPCU Society (CLEW), and by InsuranceCommentary.com

## CONTINUNG EDUCATION

- Life and Health Institute
- Agency Management Institute
- Commercial Property Institute
- Personal Lines Institute
- Ruble Graduate Seminar 11/6/2004
- Ruble Graduate Seminar 8/16/2006
- Commercial Casualty Institute
- Principles of Risk Management
- Practice of Risk Management
- So you want to be an expert witness?
- Insuring Defective Construction
- Contractual Liability, What's Covered and What's Not?
- Commercial Property Insurance and Risk Management
- Commercial Liability Insurance and Risk Management
- Principles of Risk Management and Insurance
- Issues in Insurance
- Insurance Economics
- Insurance Company Operations
- Insurance Issues and Professional Ethics
- Insurance Accounting and Finance
- Insurance Company Management
- Commercial Underwriting: Principles and Property
- Principles of Suretyship
- Liability Claim Practices
- Property Loss Adjusting
- Principles of Insurance – Liability Claims Adjusting
- Principles of Insurance – Property Loss Adjusting
- Casualty Insurance
- Property Insurance
- Louisiana Life and Health Pre-licensing

- Solutions to Disagreements over Time Element Claims
- Surprise and the Other Three "S" Words That Result in Time Element Disagreements
- Everyday Ethics
- Calculating Business Interruption
- The Law after Katrina: The Good, the Bad and the Ugly
- Practical Application of Ethics
- Wind Umpire Certification 11th Annual Windstorm Insurance Conference 2010
- National Flood Insurance Program Adjusters Certification
- Gulf Coast Case Law Update: Louisiana, Texas, Mississippi
- Florida Property Insurance Law Update
- Evaluating Storm Losses
- Disarming the Bad Faith Bomb
- Documenting the Claim
- A Claim Professional's Guide to "Outside the Box" Thinking
- Time Element Claims
- Director's Officer's Liability/Cyber Liability
- Property Insurance for Contractors
- A Detailed Review of Provisions of the CGL
- Personal Lines QA
- 2010 Insurance Coverage Update
- Insurance Coverage Issues in the CGL Policy - Emerging Issues for the next Decade
- Environmental Risk Management and Insurance Strategies
- How to Be an Agent Advocate at Claim Time
- The Insurance Industry: Today's Trends, Tomorrow's Opportunities
- Workmanship "Occurrence"
- Position Yourself as an Insurance / Risk Management Expert
- Directors and Officers Liability
- Estate Planning Techniques: Gifts, Trusts and Family Limited Partnerships
- National Health Care Reform
- Navigating Marine Workers Compensation
- Intangible Property Risk Management For Business Enterprises
- Cyber Liability Insurance: What It Covers and Who Needs It
- Flood: Levee and Rising Water
- The Internet
- Principles of Risk Management
- Analysis of Risk
- Control of Risk
- Financing of Risk
- Practice of Risk Management

- Introduction to Implementing and Monitoring the Risk Management Process
- The Risk Manager
- Building the Risk Management Team
- Information and Technology for Risk Managers
- Allocating Cost of Risk
- Due Diligence During Organizational Change
- Executive Risk Management
- Enterprise Risk Management
- Reputation and Brand Management
- NFIP Adjuster Certification – 2014
- Wage & Hour /Other Issues
- Introduction to Directors and Officers Liability Insurance
- Introduction to Employment Practices Liability
- Understanding Cyber Liability
- An Introduction to Errors and Omissions Liability
- Retaining Top Talent
- Rewards and Recognition
- Team Dynamics
- Work / Life Balance
- Coaching & Counseling
- D&O: A Dozen Dangerous Details
- Conflict Resolution
- Commercial Crime
- Arson and the Insurance Contract
- Fiduciary Liability, ERISA Fidelity, and Employee Benefits Liability Exposures And Coverage

## GENERAL INFORMATION

Louis G. Fey Jr. is a second-generation insurance professional living in Baton Rouge, Louisiana, the son of an attorney and claims manager.

### DEEMED QUALIFIED AS AN EXPERT ON INSURANCE MATTERS BY:

- The Superior Court of Fulton County- State of Georgia – (twice)

- The United States District Court of Mississippi - Southern District (twice)

- United States Bankruptcy Court, Eastern District of Louisiana

- 19th Judicial District Court, Parish of Baton Rouge, State of Louisiana

- The United States District Court for The Northern District of Georgia, Atlanta

9

- 40th Judicial District Court for The Parish of St. John The Baptist, State of Louisiana

- The United States District Court Eastern District of Louisiana (three times)

- The United States District Court Northern District of Florida

- The Civil District Court for The Parish of Orleans, State Of Louisiana

- The 22nd Judicial District for the Parish of St. Tammany, State of Louisiana

## EXPERT TESTIMONY IN THE LAST FOUR YEARS

Rigsby V State Farm – United States District Court Mississippi Southern District, 1:2007CV00075. Plaintiff's Insurance Expert Witness – Claim handling, proper investigation, processes and procedure: insurance industry custom and practice – (Deposition and trial testimony) (Trial was April 2013 – case is still pending)

Ameris Bank, As Assignee of The Federal Deposit Insurance Corporation, Receiver Of Darby Bank And Trust Co., Plaintiff, V. Lexington Insurance Company, Defendant. Case No. 4:13-CV-00241-WTM-GRS In The United States District Court For The Southern District Of Georgia Savannah Division – Plaintiff's Insurance Expert Witness - Failure to include Mortgagee on claim check, bad faith claim handling (Deposition December 2014)

Dudley Parker v Gaylon Fobb, US Agencies, American Alternative Insurance Corporation, and State Farm Mutual Automobile Insurance Company Number:61771, Division C, 40th Judicial District Court Parish of St. John The

Fox Haven of Foxfire Condominium IV Association, Inc., Plaintiff, V. Nationwide Mutual Fire Insurance Company, Defendant. Case No: 2:13-CV-399-FTM-29UAM United States District Court, Middle District of Florida, Fort Myers Division – Plaintiff's Insurance Expert Witness - failure to properly investigate claims, unfair claim practices, bad faith. (Deposition September 2014)

Brandon Raborn v Auto Club Family Insurance Company 19th Judicial District Court Parish of East Baton Rouge State Of Louisiana No. 592875   DIV. 23 – Plaintiff's Insurance Expert Witness - UIM, bad faith, unfair claim practices, unconditional tenders, proper investigation (Deposition December 2014)

Omega Hospital, LLC versus Arch Specialty Insurance Company, Insurance Underwriters Ltd., And Christopher E. Paulin, CPCU, 24th Judicial District Court for The Parish of Jefferson State of Louisiana No. 729-198 Division "A" – Plaintiff's Insurance Expert Witness – Bad Faith, Unfair Claim Practices,

Coverage (Deposition February 2015)

RSUI Indemnity Company, Plaintiff-Appellant V American States Insurance Company, Defendant - No. 12-02820 "I"(4) The United States District Court for The Eastern District of Louisiana – RSUI's Insurance Expert Witness - an underlying insurers duty to an excess insurer, claim litigation, litigation guidelines and procedures, proper claim handling, proper investigation, bad faith, insurance industry standards and practice – (Deposition and trial testimony June 2015)

Founders Insurance Company, Plaintiff v Richard Ruth's Bar & Grill, LLC, Richard Ruth Sr., Jane Ruth, And George Giannaras As Guardian For Emmanuel Kehagias, Defendants. United States District Court District Of South Carolina Civil Action No. 2:13-cv-03035-DCN Plaintiffs insurance expert – Bad Faith, unfair claim practices, policy limit, time limited demand, prejudice, late notice (Deposition August 2015)

Blaze Chaus, L.L.C. v State Farm Fire and Casualty Company, United States District Court Eastern District Of Louisiana, section I, civil action No. 2015-cv-00552 - Insurance expert for Plaintiffs – Bad Faith, Fair Claims Practices, proper claim handling, proper underwriting, property coverage, reservation of rights, non-waiver agreements, improper denial (Deposition September 2015)

Teresa Gade Plaintiff, v. State Farm Mutual Auto Insurance Co., Defendant, Civil Division Docket No. 1372-12-13-CNCV Vermont Superior Court – Plaintiff's expert on bad faith, Fair Claims Practices, proper claim handling (Deposition October 2015)

Robert W. Hughes, Jr. As Administrator of The Estate of Ronald Nathaniel Jackson, Plaintiff, V. First Acceptance Insurance Company of Georgia, Inc., Defendant. Civil Action No: 14A52088-5, The State Court of Dekalb County, State of Georgia. Defense expert on bad faith, Fair Claims Practices, proper claim handling, the settlement of multiple claims with insufficient limits, policy limited time limited demands (Deposition October 2015)

Vance Boone, Plaintiff, V. Nationwide Insurance Company, Thomas Richardson, And Unknown Managers, Administrators and Adjusters of Defendant Nationwide Collectively Referred to As Defendant Doe, Defendants. State Of South Carolina Court of Common Pleas County of Orangeburg  C/A #: 2015-CP-38-438 Plaintiff's expert (Deposition February 2016)

Brian P. Waldrop V USAA In the State Court for The County of Fulton State of Georgia No: 2010EV010377B Defense expert on bad faith, Fair Claims Practices, proper claim handling, policy limited time limited demands (Deposition April 2014)

Bruce L. Feingerts Plaintiff v Louisiana Citizens Property Insurance Corporation Defendant for The Parish of Orleans State of Louisiana Civil District Court No. 2007-11072 Division "L" Plaintiff's expert on bad faith, Fair Claims Practices, proper claim handling, reservation of rights, non-waiver (trial testimony September 2015)

National Manufacturing Co., Inc. Plaintiff, v. Citizens Insurance Company of America and The Hanover Insurance Group, Inc., Defendants, v. Janed Enterprises, Inc., Third-Part Defendants - The United States District Court District Of New Jersey, Case No. 2:13-CV-00314-SRC-CLW  Plaintiff's expert on bad faith, Fair Claims Practices, the insurance industry standards with regard to property insurance policy interpretation (Deposition January 2016)

Columbia Insurance Company, Plaintiffs, v. William Edmund Reynolds, Jr., Angela D. Reynolds, and Christopher Kamil Waymer, individually and d/b/a Q.E. Trucking, Defendants, In the United States District Court For the District Of South Carolina, Charleston Division, Civil Action No. 2:14-cv-4739-RMG Defense expert on bad faith, Fair Claims Practices, the insurance industry standards with regard liability investigations and time limited, policy limit demands (Deposition February 2016)

Bharath Kortagere & Krishna Kumari Plaintiff's v Encompass Home & Auto Insurance Company, Defendant Case No: 13-C-14-100356 In the Circuit Court For Howard County, Maryland – Insurance expert for Plaintiffs – Bad Faith, Fair Claims Practices, proper claim handling, arson investigation, reservation of rights, non-waiver agreements, improper denial (Deposition August 2015)

William Edward Stewart, Plaintiff v. Georgia Farm Bureau Mutual Insurance Company, Defendant, In the Superior Court of Bryan County State of Georgia, Civil action No: 2015-V-200-S Defense expert – Bad Faith, Fair Claim Practices, competing claims, policy limit, time limited demands (Deposition October 2016)

Advanced Imaging Partners, Inc., A Delaware Corporation, Et Al., Plaintiffs, V Edgewood Partners Insurance Center, DBA Epic, A California Corporation, Et Al., Defendants. Superior Court of The State of California County of Los Angeles, West District Case No. SC 120 707 Plaintiff's expert on Agency E&O, Risk Management. (Deposition April 2016)

Heidi Schultz, as Assignee of Sharon Brooks and Kristen Brooks, Plaintiff v. Government Employees Insurance Company, a/k/a GEICO, a corporation, Defendant, In The United States District Court Northern District of Florida Gainesville Division Case No. 1:15-cv-172-MW-GRJ. Plaintiffs expert on bad faith, fair claims practices, the insurance industry standards with regard liability investigations and time limited, policy limit demands, settlement of competing claims (Deposition May 2016)

Travelers Property Casualty Company of America and St. Paul Fire & Marine Insurance Company, Plaintiffs v. Brian C. Bossier and Richard L. Olivier  and Erin H. Boyd and Tracy C. Rotharmel and Blue Williams, LLP Defendants In The United States District Court For The Eastern District Of Louisiana - Defense expert on proper claim handling of litigated claims (Deposition 2016)

Joseph Miles, Plaintiff v Automobile Insurance Company of Hartford, Connecticut d/b/a Travelers Insurance Company, The Travelers Home and Marine Insurance Company, Carl L. Reynolds, Jr., Reynolds Insurance Services, Inc. Ted Alexander, Mike Gibson, and Palmetto Design & Renovations Contractors, LLC, Defendants, Case No: 2015-CP-40-03023 In the Court of Common Pleas, State of South Carolina, County of Richland. Plaintiff's expert on industry standards, Valued Policy Law, total loss, Xactimate estimating (Deposition December 2016)

Sherie Naquin, wife of/and Russell Naquin vs. Riverlands Insurance Services, Inc. and Mason Sandusky, 22nd Judicial District Court, Parish of St. Tammany, State of Louisiana, No. 2015-11897 Division: "H" Plaintiff's expert on bad faith, unfair claim handling practices, the impact of late reporting (Deposition May 2017)

Mark Martin, Plaintiff, vs. Thomas D. Chasteen, d/b/a Chasteen Insurance Agency, Defendant. In the State Court of Athens-Clarke County, State of Georgia, Civil File No. ST16CV0429. Plaintiff's expert on an agent's duty, Special relationship, Consultative Brokers, agency E&O. (Deposition testimony November 2017)

Antoine M. Saacks, Jr. & Kim Saacks, Plaintiffs Versus Privilege Underwriters Reciprocal Exchange, Defendant. United States District Court Eastern District of Louisiana, Civil Action No. 16-01149. Defense expert on bad faith, industry standards, red flags, fraud indicators involved in the handling of 3rd party liability and UM/UIM claims. (Trial testimony February 2017)

Robert Davis Thompson & Patsy Thompson Plaintiffs vs. The Travelers Home and Marine Insurance Defendant, In the Court Of Common Pleas State Of South Carolina, County of Florence, Civil Action No. 2015-CP-21-2867 Plaintiff's expert on bad faith, arson investigation, unfair claim practices (Deposition March 2017)

ACE American Insurance Company, Plaintiff, v. Valleycrest Companies, Now Known as Brightview TCH Companies, LLC; Erika Hernandez-Ortiz, Individually and As Administrator of The Estate of Rafael Menchaca-Delgado, Deceased; And John Doe, Defendants. In the United States District Court for The Northern District of Georgia Atlanta Division Civil Action No.  1:16-CV-02988 – Defense Expert - Bad Faith, unfair claims handling practices, UM coverage, operation of state law, UM selection rejection forms (Deposition May 2017)

Janet Lynn Gerald Vs. Liberty Mutual Fire Insurance Company, Et Al. 19th Judicial District Court Parish of East Baton Rouge State Of Louisiana Suit No.: 624,150 Section:  25– Plaintiff's Expert - Bad Faith, unfair claims handling practices. (Deposition August 2017)

Betty Ann Breaux Defiore Versus Huntington Ingalls Incorporated, CNA As Successc Fidelity & Casualty Company Of New York, Et Al Civil District Court For The Parish C Orleans State Of Louisiana No. 2016-10800 Division "J" Section: 5 Defense Expert o Policy Limits and the "Comprehensive Insurance Rating Plan" ("the Plan") used durin World War II, for War Time Projects (Deposition August 2017), defense expert on asbestosis long term exposure case

Berman Bros. Iron & Metal Co., Inc. D/B/A Bermco V. Harmon-Dennis-Bradshaw In the Circuit Court of Jefferson County, State Of Alabama Case No. 01-CV-2015-902698.00 – Plaintiff's expert on Equipment Breakdown / Boiler and Machinery Insurance Coverage, an agent's duty, Special relationship, Consultative Brokers, agency E&O. (Deposition and trial testimony August 2017)

Americas Insurance Company Plaintiffs, Versus Billie J. Haynes And Delvese D. Haynes, Defendant United States District Court Eastern District of Louisiana Civil Action No.: 2:15-CV-06232 - Defense expert on the industry standards, red flags, fraud indicators involved in the handling of property insurance claims (Deposition testimony December 2017)

Bradley W. Smith, Plaintiff Versus Shelter Insurance Company, Defendant in the United States District Court Middle District Of Louisiana Civil Action No. 15-Cv-357 Plaintiff's expert on Bad Faith, unfair claims handling practices. (Deposition March 2018)

NAZ, LLC Plaintiff, v. United National Insurance Company Defendant. United States District Court Eastern District of Louisiana, Civil Action: 17:5697 SECTION "H" (1) Plaintiff's expert on Bad Faith, unfair claims handling practices. (Deposition June 2018)

Elizabeth Benton, Individually, And Bruce W. Benton, Jr., Individually, And Bruce W. Benton, Jr., as the Personal Administrator Of The Estate Of Chase Palmer Benton, Plaintiffs, v. Steven Landress And Bradd Landress, Individually And D/B/A Landress Trucking, David Greeson, Individually And D/B/A as Greeson Hauling And David Greeson Hauling, Kerby Grading, Inc., Boatwright Construction, LLC, The Hartford Construction Group, LLC, In The State Court Of Dekalb County State Of Georgia, In Case No: 07A69635-6. Plaintiff's Expert on the proper underwriting of Motor Carriers (July 2018 Deposition)

J. Caldarera & Co., Inc. Versus  Ernest N. Morial Exhibition Hall Authority and Melvin J. Rodrigue In His Official Capacity as President of  The Ernest N. Morial Exhibition Hall Authority Board, In The Civil District Court For The Parish Of

Orleans State Of Louisiana No. 18-3204 Division "M-13". Defense expert on the proper procedures related to procurement of Project Bid Bonds (Deposition May 2018)

Alyssa Mascorro v. Peter Schultz, GEICO Insurance Company, Cullen Walsh, and USAA Insurance Company. In the 22nd Judicial District Court for the Parish of St. Tammany, State of Louisiana, Docket No. 2014-12140. Plaintiff's expert on the investigation and disclosure of excess insurance coverage, insurance claims handling standards and practice (Trial testimony)

Zydeco's II, LLC, Zydeco's Corp, Dustin Gainey and Rosemarie Gainey vs. Certain Underwriters at Lloyd's London, et al 29th Judicial District Court Parish of St. Charles State of Louisiana Case No. 82255 Plaintiff's expert on Bad Faith, unfair claims handling practices. (Deposition September 2018)